# In the Matter Of:

*Thomas Maulson v. Will Taege*

*Deposition of Dennis J. Angle*

*April 23, 2026*

For The Record Inc.
Excellence In Court Reporting

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

THOMAS MAULSON,

Plaintiff,

-vs- Case No. 25-cv-638-wmc

WILL TAEGE,

Defendant.

---

Deposition of DENNIS J. ANGLE, with all participants appearing remotely via Zoom videoconference, taken at the instance of the Plaintiff, under and pursuant to Federal Rule of Civil Procedure 30, before Anna Peich, a Notary Public in and for the State of Wisconsin, on April 23, 2026, commencing at 9:57 a.m. and concluding at 1:04 p.m.



A P P E A R A N C E S

LAWTONCATES, S.C., by
MR. DAVID M. STEGALL,
1050 East Washington Avenue, Suite 330,
Madison, Wisconsin 53703,
appeared on behalf of the Plaintiff.

HANSEN REYNOLDS LLC, by
MR. ANDREW A. JONES,
301 North Broadway Street, Suite 400,
Milwaukee, Wisconsin 53202-2660,
appeared on behalf of the Defendant.

Also present: Dixon R. Gahnz

I N D E X

Examination: Page
By Mr. Stegall....................................3
By Mr. Jones....................................117

Exhibits Identified:

(No exhibits were marked)



DENNIS J. ANGLE, called as a witness, being first duly sworn, testified on oath as follows:

EXAMINATION

BY MR. STEGALL:

Q Mr. Angle, we're here today to discuss the report that you authored in this matter. I believe it's 46 pages. Does that sound right?

**A That sounds about right.**

Q Okay. This is not meant to be a test of endurance. So if you want to take a break or you have to use the restroom, just let me know.

**A Sounds good.**

Q Okay. And just because we're by videoconference and it's being recorded by a court reporter if I see you nod your head yes or no, I know what you mean but just have to have a verbal response for the record, okay?

**A I understand.**

Q Okay. Great. Mr. Angle, where are you currently employed?

**A I currently work for the Milwaukee Brewers as the director of security.**

Q And could you briefly describe what does your work look like on a day-to-day basis in that role?



**A It's really going to be dependent on whether we have a game or whether we don't. I'm full time year round. I manage our 27 -- 24/7 security. So we always have somebody in the building as a member of our security team. So that's an ongoing process of hiring, training, and sustaining them through staffing. When we start looking at game-day postures and game-day events, primarily my role ends up being I'll be in charge of the gate screeners -- hiring, training, retaining, checking making sure they have the equipment they need, parking security. As another one of my responsibilities we have individuals inside our 25-acre property constantly doing different security things and supporting, you know, the game-day activities that we have. Once the game has begun then my posture changes to the inside. And then I support any of the different calls that we have here whether it's going to be to liaison with the Milwaukee Police Department -- we contract out with them to do police services at the ballpark -- or we also have event security staff.**

Q Fair of me to say the busiest time is April through hopefully October for the Brewers; is that

right?
A **We would love to make it to November, sir.**
Q Yeah. I understand. Okay. And do I have it right you retired from the Waukesha Police Department in 2022?
A **Correct. 27 years with the City of Waukesha and one year with Ozaukee County Drug Task Force.**
Q Okay. You are not currently a sworn law enforcement officer?
A **No. But still a certified instructor.**
Q And am I right you haven't been a sworn officer since 2022?
A **You don't have to keep reminding me, sir. I miss it.**
Q Okay. Do you -- it's fine if you don't. But do you have a copy of your report in front of you or no?
A **I do.**
Q Okay. And am I right that your report contains obviously the first 46 pages being the report itself and then you included what essentially is your CV in the last nine or so pages; is that right?
A **Yes. The CV and the report, I have both of those.**
Q Okay. And I want to -- I guess just for the



record I'll share my screen and show you what I have as Exhibit No. 1 for this deposition. Can you see my screen?
A **I can.**
Q Okay. And does this look like the report you prepared?
A **It does.**
Q Okay. And I am just going to jump to page 51 of this PDF but the first page of your CV. Is that the same as the CV you have in front of you?
A **It is.**
Q Okay. From your perspective, Mr. Angle, whichever one is easier for you to work from if it's easier to look at the copy in front of you, great. If it's easier to see my screen, that's also fine. Okay. I just want to talk to you a little bit about your prior expert consultations. Can you just briefly describe what was your role in that Tyler Holte versus City of Eau Claire matter?
A **So the Municipal Law & Litigation Group utilized me as an expert witness. I did -- you know, attended meetings, did research on it, drafted the report, and then was also deposed in the case. It did not go to trial.**
Q The case itself did not go to trial?



A **Correct.**
Q Okay. And you were -- am I right you were testifying on behalf of the City of Eau Claire?
A **Correct.**
Q Okay. And this was when you were a law enforcement officer with Waukesha at the time?
A **Yes.**
Q Okay. And that second one in time there, August 3rd of '19, Adam Kuborn versus the City of Oshkosh --
A **Yes.**
Q -- what can you tell me briefly about that engagement?
A **That one I was retained by, again, Municipal Law & Litigation Group. They were representing the City of Oshkosh. I researched the case, drafted a report, and that was all.**
Q Did that case involve the use of force?
A **It did.**
Q Can you just briefly describe what was the force at issue in that case.
A **I believe that one was a foot pursuit where officers chased the suspect. During that time, right, the suspect was taken into custody and while going down to the ground made contact with**



**some type of landscaping in a backyard and sustained some injuries.**
Q Okay. And was the first one there, Mr. Holte or Holte, did that involve the use of force?
A **It was a deadly force incident. Mr. Holte was not killed but he was shot.**
Q Okay. And what can you briefly tell me about the Jarvis Payne engagement versus the City of Chicago?
A **So that one was, again, I worked for Attorney Ernest Mincey on that case. He represented the City of Chicago in it. What that involved was Mr. Payne was on the second story of -- I believe it would be referred to as a duplex. When officers had contact with him they deployed an electronic control device, the taser. It appears as if it was a single-probe hit. Mr. Payne then turned around and jumped out of a window and then sustained injuries as he fell and hit the front stoop of the residence.**
Q And where were you employed at the time in 2010?
A **City of Waukesha.**
Q Okay. Do you remember what was your job or role in 2010 at that time with the City of Waukesha? Do you remember?

A In 2010 I was probably a captain.
Q Okay. And what rank did you retire at when you left service?
A Deputy chief, second in command.
Q Okay. Of the Waukesha Police Department?
A Yes.
Q Okay. On the next page there at the top I'm not sure if it was a man or a woman. But the City of Wauwatosa versus Braun in 2008, what can you tell me about that case?
A That one I was retained by Attorney George Schimmel who was representing the City of Wauwatosa. That case I ended up testifying in court. And the end result was they were in favor of the defendant, the city.
Q And did that involve the use of force?
A It did.
Q And could you just briefly describe what was the force at issue?
A Mr. Braun was being detained and as they were handcuffing him he resisted. And they ended up having take him down to the ground.
Q Okay. And then the last one there, September of 2006, is that, like, an inquest? It was not a criminal case, right?



A Correct. It was an inquest. Our district attorney, Paul Bucher, requested that I assist him in the case as an expert. And I testified at trial. I believe it was a six-person jury, and there were no charges filed against the officers involved in the case.
Q Okay. And what was the scope of your expert testimony in that matter?
A Specifically on the electronic control device, the taser, and general use of force principles.
Q Could you just very briefly -- well, let me ask you this. Where did you go to high school, Mr. Angle?
A West Allis Central.
Q West Allis, and what year did you graduate?
A '88.
Q And do you have schooling or formal education after high school?
A I went to the University of Wisconsin - Milwaukee and graduated with a bachelor's degree in criminal justice.
Q After you graduated what was your first job?
A I put myself through the police academy, self-sponsored through Milwaukee Area Technical College. I also did some non-sworn work for the



Kenosha County Control Substance Unit and was later hired by the Ozaukee County Drug Task Force for a sworn position in the drug unit.
Q Okay. And if I remember correctly -- tell me if I'm wrong -- you held that job in Ozaukee for about a year?
A About a year, it was one of those limited-term employment positions where they were utilizing federal funding to assist in developing metro enforcement groups.
Q And then did you go right from Ozaukee to Waukesha?
A I did.
Q And what year did you start with Waukesha?
A 1995.
Q '95, okay. And stayed there continuously until 2022?
A Yes.
Q All right. Okay. And -- right. All of the -- what, were there five of the prior engagements that you participated in were all on behalf of the law enforcement or municipality, correct?
A Correct.
Q Okay. And in fact was it three or four of those the same firm, that Municipal Law & Litigation



Group? Is that --
A Two of them.
Q Two of them?
A Two of them.
Q And those all occurred while you were a sworn active law enforcement officer, right?
A Yes.
Q Okay. Any besides this matter that you're currently working on? Any prior consultation engagements since 2022 -- between 2022 and now?
A No. Nothing where anybody retains me. With my background I get phone calls, you know, about different cases whether it's going to be old colleagues in law enforcement and they're working on a particular thing involving an officer, a deputy, or something along those lines. Sometimes I'll get calls from, you know, attorneys where they're looking for an expert and they want to talk about the case. But so much of my time is -- I don't have a lot of free time, you know, to do a lot of cases. I mean, you know, when I explained the job that I have with the Milwaukee Brewers, I also still teach at Waukesha County Technical College and the police academy. So I don't have a lot of time to do a lot of cases. So I'm pretty

selective, and I'm also really conscious of can I dedicate time to the case.
Q And do you -- is the consulting work, is that obviously separate from Milwaukee Brewers, right?
A Correct. It's separate.
Q Do you have -- is it, like, your own business, consultation business?
A Yes.
Q Okay.
A Yes, it is.
Q Okay. And at least in this matter, do I have it right, you're charging $400 an hour for your testimony?
A Yes.
Q Okay. And then $150 an hour for all the other work that you did or have been doing?
A Correct. Review, meetings, things along those lines.
Q Okay. And did you receive and review Liam Duggan's report before you finalized your own report?
A No.
MR. JONES: His report? Do you mean his report or his deposition, David?
MR. STEGALL: His report,



Mr. Duggan's report.
THE WITNESS: No, I missed -- I thought you were asking about his deposition.
MR. STEGALL: No.
THE WITNESS: No. I did receive his report before I did do my report. That's accurate.
Q All right. You received and reviewed his report. You didn't receive or review his deposition testimony?
A Prior to doing my report, correct.
Q Okay. All right. And how long did you spend reviewing the materials that you referenced in your own report?
A I couldn't say.
Q Did you keep any kind of time record?
A I do.
Q Okay. You don't have those time records with you?
A I don't.
Q If you had to estimate how long you took spending time reviewing the materials, what would you estimate?
A Between meetings, phone calls, reading, reviewing, drafting it, probably anywhere from I would say about 25 to 35 hours.



Q Do you know what your total billed amount is on the case as of this moment?
A I don't.
Q Okay. And you do keep billing records, though, right?
A I do.
Q Am I right when I read through your report that it looked like the primary DAAT, D-A-A-T, student text that you quoted from was the 2023 version; is that correct?
A I don't know that it was the 2023. Let me just look at the back -- is it okay if I look at the back of my report to see which one was referenced on it?
Q I can tell you I will --
A I think it's '21.
Q I will share my screen with you. Can you see my screen? This is -- I will represent to you if you have it front of you. This is page 7 of your report if you have it by you.
A I do.
Q Okay. And so I was just looking midway through where it says "(Wisconsin Department of Justice Law Enforcement Standards Board, 2023)". Do you see that?



A I do see that.
Q Okay. Am I right in Deputy Taege attended the police academy and received his basic recruit training before 2023, right?
A I believe so.
Q Okay. In fact, Deputy Taege was trained on the earlier version which I think is 2017; am I correct?
A There are actually more versions. I couldn't tell you right away off the top of my head. But I'm not a hundred percent sure. When you mentioned this reference of it in 2023 if you were to look at the back of my report -- and I used Microsoft Word, and I used the referenced material -- it's listed as '21. So I don't know why in the document it suddenly pops up as '23. I usually rely on that to self-populate.
Q So it looked like -- from when I read your report, Mr. Angle, it looked like you had used the 2017 DAAT instructor manual?
A That would be accurate.
Q Okay. But then for the training performance standards it seems like you primarily quote from the 2023 student text. Let me show you. Maybe I'm missing something. So I'm going to show

you -- this is page 12 of your report. It actually starts on the bottom of page 11. And the part that I was looking at was where it says "(Wisconsin Department of Justice Law Enforcement Standards Board, 2023)" do you see that?
A **Correct. I see it.**
MR. STEGALL: Do you have page -- I think -- let me just -- I think it is page 20.
**THE WITNESS: One thing, sir, did you look up a little higher on page 11 like you asked me to look? Under "Decision Making" if you notice at the end of that citation it lists as 2021.**
MR. STEGALL: Right.
**THE WITNESS: Yes.**
MR. STEGALL: Right. It just -- let me show you. I'm on now page 17, and this actually, you know, starts again the page prior. But at least at "Skill level" you cite there. And then I will show you if you turn to page 22 --
**THE WITNESS: I see that as well.**
Q Right. "Level of Resistive Tension" that's 2023 for the student portion. Would you agree,



Mr. Angle, that a recruit, he is -- he or she is evaluated against the standards that they were trained on and not a later revision?
MR. JONES: Objection to the form of the question. Go ahead.
**THE WITNESS: Could you say that again, please.**
Q Sure. Would you agree that a recruit is evaluated against the standard that he or she was trained on and not a later revision? Would you agree with that?
A **I guess the challenge in the question that you're asking, sir, is that when you mention recruit what I immediately think about is a recruit that is in the academy. Once they get done with the academy and they go to their respective organization, it's slightly different. So when a recruit leaves the academy they have been trained on whatever the standard was at that particular time they were attending the training. However, oftentimes when they go to their organization -- and I'll use Waukesha as an example -- as the system is updated and even if the system isn't updated, most organizations and they are required by law to make sure that the officers attend 24 hours worth of**



**training every year to maintain their certification. Many organizations have defensive tactics as part of that training and in-service.**
Q At least in this case Deputy Taege wasn't trained on the 2023 standards that you referenced, right?
MR. JONES: You mean at the academy?
MR. STEGALL: I mean at the academy, yes.
MR. JONES: It's an objection to the form of the question because it's vague as to when specifically you're referring to so just an objection to form.
MR. STEGALL: You can answer, Mr. Angle, unless you want me to repeat the question.
**THE WITNESS: Please repeat.**
Q Okay. You would agree with me, right, that in this case Deputy Taege was not trained when he was in the academy on the 2023 standards because he went to the academy before 2023, right?
A **I believe that's accurate.**
Q Okay.
A **In the academy.**



Q And in fact based on any of the materials that you have reviewed, do you know of any indication that Deputy Taege was trained on the 2023 DAAT version at any point in his career?
A **I didn't see anything that I can recall in the documents that were provided to me that showed that he was.**
Q Okay. At the time of this incident Deputy Taege was employed by the Oneida County Sheriff's Office, right?
A **Correct.**
Q As a deputy in Oneida County he had obligations to follow his Oneida County sheriff officer policies as well, right?
A **Correct.**
Q And this would include the -- his own department, the Oneida County sheriff officer policy on use of force, right?
A **Correct.**
Q I am going to share -- can you see my screen, Mr. Angle?
A **I can.**
Q Okay. And do you recognize Exhibit No. 3?
A **I do.**
Q And what do you know this to be?

A **That is the -- let's see, the use of force policy for the Oneida County Sheriff's Department.**
Q Okay. Do you have this document in front of you?
A **I do not.**
Q Okay. All right. I took it down for a minute. Let me put it back up real quick. It may be hard to read, Mr. Angle. So can you tell me if I read the top, the overarching policy, correctly. Okay. I'm just going to read it to you because it's probably easier on my screen, okay. "It is the policy of the Oneida County Sheriff's Office that at all times only the minimum force reasonable and necessary to effect a lawful purpose may be used. The use of force is the last resort to accomplish lawful objectives." Did I read that right?
A **You did.**
Q Okay. And am I right that an officer's departmental policy and the academy DAAT training framework are separate layers of obligation to an officer, right?
A **I don't know that I can answer the question the way you asked it when you start using the term obligation.**
Q Well, an officer is required to follow the DAAT training at the academy, right?



A **Correct.**
Q Okay. And then when and if an officer becomes employed with a specific department, they also have to comply with their own departmental policies, right?
A **Correct.**
Q Okay. And the State of Wisconsin runs the DAAT training; is that right?
A **Wisconsin Department of Justice Law Enforcement Training and Standards develops all of the standards for the academy.**
Q Right. The State of Wisconsin?
A **Correct.**
Q And all the county or sub-municipalities are also free to develop their own specific policies --
A **They are.**
Q -- right?
A **They are.**
Q Okay. And if I read your report correct, your conclusion was that Mr. or Officer Taege's conduct was consistent with Wisconsin Law Enforcement Training and Standards; is that right?
A **Correct.**
Q Okay. It didn't express an opinion -- unless I missed it -- that Deputy Taege's conduct satisfied



the Oneida County Sheriff's Office own minimal use of force as a last resort policy mandate, did you?
A **I did not include anything like that in my report.**
Q Okay. It doesn't include any standalone analysis of whether Deputy Taege violated his own unit's policy, right?
A **It was part of my process in reviewing the different materials that were provided to me. And after reviewing that policy along with the other materials I had, I formulated my report.**
Q Okay. So you're saying you did consider that only the minimum force reasonable and necessary to affect a lawful purpose may be used.
A **That is part of, you know, the materials that I reviewed to lead me to my conclusion.**
Q You didn't cite to that use of force policy anywhere in your report, though, did you?
A **I did not.**
Q Okay. Your testimony is this: that you reviewed it, you incorporated it, but you did not cite to it. Am I understanding you?
A **I did not cite to it.**
Q Okay. In Deputy Taege's case the underlying call was a disturbance, right?
A **That sounds correct.**



Q Okay. And the parties -- to your understanding the parties that were involved had separated before Deputy Taege had arrived?
A **That's my understanding.**
Q Okay. And there wasn't, like, an ongoing fight when Deputy Taege made contact with Mr. Maulson then, right?
A **There was not.**
Q To your knowledge, Mr. Angle, neither party to the disturbance called the police, right?
A **I can't speak to that. I would have to look at, you know, the initial report again to try to figure it out. I didn't include, I guess, that part in my report.**
Q Are you familiar with or do you remember who called the police?
A **I can't remember who called it off the top of my head.**
Q Okay. There weren't any reports of weapons, though, right?
A **I don't recall any reports of weapons.**
Q Okay. And no reports of any injuries?
A **I don't recall any reported injuries either.**
Q Okay. There is a part -- I'm going to -- let's see if I can get to it here. I'm going to try to

get to a part of the DAAT manual that I just had a question about. So I'm going to show you Exhibit No. 2 which I will get -- do you see my screen, Mr. Angle?
A **Yes.**
Q Okay. I'm going to submit to you Exhibit No. 2 is the June 2017 DAAT manual, okay?
A **Correct.**
Q I have 199 pages on my end. It was produced in discovery. And I want to show you -- I am turning to -- the Bates number is OC Maulson 000691. Can you see my screen? Can you see it well enough to read, Mr. Angle? There was a part, yeah, it's this paragraph here. Can you see the part that I highlighted?
A **Yes.**
Q Okay. I'm going to read it. If you think I read it incorrectly, let me know. It says, courts are less likely to find reasonable force when there is no criminal action and no threat to others. Did I read that right?
A **You did not.**
Q Okay. Which part?
A **You said -- you switched force and reasonable.**
Q Okay. Let me try it again then. "Courts are less



likely to find force reasonable when there is no criminal action and no threat to others." Did I read that right?
A **You did read that right.**
Q Okay. And do you recall reading through that provision of the DAAT manual when you were conducting your analysis in this matter?
A **I recall reading the DAAT manual that I cited in my report.**
Q Okay. And this phrase about courts being less likely to find force reasonable when there is no criminal action or no threat, did you consider that a principle in developing your opinion?
A **It is one of those factors oftentimes whenever formulating a report that is for lack of a better term the standard in use of force, you know, review -- making sure that, you know, use of force is objectively reasonable based on the totality of the circumstances. And those three big circumstances would be the severity of the alleged crime at hand, whether the person was actively resisting or attempting to evade arrest by flight, or posing an imminent threat to others.**
Q But if there's no criminal action and there is no threat then it seems like the way officers are



trained is that, hey, a court is less likely to find that force to be used reasonably, right?
MR. JONES: Objection to form. Go ahead.
A **I think that the challenging part of the excerpt that you took along with the question that you're asking me really doesn't address the consideration of reasonable suspicion and that oftentimes when police officers are conducting investigation they're operating under the reasonable suspicion of criminal activity based on the call that they were responding to. Every officer when driving to a call does not immediately have a crime that they know of at hand nor probable cause.**
Q Well, the reasonable suspicion and probable cause is different than the use of force, right?
A **Those are two different legal terms, correct.**
Q All right. Mr. Angle, what factors did Deputy Taege communicate to you either in his reports, in his notes, or otherwise that indicated Mr. Maulson posed a threat during the first 20 seconds of his contact with him?
A **I would like to -- I think in his initial report and the contact that he had that he was attempting to gather information from Mr. Maulson.**



**Mr. Maulson wasn't cooperative. I believe in the report there is some reference to that he appeared to be agitated or possibly out of breath. So those are some of the initial things that I recall from Taege's report when he made contact.**
Q Do you recall anything that Taege communicated in some manner about Maulson posing a threat? I know you said he was agitated. But I'm talking about what did Taege communicate in any way that during the first 20 seconds Mr. Maulson posed a threat?
A **I would --**
MR. JONES: Objection to the form of the question. It's not clear as to when during the interaction you're referring to. Just saying the first 20 seconds doesn't make that clear. You can answer.
A **I would have to look at the beginning part of his report to see. Again, my recollection of the incident that he had is that when he began making contact with Mr. Maulson that he was already dealing with noncompliant behavior. And then based on the circumstances that he was investigating which is a physical fight it seemed as if he had also inferred that he had had affirmation based on some of the things that**

Page 29

Mr. Maulson did when he had contact with him.
Q Would you agree based on your review from Deputy Taege's first verbal contact with Mr. Maulson to his command for Mr. Maulson to exit the vehicle was about 20 seconds?
A I'm not a hundred percent sure how much time it would be. It was not a very long time.
Q During I'm going to say 20 seconds, those first 20 seconds -- unless I missed it and that's what I want to ask you -- did Deputy Taege ever tell Mr. Maulson why he had been stopped?
A I would have to double-check and look at the report on the initial information that he provided to him when he started his contact.
Q Okay. I'm not aware of any information that Deputy Taege told Mr. Maulson he was a suspect in a disturbance. Are you aware of any?
MR. JONES: Asked and answered. Go ahead.
A Again, I mentioned it before. I would have to, you know, double-check his report to see what the information he had provided in that contact.
Q Okay. Do you recall what was -- what did Deputy Taege -- what was the reason he handcuffed Mr. Maulson? Do you remember?

Page 30

A I believe in his report that he had talked about that he wanted to separate Mr. Maulson from the individuals inside the vehicle. And he also realized that, you know, Mr. Maulson's level of agitation had increased. And then at the time he had done the handcuffing he had to physically remove Mr. Maulson from the vehicle.
Q I want to show you what's been marked as Exhibit No. 4. Mr. Angle, I will represent to you that Exhibit No. 4 is Deputy Taege's supplemental police report that was authored or created on March 31st of 2024, six pages in length. Do you recognize this document?
A I do.
Q Okay. And I am turning to page 3. Can you see this middle paragraph?
A I can.
Q Okay. And this part talks about -- this is Deputy Taege's report, correct?
A Correct.
Q And he's here indicating why he wished to handcuff Mr. Maulson; is that right?
A That's right.
Q And am I right in reading Deputy Taege wrote, "At this time, I wanted to detain Maulson and place

Page 31

him in the rear of my squad so I could question his wife separately as well as speak to the witness that was still parked behind my squad." Is that right?
A That is right.
Q Okay. And Deputy Taege also went on to describe Mr. Maulson as a no person, right?
A Correct.
Q And that phrase no person, N-O and then person, do you know what Deputy Taege meant by that?
A I believe so.
Q And what do you believe a no person refers to?
A In training I've heard before -- it's not listed necessarily in any of the manuals that we cited. But early in my career there were many instructors that would talk about categorizing people and trying to assess their level of cooperation -- a yes person being compliant, a maybe person being, you know, semi-compliant or semi-cooperative, and a no person being noncompliant and possibly resistive.
Q That -- Mr. Angle, those categories are not official law enforcement training categories, though, right?
MR. JONES: Objection to form. Go ahead.

Page 32

A The difficulty in the question that you're asking there is I don't know if it was utilized in earlier manuals because the DAAT system was in place before I even became a police officer and before I became a trainer. And, like, I can say this: that those are terms that are in common usage. But I know we don't have them listed in the manuals.
Q Right. In fact, throughout your entire law enforcement career you have never read any manual that had those categories, right?
A No, I disagree. Not the state manuals that we are citing and talking about, I believe I may have seen it in other manuals. There are some supplemental materials, and not to mention there are also different instructors. When they are of training trainers sometimes they will use supplemental materials. So there are other companies out there that do some training.
Q You then would categorize a no person as noncompliant?
A Noncompliant and resistive.
Q Okay. But would you agree with me, Mr. Angle, that being a no person -- right, a citizen

refusing to answer a law enforcement officer's questions -- that in and of itself is not a legal basis to handcuff anybody, right?
A **The challenging part about the question that you have is there is not as much context in it. I can attempt to answer it as best I can. But oftentimes in different cases, especially when you start asking me questions referring to handcuffing somebody, there are so many other factors that could be in play when doing that. But if you would like, I can try to answer that question, sir.**
Q Sure.
A **Okay. I think that merely someone not answering questions, that sole factor by itself, would not be the only reason someone would place someone in handcuffs.**
Q All right. In fact, if you ask -- if you as a law enforcement officer come up to me, a citizen, and ask me a question, I have no legal obligation whatsoever to answer your question, right?
A **Correct.**
Q Right. But nonetheless you would label me in your report then as noncompliant and resistive, right?
A **I would say noncompliant.**



Q And would you -- you categorize Mr. Maulson as noncompliant because he didn't answer Deputy Taege's questions initially, right?
A **He wasn't complying by answering the questions.**
Q Okay. But would you agree with me, Mr. Angle, that Mr. Maulson had no legal obligation to answer any of Deputy Taege's questions?
A **Correct.**
Q Right. So if he doesn't have any legal obligation, what is he not complying with in your opinion?
A **I think at that point the officer can utilize that as he can utilize all of his different observations to assess exactly what level of cooperation he has with the person he is dealing with. I concur --**
Q Right. Oh, I'm sorry. Go on.
A **I was going to say I agree with you when you make the statement saying that Maulson is under no obligation to answer the question. That's correct. But an officer also, all right, has contact with many different people throughout their careers that are compliant, that answer questions, and things along those lines. And the minority in my opinion of my, you know, 28 years**



**of service is that most people do answer questions and talk to police officers.**
Q Right. And the ones that choose not to, you as a police officer would label noncompliant and resistive?
A **Not every single person is -- resistive is the term I'm having a difficulty with you utilizing. Noncompliant, I think when I ask a question and someone doesn't answer it that that is a form of non-compliance because, again, most people that we speak to, right, talk to us and answer questions. And you know, not all of our calls involve enforcing the law. Many of our calls are calls for service.**
Q I don't want to belabor this. But explain to me, Mr. Angle, how if I don't have any obligation to answer your question or Mr. Maulson didn't have any obligation to answer Deputy Taege's question, I guess I'm not understanding what is he not complying with if he doesn't have an obligation to answer the question in the first place?
A **I think -- you mentioned very well when you say you don't want to belabor the point, right. My response to that question is I'm looking at it from the perspective of Taege's assessment of**



**Maulson. He is assessing based on the fact that Maulson is being noncompliant that he is noting that as an observation.**
Q That's not really an observation, right, more of a characterization, right? He's not observing any non-compliance, right?
MR. JONES: Argumentative. You can answer.
A **I think he's observing the behavior of Mr. Maulson. That's why I said it the way I said it.**
Q Would you agree with me, Mr. Angle, that according to the DAAT manual that if officers or citizens aren't in imminent danger, that the officers are trained to slow down the scene?
A **It's a pretty complex question. It's -- unfortunately the answer, you know, that comes to mind is it depends. I think that so many times things depend on the totality of circumstances. You know, sometimes officers are attempting to stabilize a scene. And while stabilizing a scene you might not have imminent danger of someone being, you know, stabbed, shot, killed, something along those lines; however, what you might need to do is focus on scene safety or scene security and**

making sure that you're investigating. Let's say I'm investigating a crime. I want to make sure that the appropriate people are detained. I want to make sure that the witnesses are identified and things along those lines.
Q Well, my question was much simpler than all of that. I simply asked you whether recruits are trained in the DAAT academy to slow down the scene. I'm showing you page 19 of Exhibit 2 which is the DAAT manual. Can you see under the section "Desirability and Safety Priorities"?
A Yes.
Q Can you see that second full paragraph?
A Yes, I can.
Q Could you read to me the first three sentences?
A In the second paragraph?
Q Yes. It starts "In situations."
A All right. "In situations where neither officers nor innocents are in imminent danger, officers may have discretionary time. There may be lesser need to immediately act or physically intervene, allowing officers to 'slow down' the scene. This allows more time to communicate with the suspect and may permit options that may result in less force being necessary."



Q So my question was simply would you agree that officers are trained in the DAAT academy to slow down the scene in situations where innocent people or officers themselves aren't in imminent danger?
A Correct.
Q Okay. In fact, that would have been one of the principles that Deputy Taege was trained on?
A He would have.
Q And before the first 20 seconds or before Deputy Taege put Mr. Maulson in handcuffs, right, had any officer been threatened?
A No.
Q Okay. Had any person around Deputy Taege been threatened?
A That, I'm unsure of because I don't know the disposition in regards to the fight whether that other person was available or, you know, they had already stopped the second person or suspect for lack of a better term.
Q The second person involved wasn't anywhere near Deputy Taege and Mr. Maulson, though, right?
A Yeah, I don't believe so.
Q Okay. And Deputy Taege himself in his reports or transcript he didn't report any perception that Mr. Maulson was going to harm anybody, right?



A He did not.
Q Under that DAAT framework would you agree that this was a situation where slowing down the scene was an available option to Deputy Taege?
A It is one of the options.
Q And is your opinion that Deputy Taege did not slow down the scene?
A No. I think that what he ended up doing is, you know, he made contact with Mr. Maulson. And in the excerpt you had me point out that there is discretionary time. He made a determination based on his contact with Mr. Maulson that he wanted to separate Mr. Maulson from the occupants inside the vehicle in order to conduct his investigation.
Q And part of the materials you reviewed were -- included Deputy Taege's deposition, right?
A Yes.
Q Okay. I mean, Deputy Taege himself admitted that he had no time pressure once Maulson was handcuffed and he could have stood behind him for as long as he chose to, right?
A I don't recall that specific part of the deposition.
Q I am going on show you Exhibit No. 6 here. One second. Okay. All right. Mr. Angle, I'm showing



you Exhibit No. 6 which I will represent to you is the deposition transcript of Deputy Taege from December 22nd, 2025. Do you recall reviewing this?
A I do.
MR. STEGALL: Okay. I obviously don't expect you to have the entire transcript committed to memory. It's 186 pages.
THE WITNESS: I thank you for that.
Q I'm turning to page 143 at the bottom. Can you see the question at line 22 by Mr. Gahnz talking about a "dynamic application"?
A Yes.
Q Okay. And then I'm just going to paraphrase. Deputy Taege says that means it happens fast, right, and then on the top of page 144 they start talking about handcuffing Mr. Maulson. Do you see that?
A I do.
Q Okay. And then on line 5 Deputy Taege has a question -- "Did you say any time pressure?" Do you see that part?
A I do.
Q Okay. And from line 5 through line 13 is a back

and forth between Attorney Gahnz and Deputy Taege about a time constraint, right?
A **That's what it looks like.**
Q Okay. And do you see that question that starts at line 10 where it says you could have stood behind him while "he was handcuffed for one minute, three minutes, five minutes, if you had so chosen to, correct?" And then line 16, what did Deputy Taege answer?
A **"I could have."**
Q In terms of one officer ground handcuffing somebody how are recruits trained for that type of situation?
A **So ground handcuffing, I guess, I apologize because I have to ask a question to your question. Are you referring to when a person has been directed to the ground i.e. a decentralization, or are you referring to a high-risk situation where they are verbally directed to the ground?**
Q The first one when they have been directed to the ground.
A **All right. When individuals have been directed to the ground what officers are trained to do is to move into what is known as a ground-stabilization position and handcuff an individual.**



Q And am I right from my recollection of the DAAT manual it's possible for one officer to do it, but the better training is to have multiple officers if someone is resisting; is that right?
A **I think there are a couple of different factors. I believe that you are correct when you say it is advantageous for there to be multiple officers to assist in arresting someone who is resisting, especially when it comes to ground stabilization and the application of handcuffs; however, we train officers to be able to do it independently based on organizational size, the dynamic environment that officers have to thrive in, and based on a totality of so many different circumstances.**
Q Okay. And Deputy Taege was aware that backup officers were either on scene or en route when he made contact with Maulson, right?
A **I believe so.**
Q Okay. So would you characterize it then as Deputy Taege made the decision not to wait for back up before he removed Maulson from the vehicle?
A **Yeah. I believe he made that decision.**
Q Okay. And do you think he also then made the decision to not wait for backup before he



handcuffed Mr. Maulson?
A **He did make the decision.**
Q Okay. And right, your report doesn't analyze any aspect of that -- whether his decisions to proceed alone was consistent with the DAAT preference for team handcuffing, right?
MR. JONES: Objection form. Go ahead.
A **Okay. So I think the challenge in the question that you asked, sir, is that you have a question that's talking about team-tactic handcuffing and an approach, consideration, and a decision that the officer makes is two separate things.**
Q Well, my question wasn't any of that. So in your report --
A **Okay.**
Q -- you don't analyze or evaluate Deputy Taege's decision to proceed alone and whether that was consistent with the DAAT's training for preference in team handcuffing. Your report doesn't -- you don't analyze any part of that, right?
MR. JONES: Objection to form. You can go ahead.
A **So what you attach at the end of your question -- and it could also be my issue because of my DAAT**



**knowledge -- is you keep talking about team-tactic ground handcuffing. And I'm looking at those, again, as two separate things, right. In my report do I address the decision-making that Taege made when it came to making contact with Maulson when it came to getting Maulson out of the vehicle and handcuffing, I do address that in my report. And I do believe that he did things that were consistent with his training.**
Q So your testimony while under oath is that in your report you analyzed whether Deputy Taege's decision to proceed alone and handcuff Mr. Maulson before any backup was there, your testimony is that that analysis is included in your report squared against how the DAAT manual trains officers. Is that your testimony?
A **My testimony is that I utilized the decision-making component of defensive tactics, right, to demonstrate that what Taege did would be consistent with training when it came to making contact with Maulson, right, making the determination that he could bring Maulson out of the vehicle, stabilize, and handcuff him.**
Q Handcuffing is a use of force under the DAAT system, right?

A Handcuffing is -- how we teach recruits is that they are -- handcuffs are temporary restraint devices and placing them on people, right, is an application of force. But it's not always connected to probable cause. It could be connected to reasonable suspicion as well.
Q Mr. Angle, am I right that your report doesn't include any analysis of whether handcuffing Maulson was itself the minimum force reasonable and necessary given the totality of the circumstances, right?
A My report does not indicate what you just said.
Q Okay. And your report doesn't analyze whether handcuffing Mr. Maulson was proportionate to the severity of the suspected offense either, does it?
A I didn't write anything in my report that reflects the question that you just asked.
Q Okay. In fact, the Oneida County sheriff officer policy identifies six specific purposes which force may be legitimately used, right? Did you hear my question?
A I thought you were bringing it up, sir. I won't be able to recall specifically six things from that use of force policy. I apologize for my delay. I thought you were moving your mouse



around, and you were going to be showing me it, and then asking that question.
MR. STEGALL: Give me one second here. Bear with me one second. I'm just trying to find this exact spot.
THE WITNESS: Would this be a good time for a break because you are looking?
MR. STEGALL: Sure.
(Off the record at 10:57 a.m.)
(On the record at 11:13 a.m.)
Q Mr. Angle, before the break I was attempting to talk to you about the Oneida County sheriff officer use of force policy -- or office, not officer. Let me share my screen. This is Exhibit No. 3 which we saw before. Can you see my screen?
A I can.
Q Okay. And so hiding in plain view on the first page, which I couldn't find before, under "OBJECTIVE" I'm just going to read that last sentence of that paragraph. "Officers may use force legitimately when it is needed to achieve and maintain control in six specific situations:" And then it lists six specific situations. Do you see those?



A I do.
Q Okay. And you testified before you reviewed this policy?
A I did.
Q Okay. And am I correct, Mr. Angle, that the last one "To change location of an inmate" am I correct that an inmate refers to a person who is in jail?
A That's correct.
Q Okay. And escorting a civilian detainee like Mr. Maulson across a parking lot to a squad car didn't seem to fall within any of those six outlined purposes. Would you agree with that?
A I would disagree.
Q Okay. And why would you disagree with that?
A Well, I think the second one talked about, you know, detaining personnel -- a suspected criminal. He was still conducting the investigation.
Q Mr. Angle, did your report identify which of those six authorized purposes applied during the escort phase?
A I did not.
Q And was there a reason why you did not?
A Yes.
Q Okay. What was that reason?
A I try to avoid in my use of force reports focusing



on whether they were operating under probable cause, reasonable suspicion, you know, and things along those lines. A lot of those are more legal terms that are for lawyers and judges as opposed to the scope. I really focus on the physical dynamics between the officer, the individual involved, and things along those lines. I will sometimes cross-reference if they are operating under something, but for the most part I don't write up whether he had reasonable suspicion of criminal activity and try to cite it from a legal perspective.
Q Well, that wasn't my question. My question was only that you didn't cite which one -- you didn't cite that policy at all. But nowhere in your report did you include which one of those six purposes applied, right?
A I did not.
Q Okay. And none of those six purposes had anything to do with probable cause or reasonable suspicion, right?
MR. JONES: Object to the form.
A Actually I think two of them did, didn't they?
Q They talked about arresting somebody, right?
A And detaining somebody.

Q Right.
A So that would be probable cause, and that would be reasonable suspicion, right?
Q If an officer -- well, you're not saying Deputy Taege had probable cause to arrest Mr. Maulson, are you?
A No, sir. I'm just trying to answer your question. I'm not trying to be argumentative. It's just the terms you were using and the terms that are on that sheet I see, I see the -- I guess, again, I see two points of that that relate to probable cause, arresting a subject, and detaining somebody. And whenever I think someone is being detained I think, you know, reasonable suspicion. But no, I did not cite that in my report.
Q Would you agree with me that the Oneida County Sheriff's Office policy describes handcuffing as a tool -- a stabilization technique following compliance, right?
A I don't know that I recall that being cited in their policy, but --
Q You undoubtedly recall the steps of escalation in the Oneida County Sheriff's Office policy, right?
A I would have to look at it, again, sir.
Q Okay. I will show it to you again. But would you



agree with me while I'm getting there that in the policy handcuffing is not used as a first resort response to a nonviolent investigative contact. Would you agree with that?
MR. JONES: Objection to form.
A I don't know that it was cited that specifically in the policy.
Q Okay. Well, I will show you the policy. I'm showing you Exhibit No. 3. I'm scrolling to page 4. Do you see where it says "POLICY"?
A Correct.
Q Okay. And then do you see where it says "'steps of escalation'"?
A Correct.
Q Okay. And these are the steps that you reviewed, right?
A Correct.
Q All right. And do you see where it says "ten 'steps of escalation'"? Yes?
A Yes.
MR. STEGALL: Okay. And I am going to show you page 5, step 6. I'll give you a second if you want to read step 6 to yourself. But if you do, let me know when you're done.



THE WITNESS: Okay. I have read it.
Q You read step 6, and this is step 6 of the sheriff's policy. Am I right just summarizing step 6 an officer reaches handcuff --
MR. JONES: Mr. Stegall, could you leave the policy up on the screen if you're going to ask him questions about the policy?
MR. STEGALL: I sure will.
THE WITNESS: Thank you.
MR. JONES: I don't want to speak for Mr. Angle, but it's difficult for me when it comes on and off the screen.
MR. STEGALL: Okay. I thought he just read it. So I will leave it up there if you want to consult with it again.
Q But am I fair in my reading of this, Mr. Angle, that step 6 of the use of force continuum outlined in this policy is where handcuffing is first introduced?
MR. JONES: Well, you didn't give him the opportunity to read the other steps.
Q Mr. Angle, you testified under oath that you have read this before, correct?
A Correct. I have read it.



Q Okay. And I'm focusing you on step 6, right?
A You are focusing me on step 6.
Q Right. And my question to you is step 6, am I right, is the point where it talks about an officer handcuffing somebody?
A In step 6 it does talk about an officer handcuffing someone.
Q Okay. And in any of the other steps that you read before -- or I'll let you read all the first five now if you want -- it doesn't talk about handcuffing, right?
A I did not see the word handcuffing as you were scrolling through it, nor do I remember if it specifically said handcuffing up until point 6.
Q Okay. Because point 6 is the point in time under this policy that trains officers if none of the previous five steps worked, this would be the step where you would consider handcuffing somebody, right?
A It does mention that. But when you were moving it earlier is there mention in the policy about skipping steps?
Q Mr. Angle, my question to you is this: do you agree or do you not agree that the first time in the Oneida County Sheriff's Office policy on use

of force that handcuffing is outlined or officers are trained to is in step 6?
MR. JONES: Objection to the form of the question.
A **Handcuffing is in step 6.**
Q Okay. And that is the first step in this use of force continuum that talks about handcuffing, right?
A **I believe so.**
Q Okay. And your report -- unless I missed it, tell me if I'm wrong -- doesn't analyze whether any of those prior steps were attempted before Mr. Maulson was handcuffed, right?
A **I did not include those steps in my report.**
Q And Deputy Taege in his supplemental report, right, if I'm remembering right, wrote that Mr. Maulson was not pulling his hands away during handcuffing. Do I remember his report correctly?
A **I believe that's accurate.**
Q And Deputy Taege's description of the resistance during handcuffing was that Maulson was not making it easy. Do you remember that?
A **I remember what you had mentioned before where you said that he wasn't trying to pull away at that point.**



Q I will show you Exhibit No. 4, page 3. This is Deputy Taege's report. That, I guess -- or second to last full sentence, it may be hard on your end. I will read it to you. If you have a dispute with that, just tell me. "Maulson was not pulling his hands away from me but was not making it easy for me to place handcuffs on him. Eventually, the handcuffs were placed on Maulson behind the back." Did I read that right?
A **You did.**
Q It seemed in your report you characterized that as active resistance, right?
A **I'm not a hundred percent sure if that -- there are two sections in my report that talk about that initial contact that he had with him. And when he had contact with -- when Taege had contact with Maulson that he managed two different types of resistance. One, he had to overcome the level of resistive tension coupled with the active resistance. And so those two were both described in my report around that time in the incident.**
Q Mr. Angle, active resistance is defined -- well, I'll show you. You know active resistance to be a term of art in law enforcement, right?
A **It's behavior which, you know, physically**



**counteracts an officer's intent to control efforts and creates a risk of bodily harm to the officer or others.**
Q That is correct. That is correct. And that isn't what Deputy Taege described in his own report about what Maulson was doing, though, right?
A **He did not use that term.**
Q Right. And he didn't at any point in his report or deposition say that Mr. Maulson was counteracting his control effort, right?
A **He did not use those words.**
Q Okay. Those were one of the examples, in fact, in the active resistance part of the DAAT manual is attempting to pull away from the officers's grasp, right?
A **It is.**
Q And Deputy Taege himself said Mr. Maulson wasn't doing that, right?
A **I believe in my report that I had noted that he had overcome that active resistance, that the initial behavior that he was dealing with with Maulson at that point that he was able to overcome it. So that's why I mentioned before that there is swinging back and forth between active resistance and resistive tension.**



Q Okay. But Mr. Angle, Deputy Taege when he -- he told the reason. He said he wasn't making it easy, but he wasn't pulling away from me, right? We just read that sentence, right?
A **Correct.**
Q Right. And you would agree with me that Deputy Taege's own description is not active resistance, right?
A **His description at that point is not active resistance.**
Q Right. Okay. In Deputy Taege's report he wrote that he pushed Maulson with his left hand into the pocket of his left shoulder attempting to create distance, right?
MR. JONES: Can you put that in front of him?
MR. STEGALL: Sure. Yes. I sure will.
Q I'm going to show you -- this is Exhibit 4. I'm looking for the spot here. Right here, can you see on page 4 of Exhibit 4, "Simultaneously"?
A **I can see that.**
Q And then down below where it says "As I attempted to regain control," do you see that part?
A **Yes.**

Q Okay. And so I'm just going to pick up on that sentence, "I pushed Maulson with my left hand into the pocket of his left shoulder attempting to create distance causing him to fall to the ground." Did I read that right?
**A You did.**
Q Okay. And that's from Deputy Taege's own summary of his own actions, right?
**A Yes.**
Q Okay. And your report states that Mr. Maulson lost his balance and fell to the ground, right? I'll show you Exhibit 1. Okay. I am showing you Exhibit No. 1. It's the bottom of page 5 of your report onto the top of page 6. I'll just read that sentence that runs through the pages. "While rotating Maulson's upper body and attempting to reestablish a grip on his arm, Maulson lost his balance and fell to the ground." Did I read that right?
**A You did.**
Q And that is your opinion?
**A That is.**
Q And you would agree with me, Mr. Angle, that those are meaningfully different descriptions between Deputy Taege's I pushed him causing him to fall



versus your opinion that he lost his balance?
**A Mr. Stegall, you cut out in the beginning part of that question, sir, and I didn't hear the beginning of it.**
Q Okay. No problem. Mr. Angle, would you agree with me that Deputy Taege's description that he pushed Mr. Maulson and caused him to fall is meaningfully different than your description that Mr. Maulson simply lost his balance and fell?
MR. JONES: Objection to form. Go ahead.
**A I don't know what you mean when you characterize it being meaningfully different. I'm not -- I don't understand exactly what do you mean by meaningfully different between the two.**
Q Okay. If I pushed something over -- if I pushed you over, Mr. Angle, that's meaningfully different than if you lost your own balance, right?
**A You pushing me, right, and me falling is different than if you're not even near me and I fall. That is different.**
Q Okay. Mr. Maulson [verbatim], you know the difference between someone being pushed over and someone losing their balance and falling, right?
**A Yes.**



Q Okay. And so you would agree with me that Deputy Taege's description, his own description, that he pushed Maulson and he fell is very different than your conclusion that Mr. Maulson simply fell to the ground?
MR. JONES: Objection to form. You're mischaracterizing both but you can answer.
**A I don't see it as being significantly different or meaningfully different than the term you're using, right, especially in my report when I do say that he did put his hand on his chest, he did push him, and then he lost his balance.**
Q Mr. Angle, I literally just read your conclusion. You wrote "Maulson lost his balance and fell to the ground," right?
**A I did. Yes.**
Q Okay. And in losing his balance you don't reference that Deputy Taege pushed him, right?
**A I do in the line before it.**
Q Okay. The mechanism -- Mr. Angle, your report, okay, your own report -- the mechanism, what caused Mr. Maulson to fall in your report, was him losing his balance, right?
**A After he had been pushed by Deputy Taege.**



Q Okay. I'm going to show you your report again. I'm going to show you the relevant section, and you tell me where in this part that you wrote Deputy Taege pushed him?
**A He used his upper body to try to reposition Mr. Maulson's upper body to overcome it. While he rotated his upper body and attempted to reestablish his grip Maulson lost his balance and fell to the ground.**
Q Are you finished reading this?
**A I just read that section, sir.**
Q Right. And in this section you agree with me, Mr. Angle, you don't write anything about Deputy Taege pushing Mr. Maulson, right?
**A I didn't use the term push.**
Q Okay. Why did you not use the term push when that's how the officer himself described it?
**A When I wrote my report and the way in which I wrote it is, again, if you look at it within its entire context it's the repositioning of Maulson.**
Q Mr. Angle, my question to you is this: how come you did not use the description that Deputy Taege pushed him? Although Deputy Taege that's his own description, why did you not use that description?

Page 61

A I used my description.
Q Okay. I know you did.
A Right.
Q My question to you is why?
A Because I used my description. Because I was putting this into context, choosing the words that I wanted to utilize in order to express my opinion.
Q And so your opinion is that you disagree with Deputy Taege's own assessment that he pushed Maulson. Is that what you're saying?
MR. JONES: Objection to the form and you're being argumentative. But go ahead, Mr. Angle, you can answer.
THE WITNESS: Can you ask the question again, so I know the question.
MR. STEGALL: Anna, can you read that back. I don't want to create anymore confusion.
(The above pending question was read)
A I do not disagree.
Q Deputy Taege, would you agree with this, that he described his threat perception of Mr. Maulson and that he was -- Deputy Taege said that Maulson was in a position of advantage to attack me in some

Page 62

way?
A Yes.
Q Okay.
A He said that.
Q Okay. Deputy Taege -- in fact, if you want, I'll show you. But would you agree with me that he used the phrase in some way and not a specific attack?
A That he used the phrase in some way in his report?
Q Right.
A I believe that sounds accurate.
Q Okay. That was my question. He described it by saying in some way, and Deputy Taege didn't mention some specific attack? That was my question.
MR. JONES: Objection to form.
Q Do you agree with that, Mr. Angle?
A Did he mention headbutt in his report?
Q Deputy Taege, he didn't say he believed that a headbutt or a spit attack was imminent, right?
A I'm missing the front end of some of your questions, sir, so that's why I asked that question. I don't want to misrepresent, you know, or incorrectly answer a question, or something along those lines. But if you can go back to the

Page 63

original question when you were talking about the report and you said in some way.
Q Right. That was the phrase that he used?
A Okay.
Q Right?
A He used the phrase in some way.
Q Yes. Okay. And Deputy Taege didn't write or ever say that he believed a headbutt or a spit attack was imminent?
A He did not write the words that you just said.
Q Okay. And he -- Deputy Taege, in fact, he used the word could, right, something that Maulson could do?
MR. JONES: Objection to form. Objection to the form. That's overly broad and vague. You may answer.
A I'm not a hundred percent sure if he used that term could, but he did highlight the dangerousness of what could occur.
Q What could occur, right?
A Yeah.
Q Okay. Mr. Angle, did you review or familiarize yourself with the escort section of the 2017 DAAT manual?
A I didn't use that manual when I drafted this

Page 64

report, but I am quite familiar with the language surrounding the escort hold.
Q You did -- I think you might have misspoke. I just want to make sure you did use the 2017 DAAT manual in your report, right? This is Exhibit No. 2.
A I thought when we discussed it earlier it was a different version. You said that that's the one he went through when he went through the academy.
MR. STEGALL: That is correct.
THE WITNESS: And you're saying it's not the one that I cited in my report.
MR. STEGALL: I am saying you did cite this in your report.
THE WITNESS: As the 2017 version?
MR. STEGALL: Yes. Okay. I don't want to confuse you, Mr. Angle.
THE WITNESS: Sure.
Q The 2017 DAAT manual was the one that Deputy Taege was trained on, right?
A Correct.
Q Okay. At the very beginning of your deposition we talked about the 2023 student manual, right?
A Correct.
Q Okay. And you've referenced both of these

documents in your report, right?
A I believe in the beginning part we were talking about the instructor manual, right?
Q Okay. Let me just ask you simply, Mr. Angle: did you ever look at, review, or cite to Exhibit No. 2, the 2017 DAAT manual?
A I don't believe that was the version that I used when I drafted my report. I am familiar with that version.
Q Okay. And so it's your testimony that in drafting your report you did not cite from Exhibit No. 2? That's your testimony?
A The focus of my citations was the ones that were listed in the citation part of my report.
Q Okay. And so do you agree with me that Deputy Taege was trained on, at the academy, this 2017 manual?
A I do agree.
Q Okay. And do you agree with me that he was also trained on Exhibit No. 3, the Oneida County Sheriff's Office use of force policy?
A I agree.
Q Okay. And it's your testimony that you don't cite or rely on either one of those documents in forming your opinions; is that right?



A Well, I guess the complex part about it is I did not utilize -- first and foremost, I did not utilize their use of force policy when I drafted my report from a citation standpoint. I did review the material. However, when it comes to the defensive tactic manuals a lot of the material is substantially the same as we make intermittent updates through training and things along those lines whether it's adding new pieces of equipment, new concepts, or increasing a training standard.
Q Mr. Angle, nowhere in your report do you show what sections of the manuals are consistent or updated from the time Deputy Taege went through the academy until 2023, right?
A I do not.
Q Okay. And so you didn't -- or I guess could you explain to me in authoring a report about an officer's use of force why you chose not to cite or rely on the two policies that Deputy Taege was trained on?
A Well, let me address the first one which is when you start talking about the defensive tactic manual. When I look at reviewing an incident and I start using different sources such as the defensive tactics student text oftentimes what



I'll end up doing is looking at the time of the incident and the date of the incident and try to find the version of the manual that is closest in proximity to that date. The logic surrounding that is this: after officers complete their basic recruit academy they have a series of different training that they are required to do by law. So every other year they have to go through pursuit training. Every year they have to qualify with their firearms. Additionally, on top of that every officer has to attend 24 hours worth of training, right, for them in order to maintain their state certification, right, through law enforcement training and standards. Many organizations -- my own organization being the Waukesha Police Department included -- routinely as part of the training do defensive tactics updates especially if there are some changes in the manual, if there are changes to pieces of equipment, dynamics, and things along those lines. My logic surrounding that would be this: if I was suddenly reviewing a case and the officer had been through the academy in, let's say, 1992. In 1992 training and standards had not absorbed oleoresin capsicum as a part of the use of force system. So



however, many agencies by the time 1993, '94, '95 came around the State had changed the curriculum and adopted it as one of the use of force tools that officers could use. So my logic is I try to get as close as possible to the date of the occurrence because it be in line with in-service training that officers could be attending.
Q Mr. Angle, what information do you have that Deputy Taege was at any point in his career trained on any update to the 2023 manual that you decided to use?
A I don't have any information that said he wasn't trained in it.
Q Okay. That wasn't my question. My question is what information -- a report, Deputy Taege testified, you undoubtedly reviewed his whole internal policy -- what information do you know of that shows that he was trained on anything in the 2023 manual?
A I don't have anything.
Q All right. In fact, Deputy Taege himself said he wasn't trained on that manual, right?
A I don't know. I don't recall it from his deposition.
Q Okay. So but you would agree with me at least at

the time Deputy Taege went -- became a -- went through the academy he was trained on the 2017 manual, right?
A **I agree.**
Q Okay. And that's a manual that if I understand your testimony right you did not even review, right?
A **I did not review the 2017 manual as I was formulating this.**
Q Okay. But you did review it in your career as a law enforcement officer, right?
A **Absolutely. I taught at the academy during that time, so I was teaching out of the 2017 manual during 2017 and along with several years until any other iteration of the manual was adjusted.**
Q And based on your lengthy law enforcement career then you've undoubtedly read and familiarized yourself with the escort section of the manual?
A **I have.**
Q And as you sit here today you can't tell me between 2017 and 2023 if there were any revisions to this section, can you?
A **I can't cite all the different, you know, revisions.**
Q Right. You would agree with me that at the top,



right, under the word "ESCORT" -- tell me if I'm reading the second sentence right -- "Because the subject does not have the use of his or her hands, you must be sure that you maintain physical contact with the subject at all times, to prevent injury if he or she should stumble or trip." Did I read that right?
A **You did.**
Q Okay. And if Deputy Taege was in the academy and was trained on this manual, you would agree with me that at the time of his training this would have been how he was trained?
A **Correct.**
Q And that provision does not appear anywhere in your 46-page report, does it?
A **I don't believe that I cited that part.**
Q Okay. And that section identified -- I'll put it back up -- three permissible uses, right: blanketing the arm, rear escort position, and a rear compliance hold?
A **Yes.**
Q And you're familiar with all three of those, right?
A **Yes, I am.**
Q Okay. And you don't know whether any of those



three methods have been changed since 2017, right?
A **I don't believe they have been.**
Q Okay. You did not analyze which of those three methods Deputy Taege was using at the moment or during this incident, right?
A **No. I did not utilize it in the context that you're asking.**
Q Well, I'm asking you about the context of your report.
A **Right. So I do mention escort hold in my report but not in the section you are in. The section you just showed me towards was follow-through considerations because the next part would be, I believe, either turnover or transport. I cited it from the earlier part where the technique is introduced.**
Q And Deputy Taege's own report states that his attention was diverted to Ms. Maulson, right, while he was escorting Mr. Maulson, right?
A **Yes.**
Q At that moment of diverted attention can you tell me which one of those three specified forms of physical contact Deputy Taege was employing?
A **I believe in his report he talked about that he had had a form of an escort hold on Mr. Maulson's**



**arm. So like he had his hand -- so he was in a position, right, behind to him start guiding him towards the vehicle, gets distracted to turn away, and I believe he has his right hand on the area of Maulson's bicep.**
Q Okay. Which one of the escort holds would that be?
A **I would consider that, you know, it's a blanket when I'm stabilizing somebody's hand. He has his arm in control.**
Q That is not the way that you're -- the way that Deputy Taege employed it was not how officers are trained, though, right?
A **So him having a singular hand on him as he starts to move him away, it's not what you would sit there and say a classroom model of a trained technique.**
Q Okay. And you would agree with me that somebody in handcuffs who stumbles or trips, they can't use their hands to break their fall?
A **I agree.**
Q Would you agree that falling face first onto the concrete if you're handcuffed could create a risk of serious injury?
A **It could create a risk of serious injury.**

Q And that that escort provision that we just saw, that specifically is designed to prevent that kind of injury, right?
**A The most important part is -- and I believe it was cited in the instructor manual when it comes to transport was the term we oftentimes use is avoid not touching which means you want to have physical contact with the person as you're escorting them.**
Q I brought up again Exhibit No. 2. Mr. Angle, my question to you was in this DAAT manual, the one that Deputy Taege was trained on, at page 121 this -- the point of this training is to prevent somebody from stumbling, or tripping, or suffering a head-first fall to the concrete, right?
**A It can be, yes.**
Q Your report concluded that Deputy Taege's conduct was consistent with Wisconsin Law Enforcement Training, right, but I believe we agreed you didn't analyze whether Deputy Taege's conduct during this escort phase was consistent with the manual that he was trained on, right?
**A I didn't cite that spot within the manual that you're talking about.**
Q Well, let's talk about Deputy Taege's training for a second. Do you recall him testifying that as



part of his training he was taught that handcuffed subjects are more likely to fall?
**A I don't recall a hundred percent if, you know, he said that in his deposition.**
Q I will show you Exhibit No. 6. This is Deputy Taege's deposition. On page 141, do you see the question at line 15?
**A I do.**
Q Okay. Tell me if I read this right. Question, "As part of your training, have you been taught that handcuffed subjects are more likely to fall?" answer, "Yes." Do you see that?
**A I do.**
Q The next question, "Have you been taught that handcuffed subjects -- you need to be careful so that you can protect their head?" answer, "Yes." Did I read that right?
**A You did.**
Q I should have brought that back up. When Deputy Taege was questioned about -- well, I'll just read it, line 22: "Okay. And there's specific ways that, if there is a subject that's standing and handcuffed, that you're taught to bring that person to the ground, correct?" Do you see that question?



**A I do.**
Q And Deputy Taege said correct, right?
**A He did.**
Q And then on page 142 at line 2 he is asked, "Can you describe those for us?" Do you see that question?
**A I do.**
Q And his answer was, "It would be hard for me to articulate." I don't know -- or "I'm -- I don't know." Did I read that right?
**A You did.**
Q Deputy Taege was also asked about the escort positions. Let me make sure I get that. I'm just trying to find the spot. Give me one second here. Okay. On page -- this is Exhibit 6, page 144 at the very bottom. There it is. Okay. At line 24 this is a question to Deputy Taege: "What are the various escort positions?" Do you see that question?
**A I do.**
Q And on line 25 his answer, "I don't know offhand. I could refer to the manual." Do you see that?
**A I do.**
Q And do you know what manual was Deputy Taege referring to, if you know?



**A My guess would be that he's referring to the DAAT manual.**
Q Would you agree it would either probably be the DAAT manual or his own Oneida County Sheriff's Office use of force policy?
**A If they call it a manual, yes, it could be that as well.**
Q Okay. As an expert evaluating whether Deputy Taege's conduct was consistent with training, would you account or did you account for what Deputy Taege himself testified about his own training?
**A Could you expand on that question.**
Q Well, I can ask it again. As an expert evaluating whether conduct was consistent with training, okay, did you evaluate or consider what the officer himself, in this case Deputy Taege, testified to about his own training?
**A I do consider what he testifies to in regards to his own training.**
Q And did you -- what significance, if any, did you place on the fact that Deputy Taege could not name any escort position?
**A I don't think it's uncommon. You know, officers when they go through the academy they have a lot**

of training. They have to test out in the different standards. And sometimes when they get into the organization if the organization doesn't do a lot of defensive tactic training, it's unfortunate and sometimes they're not going to remember every single technique -- they're not going to, you know, be able to recall it. I would imagine that it's probably consistent in a lot of other professions as well where you're learning certain parts. You maintain certain parts that are very, very critical in your day-to-day operations and decision-making, but you also need to sustain it through in-service training.
Q Okay. Your opinion then that Taege's conduct was consistent with training does not account for Taege's own sworn admission that he couldn't name any of the head/neck protection techniques that he was trained on?
A No, I don't -- it wouldn't be the first time somebody can't explain exactly the technique. Oftentimes what I look at for my opinions is when reviewing -- or let's say for example a report or maybe some deposition is looking at it and saying, okay, the description of what I had read or what I had heard is consistent with this element from the



manual's standpoint. But him not remembering a name of a particular technique, I don't think that's uncommon.
Q And not remembering the name could also mean that he doesn't know how to do it. That's possible, too, right?
A It is possible that he could have forgotten the technique.
Q Could you walk me through the process that you used to review the squad video in this case.
A When looking at the squad video, I was given copies of it. One of them was one where it was slightly slowed down, so I could -- especially at the point where Deputy Taege is then moving away from the back of the vehicle and this is the point in which also the use of force incident part happens so looking at it both in real time, looking at it both in slow motion time, rewinding, watching it again and again, looking for the different things that I can see, and then also looking at the different references that were provided to me whether it's being a report, a deposition, things along those lines.
Q Did you extract any still frames from the video?
A I did not.



Q Did you review Mr. Duggan's still frames?
A I did.
Q In your report -- I'm going to show you Exhibit No. 1. I am on page 41 of 46 -- you describe Deputy Taege as "fixing the angle." Do you see that phrase?
A I do.
Q Okay. And you have your report in front of you?
A I do.
Q Okay. Did you -- am I wrong, maybe I missed it. Did Deputy Taege himself ever use the phrase fixing the angle?
A No, sir, he didn't.
Q And that was your report describing Taege's actions as he was rotating Mr. Maulson's torso?
A Yes.
Q Okay. Taege himself described it as pushing Maulson's left shoulder, right?
A Yes.
Q Deputy Taege nowhere in his report talks about fixing the angle or rotating the torso, right?
A He doesn't.
Q Okay. And so you disagree with Deputy Taege's own description that he pushed Maulson's left shoulder?



A I don't.
Q Why did you not use Deputy Taege's description that he pushed Maulson's left shoulder?
A When I was reviewing everything -- a lot of the times while assembling a use of force expert report I'm going to be using the different resources that you've seen me use. I'm also going to be utilizing terms that I feel comfortable in explaining why I drew a specific opinion. It doesn't always involve using their specific words. Many times I could read their description of an event and then I'll utilize my understanding of defensive tactics, and I will formulate how I want to describe it.
Q Right. So you chose -- you yourself, Mr. Angle, chose not to use the deputy's own description that he pushed him. And instead your characterization is that he made some maneuver that wasn't a push to fix the angle, right?
MR. JONES: Object to the form. Go ahead.
A No. I don't have a problem with the term push, sir. You've brought it up a couple different times. What I try to do is --
Q Well, I brought it up because, Mr. Angle, it

doesn't appear anywhere in your report, right? That's why I brought it up.
MR. JONES: Mr. Stegall, you got to let him finish the question and please don't interrupt him. Go ahead.
A **So using the term or the phrase "fixing the angle" at that part in the report when I begin to do my description I'm pulling together a series of different DAAT concepts that get me or allow me to explain, right, the dangerous situation that was created at that exact moment. Right, encompassing all of those, I oversimplify it and use certain terms. The term fix the angle is a term I use to oversimplify, right, how Taege is trying to regain the position of advantage.**
Q Okay. So as you just explained it your testimony is that your use of the phrase fixing the angle is much more straightforward and simplified than the description of being pushed, right?
A **No. The term "fixing the angle" as I mentioned before it's what I was using in order to capture the different DAAT concepts that talk about the problem that was created, the danger that was created in that situation and that the solution -- a very dynamic solution -- is merely fixing the**



**angle.**
Q Okay. And you're familiar with the pull in-push down technique?
A **I am.**
Q And am I right in saying that involves clasping the hands behind the subject's neck, stepping back, and lowering the subject's center, right?
A **Yes.**
Q Okay. I described that correctly, right?
A **That was pretty good, sir.**
Q Okay. It's not a single-hand chest push, right?
A **It's not.**
Q Right. A single-hand chest push is much, much different than the pull in-push down technique, right?
A **It is.**
Q Okay. And your report states that the technique that Mr. or Deputy Taege employed doesn't involve focus strike nor an intentional attempt to decentralize Mr. Maulson, right?
A **Correct.**
Q And so you're saying -- if I'm understanding right -- that what Deputy Taege did was not an intentional focus strike, right?
A **Correct.**



Q And was not an intentional attempt to decentralize him?
A **Correct.**
Q That's your opinion?
A **That's my opinion.**
Q Okay. But Deputy Taege admitted he pushed Maulson and caused him to fall to the ground, right?
A **He did.**
Q And if an officer pushes a handcuffed subject and the subject falls face first onto the pavement, would you agree that the officer has taken the subject to the ground?
A **I wouldn't.**
Q You would not agree?
A **No, not the way you characterized that.**
Q So if I'm handcuffed and you push me and I fall face first to the ground, you would not agree that you have taken me to the ground?
A **When you use the term taking someone to the ground, what that makes me think from a training standpoint is that I have contact with you and I am intentionally trying to take you down to the ground to decentralize you.**
Q Decentralization is directing a subject to the ground for stabilization, right, that's the law



enforcement definition?
A **I wouldn't say it's necessarily the law enforcement definition. The goal of a passive countermeasure is to decentralize -- I cannot control someone in a standing position; therefore, I need to bring them to the ground to attempt to control them.**
Q All right. I'm going to show you Exhibit No. 5 which are the still images from Mr. Duggan's report. Can you see my screen?
A **I can, sir.**
Q Okay. One second here. I'm going to take it down just for a second. I got to make sure I get to the right pages for you. Okay. On Exhibit 5 I am on image number 39. Can you see that?
A **I can.**
Q Okay. And you can see Mr. Maulson and Deputy Taege?
A **I can.**
Q And what technique is Deputy Taege employing right now?
A **It looks like he has his hand on Mr. Maulson's chest.**
Q Okay. But my question is what technique -- what law enforcement technique that he was trained on

is he employing right now?
A **I don't see a trained technique.**
Q Okay. I'm going to show you image number 53. Can you see that image?
A **I can.**
Q And this is one of the images that you reviewed before you finalized your report, right?
A **No.**
Q You didn't review these? Oh, you probably didn't before you finalized the report, right?
A **Correct. I did not review these before I finalized my report.**
Q You saw these at some point after your report was finalized?
A **Yes.**
Q And you reviewed all 71 of them?
A **Yes.**
Q Okay. And you haven't authored any supplemental report, right?
A **I have not.**
Q Okay. And you don't intend to author any supplemental report either, right?
A **I do not.**
Q Okay. And on image number 53 can you tell me what law enforcement technique is Deputy Taege



employing in this image?
A **He's not applying a technique, a classroom model technique.**
Q This is not the push and pull down technique at all, right?
A **Pull in-push down is the phrase and no it's not.**
Q And law enforcement officers aren't trained to trip people in handcuffs, right?
A **They are not.**
Q Okay. I'm showing you image number 60. Can you tell me what law enforcement technique is Deputy Taege doing at this moment?
A **He's not doing a classroom model technique.**
Q Would you agree with me that he's not doing any technique that's trained by the Oneida County Sheriff's Office or the Wisconsin Department of Justice?
A **I don't know if -- I don't have all of the training records from Oneida County, so I can't speak to their policy. But what I see on the screen is not a classroom model technique.**
Q You reviewed the Oneida County Sheriff's Office use of force report -- or policy, right?
A **I did.**
Q Right. Okay. And anywhere in that policy does it



authorize this technique?
A **No. I don't believe it does.**
Q And you can see Deputy Taege's hand is on Mr. Maulson's left shoulder pocket, right?
A **Correct.**
Q And that's just how Deputy Taege described it in his report, right?
A **It is.**
Q All right. And you can see Deputy Taege's -- what is that, his right leg by Mr. Maulson's feet, right?
A **I can see.**
Q And you can see the thrust of Deputy Taege's body weight and momentum is in a pushing motion, right?
A **It is.**
Q And his back leg is stabilized a couple feet behind him, right?
A **It is.**
Q And that back leg is what would generate the push, the force for the push, right?
A **I believe so.**
Q And I'm going to show you number 66. Would you agree that this is a continuation of that same incident, and you can see Deputy Taege's hand now off Mr. Maulson?



A **I can see that his left hand is off Mr. Maulson.**
Q And you can't see where his right hand is at all, right?
A **In this still I cannot see where his right hand is.**
Q And would you agree -- in frame number 60 and frame number 66 would you agree with me that Deputy Taege tripped Mr. Maulson?
A **I would not agree with you.**
Q You, despite seeing these photographs, Mr. Angle, is it still your testimony under oath that Mr. Maulson lost his balance and fell to the ground?
A **That's what I stated in my report.**
Q Okay. But my question to you is this, Mr. Angle: now that you've reviewed these photographs and you have still images from that squad video, is it still your opinion under oath that Mr. Maulson simply lost his balance and fell to the ground?
A **Not the way in which you've characterized that in your question, sir.**
Q Mr. Angle, I'm just going to ask the question again, okay. Now that you have reviewed these still images, do you still hold the opinion that Mr. Maulson lost his balance and fell to the

ground?
A I hold the opinion that Deputy Taege, right, utilized his hand to push Mr. Maulson, right, and rotate his upper body. During that time, right, Mr. Maulson, right, goes to the ground.
Q Okay. I'll just ask you the same question one more time. Now that you've reviewed these squad video still images, do you, Mr. Angle, still hold the opinion that's written in your report on pages 8 and 9 that Mr. Maulson lost his balance and fell to the ground?
A Yes. He lost his balance. He is unbalanced in the photograph that you are showing me.
Q And if I show you number 71, would you agree that this shows Mr. Maulson falling head first towards the pavement?
A Yes, I would agree.
Q And you can clearly see Deputy Taege's hands, right?
A I can see his hands.
Q And Deputy Taege's hands are nowhere on Mr. Maulson, right?
A They are not.
Q And you would agree with me that this image does not capture any law enforcement technique that



either yourself or Deputy Taege was ever trained on?
A No classroom model technique.
Q You keep saying classroom model. I'm talking about any technique, none, right?
A Like I said, he's not doing a classroom model of any technique.
Q Okay. Are you drawing a difference between a classroom model and some other model of the technique?
A When you ask the question the way you do, again, based on my training, experience, and in the context of that question is that a classroom model is the term that we use for the thing that is taught -- like, for example, recruits learn multiple things within defensive tactics. And at the end of their academy -- or excuse me, that particular phase of defensive tactics they have to go through a test day where we complete what is known as the skills competency checklist. While doing the skills competency checklist it lists all those techniques, and they are judged to do those based on the classroom model technique hence why I answer it in that fashion.
Q There is no video frame still image that you saw



that showed Deputy Taege using cupped chin lowering technique, right?
A No, the term I think you're looking for is secure the head.
Q No, the term -- my question, just so we're clear --
A Okay. I'm sorry.
Q Okay. My question to you is --
A Sure.
Q -- there's no frame showing Deputy Taege using the cupped chin lowering technique, right?
A I'm not familiar with -- I apologize. The reason why I answered it the way I did before is I thought you were referring to a technique within the DAAT manual and not saying it right the way it's listed. So the answer is, no, there is no version of him doing what you called the cupped head technique.
Q And are you saying that the cupped chin lowering technique is not in the 2017 DAAT manual?
A There is no technique labeled the way you just said it.
Q Okay. And Deputy Taege testified he was never trained to push into the shoulder pocket of a handcuffed subject, right?



A I believe that he said that in his deposition.
Q And in all of Deputy Taege's training he never received any information or training that it was appropriate to trip a handcuffed person, right?
A I don't know that he received any information saying that it was okay.
Q All right. Well, Deputy Taege himself said he didn't receive any training, demonstration, video that ever depicted an officer pushing a handcuffed subject to the ground, right?
A Okay. He said that in his deposition?
Q That's what I'm -- I mean, right. That's what I'm saying.
A Right. When you discussed the term tripping, yes, he does say something to that effect.
Q Okay. And your opinion in your report and still today is that Deputy Taege's conduct was quote, "consistent with Wisconsin Law Enforcement Training and Standards," right?
A Yes.
Q And is that opinion based in part on your characterization of the shoulder push as a DAAT-consistent technique?
A No. It's based on the way in which use of force is categorized in the defensive tactic manual. So

when you look at the manual, they talk about a lot of different areas by which officers make use of force decisions. When they get to the section that starts talking about officer's training, they talk about three different techniques. The first one is the one that I had mentioned which is the classroom model. So the classroom model is me doing exactly what was demonstrated in the skills competency checklist. So that's one version of a technique. Another option is what is known as dynamic application of a trained technique. Oftentimes when officers are in positions on the street they're dealing with very rapid, intense circumstances that are dynamically changing as the environment changes. So they may be trying to apply a technique that you could see in the classroom; however, based on the level of resistance the person is displaying or maybe the footing that the officer has or the suspect has, they might be put in a position to dynamically apply a technique. That's where oftentimes you can see some of the concepts and ideas within the classroom model but they are not all applied. The last one is called not trained but justified. And in defensive tactics we understand that we cannot



plan for every contingency, right, in the rapidly changing environment that we have within law enforcement use of force. That's where you look at a technique considered no trained but justified based on the totality of the circumstances. So that would be a case where an officer now is looking at a very unique circumstances and maybe using other DAAT concepts to explain exactly why he or she felt the way they did, what type of danger they felt they were faced in, and the other element would be what kind of opportunities to try to control the situation that they might be suddenly forced to employ. That's where we fall into the category of not trained but justified.

Q How does a technique remain consistent with training in your words when Deputy Taege himself testified that he was never trained to use them?

A I believe it is because of the third parameter that I just mentioned in the last question that I believe that the DAAT system has an understanding that we cannot plan for every contingency and that when you're applying, right, many of the different concepts within defensive tactics such as the approach considerations, right, which is going to contain whether it's going to be my



decision-making, my tactical -- the deployment, or my tactical evaluation. The approach considerations influence a lot of the different things that officers do. So many times you might have a technique that is shown on the street. It becomes something that an officer does and it's very organic, but it's based on a lot of DAAT concepts. We can't plan for every contingency in training.

Q Mr. Angle, my question had not a lot to do with that. My question is simply how does a technique, okay, that Deputy Taege himself said I was never trained on this technique -- so explain to me how does that render it consistent with training?

MR. JONES: Asked and answered. He just answered that, but you can answer it again.

A So I mentioned before in the previous question, right, that techniques can fall under three different categories: a classroom model, a dynamic application of a trained technique, or not trained but justified. This is in the DAAT manual itself. And part of the reason that it's in the DAAT manual is because we cannot plan for every contingency or circumstance that officers do. So



to sit there and try to say that everything has to be identical to the classroom would be unrealistic, right. It would force officers, right, to try to achieve standards that are unobtainable because of the rapidly changing environment that they have to deal with when dealing in these dynamic circumstances; therefore, that is one of the reasons why the defensive tactics system acknowledges that officers are going to do techniques that are not trained but justified based on the totality of the circumstances. So oftentimes when officers are forced to make these types of decisions they are in line with many defensive tactic approach considerations, right, whether that be officer subject factors, special circumstances, or maybe early warning signs of a pre-attack posture. And when something like that is produced organically, the officer is forced to react very quickly to fix the situation, to try to control the suspect. So that is why my answer says that he did that -- that what he did was consistent with training is because I believe that it falls under that third parameter that I just explained.

Q Mr. Angle, would you agree with me that the phrase

not trained but justified doesn't appear anywhere in the Oneida County Sheriff's Office use of force report -- or policy?
A I don't believe it does show up in the policy.
Q Right. And it doesn't show up anywhere in the 2017 DAAT manual either, does it?
A I think it does, sir.
Q Okay. So you did read that manual or you didn't? Because I thought earlier you said you didn't read the DAAT manual.
MR. JONES: You're mischaracterizing.
Q Did you read the 2017 one or not?
MR. JONES: Go ahead.
A So what I said before, sir, was this: I did not read that manual specifically and cite that manual while I was formulating my report. I used a different manual. What I did say in response to your question was I believe that if you look in the 2017 manual, that you can find that not trained but justified statement. It's going to be under the section labeled "Officer Training." It's right after organizational policy.
Q Okay. And you didn't cite that in your report?
A The 2017?



Q What you just quoted to me. You didn't cite that in your report, right?
A Excuse me for a second. I did cite it, sir. It's on page 40.
Q Page 40, the Oneida County use of -- the Oneida County Sheriff's use of force policy requires some specific post-force medical care obligations. Did you review those?
A I did.
Q Okay. And that requires some actions that the officer must do after force is used, right?
A It does.
MR. STEGALL: And I'll bring it up.
THE WITNESS: Sir, before we go any further, would it be okay to take one more break.
MR. STEGALL: Sure.
(Off the record at 12:24 p.m.)
(On the record at 12:37 p.m.)
Q Mr. Angle, right before the break you used a phrase not trained but justified, right?
A I did.
Q Okay. And then if I understood you right you said that you had that phrase in your report?
A I did.



Q Right. And then you directed me to page 40 of your report?
A I did.
MR. STEGALL: Okay. I'm on page 40 of your report. I do not see that phrase anywhere.
THE WITNESS: Can you scroll up so I can see the bottom of that page, sir.
MR. STEGALL: This is on page 37 of your report.
THE WITNESS: Okay. So can you go back, please.
MR. STEGALL: Okay.
THE WITNESS: Keep going.
MR. STEGALL: Off a different page, or just --
THE WITNESS: Yeah, go -- scrolling up getting, like -- so if you notice the bottom page what I'm using for my numbers on your screen it says 36 of 46.
MR. STEGALL: Right.
THE WITNESS: If you go to a page that says --
MR. STEGALL: Got it. I was on the wrong page. Okay. Let me go back to this



page for a second here just because I want to clear up some confusion.
THE WITNESS: Sure.
Q So on this -- on page 40, right, you cite to the 2023 one which we talked about?
A Correct.
Q But then you also cited to the 2017 DAAT manual that we've been discussing?
A Okay. That's the DAAT instructor manual, sir.
Q Got it.
A It's mentioned in the excerpt. So that one is a 2017 date.
Q Got it. So when you write -- so this Standards Board, you're not referring to the DAAT manual that Deputy Taege was trained on. You're referring to the instructor version; is that right?
A Yes. Because within the instructor version there's a very large component within it that is a classroom component of use of force. So what the State provides for the recruits is it's a PowerPoint that basically gives them the overview of use of force, you know, in Wisconsin, right, in covering obviously the constitutionality -- the state law, later on, you know, talking a little

**bit about them following organizational policy, and then the training pieces where I was talking about with you earlier. So I used that because there's also parts within the notes when that's being taught where recruits receive that type of information.**
Q Got it. Okay. And then the Oneida County Sheriff's Office use of force we were talking right before the break about post-use of force medical care -- or not medical care but the responsibility of an officer after the use of force. I'm showing Exhibit No. 3 page 15. This is Bates number 000447. Would you agree with me, Mr. Angle, that this page here sets forth the steps that an officer should take after the use of force?
**A Yeah, Oneida's policy on it.**
Q Okay. And your report doesn't address whether Deputy Taege complied with any of those provisions, right?
**A I think in my report I talked -- I utilized more of the State's standard's involved in follow through considerations.**
Q Right. My question was that your report doesn't address whether Taege complied with the Oneida



County Sheriff's Office use of force policy, right?
**A I did not render an opinion on whether he followed it or didn't.**
Q Okay. And then one of the -- well, if I have this right, the DAAT manual identifies three foundation principles. One is that no subjects are injured needlessly. Does that sound right? I'm going to get to the --
MR. JONES: Do you want to show him what you're referring to.
Q Yeah, I'm getting there. Sorry, it just takes me a little bit here. Okay. I am showing you Exhibit No. 2. This is the 2017 DAAT manual, page 12 under, I guess, the section "Fighting Rules" and then it says three additional principles. Do you see that?
**A I do.**
Q "1. No officers are injured 2. No subjects are injured needlessly. 3. No one is accepted/detained or released improperly." Did I read those right?
**A You did, sir.**
Q Okay. And those are just three general overarching principles that officers are trained



on when use of force is involved, right?
**A Correct.**
Q Okay. And did you account for that principle of no subject being injured needlessly in your analysis?
**A I didn't cite that in my report. It is a part of the DAAT system that I am familiar with and didn't see anything that I was reviewing that led me to put it in my report.**
Q You would agree that Mr. Maulson appeared to have suffered some injury at least, right?
**A Yes.**
Q Okay. And your report doesn't include any analysis of whether Mr. Maulson's injury was needless under the circumstances, right?
**A I did not use any of those words.**
Q Okay. And to the when officers are trained in using use of force to the extent that either the subject's behavior allows or the situation allows, officers are trained to act with the well-being of the subject in mind, right?
**A They are -- officers are trained to try to strike the balance, right, between their own personal safety, right, and the person that they're trying to take into custody.**



Q We talked about slowing down the scene, I believe, in the beginning -- situations where the officers aren't in danger. Do you recall that?
**A I do.**
Q Okay. In Deputy Taege's own account, would you agree, he doesn't describe any imminent danger to himself during -- or any other innocent person during the initial 20 seconds or 30 seconds of contact, right?
MR. JONES: Objection to form. It's not clear what part of the interaction you're referring to but you can answer.
**A If you're referring to the part where he approaches the vehicle and has his initial contact with him, no, he does not make any mention of danger.**
Q Okay. So at least one decision that Deputy Taege would have had at that moment was to slow down the scene. Would you agree?
**A One more time, sir.**
Q Sure. One of the options that Deputy Taege had was that he could have slowed down the scene with Mr. Maulson?
**A He could, yeah, he could have done things slower if he wanted to, correct.**

Q Okay. The DAAT manual that Deputy Taege was trained on -- this is Exhibit No. 2 Bates number 000684. This talks about the five key rules for the use of force?
**A Yes.**
Q Okay. And these rules were in force at the time of Deputy Taege's training, right?
**A Correct.**
Q And to your knowledge at least still are in effect today?
**A Yes.**
Q Okay.
**A Very similar wording, almost identical.**
MR. STEGALL: Okay. I want to ask you some questions about these. I'm not going to ask you specific wording. If you want to see this page again, just let me know and I'll put it back up.
**THE WITNESS: Sure.**
Q Okay. All right. Well, before we -- would you agree that number 4 -- this is what I really want to talk about. Tell me if I'm reading this right: "Once you have gained control of a subject, you must reduce the level of force to that needed to maintain control." Did I read that right?



**A You did.**
Q Okay. And that, it seems consistent with the Oneida County Sheriff's Office use of force policy step number 6 that we talked about before -- the same sort of obligation that once an officer has compliance, the techniques must be lessened in degree; is that right?
**A Something similar it sounds like from step 6.**
Q Yeah. So well, would you agree that the key rule 4 -- once control is gained you've got to reduce the force to what's only needed to maintain control -- is pretty similar with step 6 of the policy?
**A They seem congruent.**
Q Okay. And because Deputy Taege worked for the Oneida County Sheriff's Office that their specific policy is a separate independent obligation from the DAAT rule 4 that we talked about, right?
**A They are separate, yes.**
Q All right. Okay. And you agree Mr. Maulson at the time -- well, you agree that using handcuffs is use of force, right?
**A I concur.**
Q Okay. And Mr. Maulson was handcuffed during this incident, right?



**A He was.**
Q Okay. And that the stabilization part that you talk about in your report -- I'm paraphrasing, okay, but am I right that a handcuffed subject represents a higher degree of stabilization than an unrestrained subject?
**A That's accurate.**
Q Okay. And so once Deputy Taege had Maulson handcuffed in an escort, the force level required to maintain control should have been reduced, right?
**A Yes, if he's under control.**
Q Okay. And your report didn't at least specifically analyze whether Deputy Taege's use of force during the escort phase was consistent with that key rule 4, right?
**A I did not.**
Q Okay.
**A I didn't make a parallel that time, yes.**
Q All right. And your report doesn't analyze whether Taege's conduct was consistent with that corresponding Oneida County Sheriff's step 6 policy, right?
**A I didn't address that in my report.**
Q As an expert in this area, are you familiar with



Graham versus Connor, the supreme court case?
**A I am.**
Q Okay. And you have talked about that case during your time as a law enforcement officer?
**A I have.**
Q Okay. I'm not going to quiz you on the opinion or anything like that, okay. But would you agree that there's factors that are laid out in that opinion?
**A There are.**
Q Okay. And the severity of the crime -- whether the suspect posed an immediate threat and whether the suspect was actively resisting arrest or attempting to flee -- do those sound right?
**A Attempting to evade arrest by flight, yes.**
Q Okay. And your report, your conclusion that the conduct was consistent with Wisconsin Law Enforcement Training and Standards, would you agree is not the same as the constitutional standard as whether the force was objectively reasonable?
MR. JONES: Objection to the form of the question. You can answer.
**A When drafting my reports and reviewing cases, what I found is that is oftentimes something for**

**the Court to decide when you start talking about the constitutionality of it. So I usually refrain, right, from writing something up saying whether I believe that was objectively reasonable or not. I merely utilize, right, the defense and arrest tactic system and then my knowledge of use of force to formulate the report. Again -- but oftentimes what I'll find is that based on the information that people can infer, right, from it.**
Q Okay.
A **It is the gold standard in use of force as it should be.**
Q Would you agree that police conduct can be consistent with training but still violate the constitution?
A **Yes. I believe that an officer could possibly be operating under the, you know, appropriate defense and arrest tactic techniques -- do them properly but unfortunately maybe they were operating outside of probable cause, maybe they did not have the reasonable suspicion.**
Q At the time Mr. Maulson was handcuffed he had not been -- he wasn't formally under arrest, right?
A **I don't believe that he notified him that he was under arrest so I don't think he was.**



Q Okay. And to the extent that you know the underlying call of this disturbance -- both parties, both Mr. Taege and this other person, had left the area of where that disturbance had taken place when Deputy Taege arrived, right?
A **I believe that they had both changed locations.**
Q Right. Would you agree that I didn't see anywhere in Deputy Taege's report or in his deposition testimony that he expressed a belief that Mr. Maulson was ever trying to flee from him, right?
A **I don't recall him making any statements in regards to that.**
Q Okay. At the moment that Deputy Taege pushed Mr. Maulson, would you agree that Mr. Maulson had not assaulted Deputy Taege?
A **He had not assaulted Deputy Taege at the time.**
Q Okay. And he had not attempted to flee or, like, pull his hands away?
A **I don't believe he did.**
Q Okay. I was trying to find the page. I'm looking for it. Mr. Angle, I thought I recall reading in your report that you indicated that Deputy Taege selected a technique that had lower propensity for injury than a protective countermeasure. Am I



remembering that correctly?
A **You are, sir, it was protective alternative I think is the term that you are trying to find.**
Q Okay. And does that opinion of yours assume that the technique that Deputy Taege used was itself proportionate?
A **The last part of your question, sir, if there's a way you can rephrase that. Self proportionate, I'm not -- I apologize. I don't know what you mean when you say that.**
Q No, it's okay. It might have been the connection. So it was your conclusion that he selected a technique that had a lower propensity for injury -- or lower -- I don't think you used the word propensity, right?
MR. JONES: Well, why don't we look to the part of his report you're talking about.
Q Well, that's what I'm trying to find. And I thought you just said, Mr. Angle, that you did use the word -- there we go. Yeah, he had "a lower propensity for injury than a Protective Countermeasure," right?
A **Active countermeasure or protective alternative, there's two terms. So a protective alternative is**



**a mode within the use of force and then techniques that are in there are called active countermeasures. You just merged the two.**
Q Got it. Okay. And am I correct you're not offering an opinion about whether the technique that Deputy Taege employed was the least force option available to him, right?
A **So I believe in my report what I reflected was is that there were other use of force options, right, that I believe Deputy Taege could have responded with and that the technique that he selected, right, by bringing his hand out and pushing, right, Mr. Maulson had a lower propensity for injury than a lot of the other things that I believe he would be justified in doing at that exact moment.**
Q And give me an example. What would be some of the higher force things that you believe he could have chosen to employ if he decided?
A **Sure. So you started to talk about it just a moment ago, sir. So I believe that at that point when suddenly, right, Mr. Maulson turns on him and he is now in the position of disadvantage -- meaning Taege is in the position of advantage -- that I believe that it would be**

justified in responding with an active countermeasure using some type of focus strike in hitting Mr. Maulson in order to create distance. He had lost the commodity of distance at that point, and he had lost the commodity of relative positioning. So Taege needs to now try to take control of the situation. So he could have responded with a technique like striking him, right, which has a higher propensity for injury and that also could produce, right, him falling to the ground -- an uncontrollable fall. The other thing that he could have done also, I believe, would have been a pull in-push down decentralization that you had mentioned earlier where I believe he could have hooked around his head, pulled in, and then drove, right, Mr. Maulson towards the ground. The challenge in that one then is he's intentionally taking him down to the ground, he in handcuffs, and there's a possible impact of him making contact with Taege while he's also going down. So those are techniques that I think would have a higher propensity for injury as opposed to -- and you had mentioned the term that I used -- as opposed to fixing the angle by utilizing his hand and



rotating the upper body in an attempt to create a different angle that would give him the position of advantage.

Q That fixing the angle, I mean, right, that slide that we looked at you saw one hand that Deputy Taege had on Mr. Maulson's bicep, right?

A He did.

Q And that was presumably to maintain control of Mr. Maulson?

A That's what I believe.

Q All right. And then at the same time that he had his hand on Mr. Maulson's arm, with Deputy Taege's other hand that's when he delivers the push into the shoulder pocket, right?

MR. JONES: Objection to the form. Go ahead.

A So how I would describe it would be that he's utilizing his right arm in the area of the bicep. He utilizes that left arm across the shoulder in a pushing motion and turning him on his axis this way now he is -- as I mentioned before, he's fixing the angle. He's removing the threat that is posed based on the loss of distance and the loss of relative positioning in order to gain the position of advantage which would be -- in this



case ideally it would be at a two and a half.

Q Do you consider Deputy Taege's own assessment of what he was trying to do in this move? My memory is that Deputy Taege said he was trying to create space; is that right?

A Yes, space, distance.

Q Okay. All right. Mr. Angle, you're not offering any opinion about whether the initial traffic stop was constitutionally justified, right?

A I am not.

Q You're not offering any opinion about whether Deputy Taege had probable cause or reasonable suspicion to handcuff Mr. Maulson?

A I am not.

Q You're not offering any opinion about whether the Oneida County Sheriff's Office training program was adequate?

A Not offering any opinion.

Q Okay. Not offering any opinion on the findings of the internal investigation of Deputy Taege?

A Not offering an opinion.

Q Okay. And of course, you're not offering any opinion on any of Mr. Maulson's injuries?

A Correct. I'm not offering an opinion.

Q All right. Am I right your report is limited to



whether Deputy Taege's use of force was consistent with Wisconsin Law Enforcement Training Standards, right?

A I focus on the Wisconsin, you know, resources, right, when I formulate that report. What I also find is many of those resources are very consistent across the states. I've had the opportunity to train in other states with other different, you know, trainers that change systems. All the systems are really doing the same thing. We're all focused on objectively reasonable use of force decision making by officers in the respective agencies.

Q Okay. Not the focus of whether the officer's actions caused harm to Mr. Maulson, right?

A Correct.

MR. STEGALL: All right. Okay. I don't have any other questions.

MR JONES: As long as you can hear me, I just have a few questions for Mr. Angle.

THE WITNESS: You are able to hear okay, sir? You can hear Andrew?

MR. STEGALL: Yes. Yeah, I can hear you.

MR. JONES: Anna can hear me?
THE REPORTER: Yes.
EXAMINATION
BY MR. JONES:
Q Okay. Like I said, just a couple -- you were asked early on, I think, whether you had reviewed Mr. Duggan or Duggan's deposition transcript at the time you wrote your report. Do you remember that?
**A Correct.**
Q And you had not at that point, correct?
**A At the time I wrote my report I had not reviewed Mr. Duggan's deposition.**
Q Had you had the benefit of reviewing his deposition in the meantime?
**A I have.**
Q And did you?
**A I did.**
Q And have you also had the benefit or the opportunity to review Mr. Maulson's deposition transcript in the meantime?
**A I have.**
Q And I think you testified that you have seen the still shots that Mr. Duggan created from the squad camera recording since you wrote your report?



A I have.
Q And based on your review of Mr. Duggan's deposition transcript, Mr. Maulson's deposition transcript, and the still photographs or still frames, have your opinions changed in any way?
A They have not.
Q You were also asked questions at various points during your deposition so far today about various versions of the Defensive and Arrest Tactics manual that the Law Enforcement Standards Board publishes for training purposes, correct?
A Correct.
Q And you cited to various versions of the student text in your report, yes?
A I did.
Q You also cited to the text from 2017 for the trainer's version of that manual; is that correct?
A The instructor manual, yes.
Q The instructor manual, thank you. And Counsel asked you about a 2017 version of the student text for that manual, correct?
A He did.
Q All of the versions of the DAAT manual that we discussed today -- both the student text and the instructor version -- have you reviewed those in



the course of your work as a law enforcement officer and a certified trainer for the State of Wisconsin?
A Yes. It was really critical that I attend all of the updates and stay up to date on all the different information as it changes. I can even reach further back. I've been an instructor trainer also referred to as a master instructor trainer in defensive tactics since about 2002, 2003, where I conduct training for trainers. So that makes me know the manual as well as I can. And then as I'm teaching these different courses, both to recruits and to instructors, I have to stay up to date with all the different updated manuals.
Q And so all of the manuals that we discussed today at your deposition, you are familiar with those. You have reviewed them. You know them as part of your work as a law enforcement officer and a trainer, correct?
A Yes.
Q And in your report you drew on certain principles and concepts that are expressed in the DAAT -- the various DAAT manuals, correct?
A I have.



Q And you utilized those concepts and principles in forming your opinions in this case, correct?
A I did.
Q And based on your knowledge of the various manuals that have been discussed today, the DAAT manuals, have the concepts and principles that you relied on in forming your opinions in this case have those materially changed between 2017 and today?
A They have not.
Q So the concepts and principles that you discuss in your report and that you relied on in forming your opinions, would those concepts and principles as it's expressed in the 2017 version of the DAAT manual student text be essentially the same as discussed in the 2021 or 2023 student version?
A Yes, very consistent.
MR. JONES: Okay. That was all I had. Thank you.

(Adjourning at 1:04 p.m.)

STATE OF WISCONSIN.)
                    ) ss.
COUNTY OF DANE      )

I, Anna Peich, a Notary Public in and for the State of Wisconsin, do hereby certify that the foregoing deposition of DENNIS J. ANGLE was taken before me on April 23, 2026, and reduced to writing by me, a professional court reporter and disinterested person, approved by all parties in interest and thereafter converted to typewriting using computer-aided transcription.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal of office at Madison, Wisconsin, this 4th day of May 2026.



_________________________________
Notary Public, State of Wisconsin
My Commission Expires 4/29/2029



Errata Sheet

NAME OF CASE: Thomas Maulson v. Will Taege
DATE OF DEPOSITION: 04/23/2026
NAME OF WITNESS: Dennis J. Angle
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________

_______________________

**$**

**$150**
13:15

**$400**
13:12

**0**

**000447**
101:13

**000684**
105:3

**000691**
25:11

**1**

**1**
6:2 57:12,13 79:4 102:19

**10**
41:5

**10:57**
46:9

**11**
17:2,11

**11:13**
46:10

**12**
17:1 102:15

**121**
73:11

**12:24**
98:18

**12:37**
98:19

**13**
40:25

**141**
74:6

**142**
75:4

**143**
40:11

**144**
40:17 75:15

**15**
74:7 101:12

**16**
41:8

**17**
17:18

**186**
40:8

**19**
7:9 37:9

**199**
25:9

**1992**
67:23

**1993**
68:1

**1995**
11:15

**2**

**2**
25:3,6 37:9 64:6 65:6,11 73:9 75:4 102:14,19 105:2

**20**
17:9 27:21 28:10,15 29:5,8 38:9 104:8

**2006**
9:24

**2008**
9:9

**2010**
8:21,24 9:1

**2017**
16:7,19 25:7 63:23 64:4,15,19 65:6,17 69:2,8,13,14,21 71:1 91:20 97:6,13, 20,25 100:7,12 102:14

**2021**
17:14

**2022**
5:5,12 11:17 12:10

**2023**
15:9,11,24 16:4,12,24 17:5,24 19:5, 21,22 20:3 64:23 66:14 68:10,19 69:21 100:5

**2024**
30:12

**2025**
40:3

**21**
15:16 16:15

**22**
17:22 40:12 74:21

**22nd**
40:3

**23**
16:16

**24**
18:25 67:11 75:16

**24/7**
4:3

**25**
14:25 75:21

**25-acre**
4:14

**27**
4:3 5:6

**28**
34:25

**3**

**3**
20:23 30:15 46:15 50:9 54:1 65:20 101:12 102:20

**30**
104:8

**31st**
30:12

**35**
14:25

**36**
99:20

**37**
99:9

**39**
84:15

**3rd**
7:9

**4**

**4** 30:9,10 50:10 54:1 56:19,21 105:21 106:10,18 107:16
**40** 98:4,5 99:1,4 100:4
**41** 79:4
**46** 3:8 5:20 79:4 99:20
**46-page** 70:15

**5**

**5** 40:21,25 50:22 57:13 84:8,14
**51** 6:8
**53** 85:3,24

**6**

**6** 39:24 40:1 50:22,23 51:3,5,18 52:1,2,3,6,14,15 53:2,5 57:14 74:5 75:15 106:4,8,12 107:22
**60** 86:10 88:6
**66** 87:22 88:7

**7**

**7** 15:19
**71** 85:16 89:14

**8**

**8** 89:10
**88** 10:16

**9**

**9** 89:10
**94** 68:1
**95** 11:16 68:1

**A**

**a.m.** 46:9,10
**Absolutely** 69:12
**absorbed** 67:24
**academy** 10:23 12:24 16:3 18:15,18 19:8,10,21,22,25 21:18,25 22:11 37:8 38:2 64:9 65:16 66:14 67:6,23 69:2,12 70:9 76:25 90:17
**accepted/detained** 102:21
**accomplish** 21:14
**account** 76:10 77:15 103:3 104:5
**accurate** 14:7 16:21 19:23 53:19 62:11 107:7
**achieve** 46:22 96:4
**acknowledges** 96:9
**act** 37:21 103:20
**action** 25:20 26:2,12,24
**actions** 57:8 79:15 98:10 116:15
**active** 12:6 54:12,19,22,23 55:13,20,24 56:7,9 111:24 112:2 113:1
**actively** 26:21 108:13
**activities** 4:16
**activity** 27:11 48:11
**Adam** 7:9
**adding** 66:9
**additional** 102:16
**Additionally** 67:10
**address** 27:7 44:4,7 66:21 101:18,25 107:24
**adequate** 115:17
**adjusted** 69:15
**admission** 77:16
**admitted** 39:18 83:6
**adopted** 68:3
**advantage** 61:25 81:15 112:25 114:3,25
**advantageous** 42:7
**affect** 23:13
**affirmation** 28:25
**agencies** 68:1 116:13
**agitated** 28:3,8
**agitation** 30:5
**agree** 17:25 18:8,10 19:19 29:2 32:24 34:5,18 36:12 38:1 39:2 47:12 49:16 50:1,4 52:24 56:6 57:23 58:5 59:1 60:12 61:22 62:6,17 65:15,18,19,22 68:25

69:4,25 70:10 72:18,21,22 76:3 83:11, 14,17 86:14 87:23 88:6,7,9 89:14,17, 24 96:25 101:13 103:10 104:6,19 105:21 106:9,20,21 108:7,19 109:13 110:7,15

**agreed**
73:18

**ahead**
18:5 27:4 29:19 32:1 43:8,23 58:11 61:14 80:21 81:5 97:14 114:16

**alleged**
26:20

**Allis**
10:14,15

**allowing**
37:22

**alternative**
111:2,24,25

**amount**
15:1

**analysis**
23:4 26:7 44:14 45:8 103:5,14

**analyze**
43:3,17,21 45:13 53:11 71:3 73:19 107:14,20

**analyzed**
44:11

**Andrew**
116:23

**angle**
3:1,6,20 6:12 10:13 16:19 18:1 19:16 20:21 21:7 24:9 25:4,13 27:18 30:9 31:22 32:24 34:5 35:16 36:12 39:25 45:7 46:11 47:5,18 51:12,17,23 52:23 54:22 56:1 57:23 58:5,17 59:14,21 60:13,21 61:14 62:17 63:22 64:17 65:4 66:11 68:8 73:9 79:5,12,21 80:15,19,25 81:6,13,17,20 82:1 88:10, 15,22 89:8 95:10 96:25 98:20 101:14 110:22 111:20 113:25 114:2,4,22 115:7 116:21

**Anna**
61:17 117:1

**answering**
33:14 34:4

**anymore**
61:18

**apologize**
41:14 45:24 91:12 111:9

**appeared**
28:2 103:10

**appears**
8:17

**application**
40:13 42:10 45:4 93:11 95:21

**applied**
47:19 48:17 93:23

**apply**
93:16,21

**applying**
86:2 94:22

**approach**
43:12 94:24 95:2 96:14

**approaches**
104:14

**April**
4:24

**area**
10:24 72:4 107:25 110:4 114:18

**areas**
93:2

**argumentative**
36:7 49:8 61:13

**arm**
57:17 70:19 72:1,10 114:12,18,19

**arrest**
26:22 49:5 108:13,15 109:6,18,23,25

**arresting**
42:8 48:24 49:12

**arrived**
24:3 110:5

**art**
54:24

**articulate**
75:9

**aspect**
43:4

**assaulted**
110:16,17

**assembling**
80:5

**assess**
31:17 34:14

**assessing**
36:1

**assessment**
35:25 61:10 115:2

**assist**
10:2 11:9 42:8

**assume**
111:4

**attach**
43:24

**attack**
61:25 62:8,14,20 63:8

**attempt**
33:6 82:19 83:1 84:6 114:1

**attempted**
53:12 56:23 60:7 110:18

**attempting**
26:22 27:24 36:20 46:11 55:14 56:13 57:3,16 108:14,15

**attend**
18:25 67:11

**attended**
6:22 16:2

**attending**
18:20 68:7

**attention**
71:18,21

**attorney**
8:11 9:12 10:2 41:1

**attorneys**
12:17

**August**
7:8

**author**
85:21

**authored**
3:7 30:11 85:18

**authoring**
66:17

**authorize**
87:1

**authorized**

47:19

**avoid** 47:25 73:6

**aware** 29:15,17 42:16

**axis** 114:20

**B**

**bachelor's** 10:20

**back** 15:12,13 16:13 21:6 40:25 42:21 54:8 55:24 61:18 62:25 70:18 74:19 78:15 82:7 87:16,19 99:12,25 105:18

**background** 12:12

**backup** 42:16,25 44:13

**backyard** 8:1

**balance** 57:11,18 58:1,9,18,24 59:13,15,18,24 60:8 88:12,19,25 89:10,12 103:23

**ballpark** 4:22

**based** 20:1 26:18 27:11 28:22,25 29:2 36:1 39:11 42:12,14 69:16 90:12,23 92:21, 24 93:17 94:5 95:7 96:11 109:8 114:23

**basic** 16:3 67:5

**basically** 100:22

**basis** 3:25 33:3

**Bates** 25:11 101:13 105:2

**Bear** 46:4

**began** 28:19

**begin** 81:7

**beginning** 28:17 58:2,4 64:22 65:2 104:2

**begun** 4:17

**behalf** 7:3 11:21

**behavior** 28:21 36:9 54:25 55:21 103:19

**belabor** 35:15,23

**belief** 110:9

**believed** 62:19 63:8

**benefit** 117:14,19

**bicep** 72:5 114:6,18

**big** 26:19

**billed** 15:1

**billing** 15:4

**bit** 6:16 101:1 102:13

**blanket** 72:8

**blanketing** 70:19

**Board** 15:24 17:5 100:14

**bodily** 55:2

**body** 57:16 60:5,6,7 87:13 89:4 114:1

**bottom** 17:2 40:11 57:13 75:16 99:8,19

**Braun** 9:9,20

**break** 3:11 46:7,11 72:20 98:16,20 101:9

**breath** 28:3

**Brewers** 3:22 4:25 12:22 13:4

**briefly** 3:24 6:18 7:12,20 8:7 9:18 10:11

**bring** 44:22 74:24 84:6 98:13

**bringing** 45:22 112:12

**broad** 63:15

**brought** 73:9 74:19 80:23,25 81:2

**Bucher** 10:2

**building** 4:4

**busiest** 4:24

**business** 13:6,7

**C**

**call** 23:23 27:11,13 76:6 110:2

**called** 3:1 24:10,16,17 91:17 93:24 112:2

**calls** 4:18 12:12,17 14:23 35:12,13

**camera** 117:25

**capsicum** 67:25

**captain** 9:1

**capture** 81:21 89:25

**car** 47:10

**care** 98:7 101:10

**career** 20:4 31:15 32:11 68:9 69:10,16

**careers** 34:23

**careful**
74:15

**case**
6:23,25 7:16,18,21 8:11 9:10,13,25 10:3,6 12:19 13:2 15:2 19:4,20 23:23 67:22 76:17 78:10 94:6 108:1,3 115:1

**cases**
12:13,21,25 33:7 108:24

**categories**
31:22,23 32:12 95:20

**categorize**
32:21 34:1

**categorized**
92:25

**categorizing**
31:16

**category**
94:14

**caused**
58:7 59:23 83:7 116:15

**causing**
57:4,25

**center**
82:7

**Central**
10:14

**certification**
19:2 67:13

**certified**
5:10

**challenge**
18:12 43:9 113:17

**challenging**
27:5 33:4

**change**
47:6 116:9

**changed**
68:2 71:1 110:6

**changing**
93:14 94:2 96:5

**characterization**
36:5 80:17 92:22

**characterize**
42:20 58:12

**characterized**
54:11 83:15 88:20

**charge**
4:9

**charges**
10:5

**charging**
13:12

**chased**
7:23

**checking**
4:11

**checklist**
90:20,21 93:9

**chest**
59:12 82:11,13 84:23

**Chicago**
8:9,12

**chief**
9:4

**chin**
91:1,11,19

**choose**
35:3

**choosing**
61:6

**chose**
39:21 66:18 80:15,16

**chosen**
41:7 112:19

**circumstance**
95:25

**circumstances**
26:19,20 28:22 36:19 42:15 45:11 93:14 94:5,7 96:7,12,16 103:15

**citation**
17:14 65:14 66:4

**citations**
65:13

**cite**
17:21 23:16,20,22 48:11,14,15 49:15 64:14 65:5,11,23 66:18 69:23 73:22 97:16,24 98:1,3 100:4 103:6

**cited**
26:8 31:14 49:20 50:6 64:12 70:16 71:14 73:5 100:7

**citing**
32:14

**citizen**
32:25 33:19

**citizens**
36:13

**city**
5:6 6:19 7:3,9,16 8:9,12,22,24 9:9,13, 15

**civilian**
47:9

**Claire**
6:19 7:3

**clasping**
82:5

**classroom**
72:16 86:2,13,21 90:3,4,6,9,13,23 93:7,17,23 95:20 96:2 100:20

**clear**
28:13,16 91:6 100:2 104:11

**close**
68:5

**closest**
67:3

**colleagues**
12:14

**College**
10:25 12:24

**comfortable**
80:8

**command**
9:4 29:4

**committed**
40:8

**commodity**
113:4,5

**common**
32:7

**communicate**
27:19 28:9 37:23

**communicated**
28:6

**companies**

32:20

**competency**
90:20,21 93:9

**complete**
67:5 90:19

**complex**
36:16 66:1

**compliance**
49:19 70:20 106:6

**compliant**
31:18 34:23

**complied**
101:19,25

**comply**
22:4

**complying**
34:4,10 35:20

**component**
44:18 100:19,20

**concepts**
66:10 81:9,22 93:22 94:8,23 95:8

**concluded**
73:16

**conclusion**
22:20 23:15 59:4,14 108:16 111:12

**concrete**
72:23 73:14

**concur**
34:16 106:23

**conduct**
22:20,25 39:14 73:16,19 76:9,15 77:14 92:17 107:21 108:17 109:13

**conducting**
26:7 27:9 47:17

**confuse**
64:17

**confusion**
61:19 100:2

**congruent**
106:14

**connected**
45:5,6

**connection**
111:11

**Connor**
108:1

**conscious**
13:1

**consideration**
27:7 43:12

**considerations**
71:13 94:24 95:3 96:15 101:23

**considered**
94:4

**consistent**
22:21 43:5,19 44:9,20 66:12 73:17,20 76:9,15 77:8,15,25 92:18 94:15 95:14 96:22 106:2 107:15,21 108:17 109:14 116:1,7

**constantly**
4:14

**constitution**
109:15

**constitutional**
108:19

**constitutionality**
100:24 109:2

**constitutionally**
115:9

**constraint**
41:2

**consult**
51:16

**consultation**
12:9 13:7

**consultations**
6:17

**consulting**
13:3

**contact**
7:25 8:15 24:6 27:22,24 28:5,20 29:1,3,14,22 34:22 39:9,12 42:18 44:5,21 50:3 54:15,16 70:5 71:23 73:8 83:21 104:9,14 113:20

**context**
33:5 60:20 61:6 71:6,8 90:13

**contingency**
94:1,21 95:8,25

**continuation**
87:23

**continuously**
11:16

**continuum**
51:18 53:7

**contract**
4:21

**control**
8:16 10:9 11:1 46:23 55:1,10 56:24 72:10 84:5,7 94:12 96:20 105:23,25 106:10,12 107:10,12 113:7 114:8

**cooperation**
31:17 34:15

**cooperative**
28:1

**copies**
78:12

**copy**
5:16 6:14

**correct**
5:6 7:1,4 10:1 11:22,23 13:5,17 14:11 15:10 16:8 17:6 20:11,15,19 22:1,6,13,19,23 23:25 25:8 27:17 30:19,20 31:8 33:22 34:8,21 38:5 41:8 42:6 47:5,6,8 50:11,14,17 51:24,25 55:4 56:5 64:10,21,24 70:13 74:24 75:2 82:21,25 83:3 85:11 87:5 100:6 103:2 104:25 105:8 112:4 115:24 116:16 117:10,11

**correctly**
11:4 21:8 53:18 82:9 111:1

**counteracting**
55:10

**counteracts**
55:1

**countermeasure**
84:4 110:25 111:23,24 113:2

**countermeasures**
112:3

**county**
5:7 11:1,2 12:23 20:9,12,13,17 21:2,11 22:14 23:1 45:18 46:12 49:16,23 52:25 65:20 76:4 86:15,19,22 97:2 98:5,6 101:7 102:1 106:3,16 107:22 115:16

**couple**
42:5 80:23 87:16 117:5

**coupled**
54:19

**court**
3:15 9:14 27:1 108:1 109:1

**courts**
25:18,25 26:10

**covering**
100:24

**create**
56:13 57:4 61:18 72:23,25 113:3 114:1 115:4

**created**
30:11 81:11,23,24 117:24

**creates**
55:2

**crime**
26:21 27:13 37:2 108:11

**criminal**
9:25 10:20 25:20 26:2,12,24 27:11 47:16 48:11

**critical**
77:11

**cross-reference**
48:8

**cupped**
91:1,11,17,19

**curriculum**
68:2

**custody**
7:24 103:25

**cut**
58:2

**CV**
5:22,24 6:9,10

**D**

**D-A-A-T**
15:8

**DAAT**
15:8 16:20 20:3 21:18,24 22:7 25:1,7 26:6,8 32:4 36:13 37:8,10 38:2 39:2 42:1 43:5,25 44:15,24 55:13 63:23 64:4,19 65:6 73:10 76:1,4 81:9,22 91:15,20 94:8,20 95:7,22,23 97:6,10 100:7,9,14 102:6,14 103:7 105:1 106:18

**DAAT's**
43:19

**DAAT-CONSISTENT**
92:23

**danger**
36:14,22 37:19 38:4 81:23 94:10 104:3,6,16

**dangerous**
81:10

**dangerousness**
63:18

**date**
67:2,4 68:5 100:12

**David**
13:24

**day**
90:19

**day-to-day**
3:25 77:11

**deadly**
8:5

**deal**
96:6

**dealing**
28:21 34:15 55:21 93:13 96:7

**December**
40:3

**decentralization**
41:17 83:24 113:14

**decentralize**
82:20 83:1,23 84:4

**decide**
109:1

**decided**
68:11 112:19

**decision**
17:12 42:21,23,25 43:2,12,18 44:12 104:17 116:12

**decision-making**
44:4,18 77:12 95:1

**decisions**
43:4 93:3 96:13

**dedicate**
13:2

**defendant**
9:15

**defense**
109:5,17

**defensive**
19:2 44:18 66:6,22,25 67:17 77:4 80:13 90:16,18 92:25 93:25 94:23 96:8,14

**defined**
54:22

**definition**
84:1,3

**degree**
10:20 106:7 107:5

**delay**
45:25

**delivers**
114:13

**demonstrate**
44:19

**demonstrated**
93:8

**demonstration**
92:8

**DENNIS**
3:1

**department**
4:20 5:5 9:5 15:23 17:4 20:16 21:2 22:3,9 67:16 86:16

**departmental**
21:18 22:4

**depend**
36:19

**dependent**
4:1

**depends**
36:18

**depicted**
92:9

**deployed**
8:16

**deployment**
95:1

**deposed**
6:23

**deposition**
6:2 13:24 14:3,9 39:16,23 40:2 55:9 64:22 68:24 74:4,6 77:23 78:23 92:1, 11 110:8 117:7,13,15,20

**deputy**
9:4 12:16 16:2,6 19:4,20 20:3,8,12 22:25 23:5,23 24:3,6 27:19 29:3,10, 16,24 30:10,19,24 31:6,10 34:3,7 35:18 38:7,10,13,21,23 39:4,6,16,18 40:2,16,21 41:1,8 42:16,20 43:17 44:11 49:5 53:15,20 54:2 55:5,17 56:1,7,11 57:7,25 58:6 59:2,19,25 60:4,14,22,23 61:10,22,24 62:5,13,19 63:7,11 64:19 65:16 66:13,19 68:9,15, 21 69:1 70:9 71:4,17,23 72:12 73:11, 16,19,24 74:6,20 75:2,12,17,24 76:9, 11,17,22 78:14 79:5,11,20,23 80:2 82:18,23 83:6 84:18,20 85:25 86:12 87:3,6,9,13,24 88:8 89:2,18,21 90:1 91:1,10,23 92:2,7,17 94:16 95:12 100:15 101:19 104:5,17,21 105:1,7 106:15 107:8,14 110:5,8,14,16,17,23 111:5 112:6,10 114:6,12 115:2,4,12, 20 116:1

**deputy's**
80:16

**describe**
3:24 6:18 7:20 9:18 31:6 75:5 79:4 80:14 104:6 114:17

**describes**
49:17

**describing**
79:14

**description**
53:20 56:7,9 58:6,8 59:2 60:22,24,25 61:1,5 77:24 79:24 80:2,11,16 81:8,19

**descriptions**
57:24

**designed**
73:2

**Desirability**
37:11

**detain**
30:25

**detained**
9:20 37:3 49:14

**detainee**
47:9

**detaining**
47:16 48:25 49:12

**determination**
39:11 44:22

**develop**
22:15

**developing**
11:9 26:13

**develops**
22:10

**device**
8:16 10:9

**devices**
45:3

**difference**
58:23 90:8

**difficult**
51:12

**difficulty**
32:2 35:7

**directed**
41:17,19,20,22 99:1

**directing**
83:24

**director**
3:23

**disadvantage**
112:24

**disagree**
32:13 47:13,14 61:9,21 79:23

**discovery**
25:10

**discretionary**
37:20 39:11

**discuss**
3:6

**discussed**
64:7 92:14

**discussing**
100:8

**displaying**
93:18

**disposition**
38:16

**dispute**
54:4

**distance**
56:14 57:4 113:3,4 114:23 115:6

**distracted**
72:3

**district**
10:1

**disturbance**
23:24 24:10 29:17 110:2,4

**diverted**
71:18,21

**document**
16:16 21:3 30:13

**documents**
20:6 65:1,24

**double-check**
29:12,21

**drafted**
6:22 7:16 63:25 65:8 66:3

**drafting**
14:24 65:10 108:24

**drawing**
90:8

**drew**
80:9

**driving**
27:12

**drove**
113:16

**drug**
5:7 11:2,3

**Duggan**
117:7,24

**Duggan's**
13:20 14:1 79:1 84:9 117:7,13

**duly**
3:2

**duplex**
8:15

**dynamic**
40:13 42:12 81:25 93:11 95:20 96:7

**dynamically** 93:14,20
**dynamics** 48:6 67:20

E

**earlier** 16:7 32:4 52:21 64:7 71:15 97:9 101:3 113:14
**early** 31:15 96:17 117:6
**easier** 6:13,15 21:10
**easy** 53:22 54:6 56:3
**Eau** 6:19 7:3
**education** 10:17
**effect** 21:13 92:15 105:9
**effort** 55:10
**efforts** 55:1
**electronic** 8:16 10:9
**element** 77:25 94:11
**employ** 94:13 112:19
**employed** 3:21 8:21 20:9 22:3 72:12 82:18 112:6
**employing** 71:23 84:20 85:1 86:1
**employment** 11:8
**en** 42:17
**encompassing** 81:11
**end** 9:14 17:13 25:9 43:24 54:3 62:21 67:1 90:17
**ended** 9:13,21 39:8
**ends** 4:9
**endurance** 3:11
**enforcement** 5:9 7:6 11:10,22 12:6,14 15:24 17:4 22:9,21 31:23 32:11 33:1,19 54:24 67:14 69:11,16 73:17 84:1,3,25 85:25 86:7,11 89:25 92:18 94:3 108:4,18 116:2
**enforcing** 35:13
**engagement** 7:13 8:8
**engagements** 11:20 12:10
**entire** 32:10 40:7 60:20
**environment** 42:13 93:15 94:2 96:6
**equipment** 4:11 66:9 67:20
**Ernest** 8:11
**escalation** 49:22
**escalation'** 50:13,19
**escort** 47:19 63:23 64:2 69:18 70:1,19 71:10,25 72:6 73:1,20 75:12,18 76:23 107:9,15
**escorting** 47:9 71:19 73:8
**essentially** 5:21
**estimate** 14:20,22
**evade** 26:22 108:15
**evaluate** 43:17 76:16
**evaluated** 18:2,8
**evaluating** 76:8,14
**evaluation** 95:2
**event** 4:22 80:12
**events** 4:8
**Eventually** 54:7
**exact** 46:5 81:11 112:16
**EXAMINATION** 3:4 117:3
**examples** 55:12
**excerpt** 27:5 39:10 100:11
**excuse** 90:17 98:3
**Exhibit** 6:2 20:23 25:2,6 30:9,10 37:9 39:24 40:1 46:15 50:9 54:1 56:19,21 57:12,13 64:6 65:6,11,20 73:9 74:5 75:15 79:3 84:8,14 101:12 102:14 105:2
**exit** 29:4
**expand** 76:13
**expect** 40:7
**experience** 90:12
**expert** 6:17,21 10:3,7 12:18 76:8,14 80:5 107:25
**explain** 35:15 66:17 77:20 81:10 94:8 95:13
**explained** 12:21 81:16 96:24
**explaining** 80:9
**express** 22:24 61:7

**expressed**
110:9

**extent**
103:18 110:1

**extract**
78:24

**F**

**face**
72:22 83:10,17

**faced**
94:10

**fact**
11:24 16:6 20:1 32:10 33:18 36:1 38:6 45:18 55:12 62:5 63:11 68:21 76:22

**factor**
33:15

**factors**
26:14 27:18 33:9 42:5 96:16 108:8

**fair**
4:24 51:17

**fall**
47:11 57:4,25 58:7,20 59:23 72:20 73:14 74:2,11 83:7,16 94:13 95:19 113:11

**falling**
58:19,24 72:22 89:15 113:10

**falls**
83:10 96:23

**familiar**
24:15 64:1 65:8 70:22 82:2 91:12 103:7 107:25

**familiarize**
63:22

**familiarized**
69:17

**fashion**
90:24

**fast**
40:16

**favor**
9:15

**federal**
11:9

**feel**
80:8

**feet**
87:10,16

**fell**
8:19 57:11,18 58:9 59:3,5,15 60:9 88:12,19,25 89:11

**felt**
94:9,10

**fight**
24:5 28:23 38:16

**Fighting**
102:15

**figure**
24:13

**filed**
10:5

**finalized**
13:20 85:7,10,12,14

**find**
25:19 26:1,11 27:2 46:5,19 67:3 75:14 97:20 109:8 110:21 111:3,19 116:6

**findings**
115:19

**fine**
5:15 6:15

**finish**
81:4

**finished**
60:10

**firearms**
67:10

**firm**
11:25

**fix**
80:19 81:13 96:19

**fixing**
79:5,12,21 81:6,17,20,25 113:25 114:4,22

**flee**
108:14 110:10,18

**flight**
26:22 108:15

**focus**
36:25 48:5 65:13 82:19,24 113:2 116:4,14

**focused**
116:11

**focusing**
47:25 52:1,2

**follow**
20:13 21:24 101:22

**follow-through**
71:12

**foot**
7:22

**footing**
93:19

**force**
5:7 7:18,20 8:4,5 9:16,19 10:10 11:2 20:18 21:1,12,14 23:2,12,16 25:19,24 26:1,11,16,17 27:2,16 37:25 44:24 45:4,9,20,24 46:13,22 47:25 51:18 53:1,7 65:21 66:3,18 67:25 68:3 76:5 78:16 80:5 86:23 87:20 92:24 93:3 94:3 96:3 97:2 98:6,11 100:20,23 101:8,9,12,16 102:1 103:1,18 105:4,6, 24 106:3,11,22 107:9,15 108:20 109:7,11 112:1,6,9,18 116:1,12

**forced**
94:13 96:13,19

**foremost**
66:2

**forgotten**
78:7

**form**
18:4 19:12,14 27:3 28:12 31:25 35:9 43:7,22 48:22 50:5 53:3 58:10 59:6 61:12 62:16 63:14,15 71:25 80:20 104:10 108:22 114:15

**formal**
10:17

**formally**
109:23

**forming**
65:25

**forms**
71:22

**formulate**
80:13 109:7 116:5

**formulated**

23:10

**formulating**
26:15 69:9 97:17

**found**
108:25

**foundation**
102:6

**frame**
88:6,7 90:25 91:10

**frames**
78:24 79:1

**framework**
21:19 39:2

**free**
12:20 22:15

**front**
5:16 6:10,14 8:20 15:19 21:3 56:16 62:21 79:8

**full**
4:2 37:13 54:3

**funding**
11:9

G

**Gahnz**
40:12 41:1

**gain**
114:24

**gained**
105:23 106:10

**game**
4:2,16

**game-day**
4:8,16

**gate**
4:10

**gather**
27:25

**general**
10:10 102:24

**generate**
87:19

**George**
9:12

**give**
46:3 50:22 51:21 75:14 112:17 114:2

**goal**
84:3

**gold**
109:11

**good**
3:13 46:6 82:10

**graduate**
10:15

**graduated**
10:20,22

**Graham**
108:1

**grasp**
55:14

**great**
3:20 6:14

**grip**
57:17 60:8

**ground**
7:25 9:22 41:11,14,17,19,21,23 42:9 44:2 57:5,11,18 59:5,16 60:9 74:24 83:7,12,17,18,20,23,25 84:6 88:13,19 89:1,5,11 92:10 113:11,17,19

**ground-stabilization**
41:24

**Group**
6:20 7:15 12:1

**groups**
11:10

**guess**
5:25 18:12 24:13 35:19 41:14 49:10 54:2 66:1,16 76:1 102:15

**guiding**
72:2

H

**half**
115:1

**hand**
26:21 27:14 56:12 57:2 59:12 72:1,4, 9,14 84:22 87:3,24 88:1,2,4 89:3 112:12 113:25 114:5,12,13

**handcuff**
30:21 33:3 41:25 44:12,23 51:5 115:13

**handcuffed**
29:24 39:20 41:6 43:1 53:13 72:23 74:1,11,15,23 83:9,16 91:25 92:4,9 106:24 107:4,9 109:22

**handcuffing**
9:21 30:6 33:8 40:18 41:11,14 43:6, 11,20 44:2,7,24 45:1,8,14 49:17 50:2 51:19 52:5,7,11,12,14,18 53:1,5,7,18, 21

**handcuffs**
33:17 38:10 42:10 45:2 54:7,8 72:19 86:8 106:21 113:19

**hands**
53:17 54:6 70:3 72:20 82:6 89:18,20, 21 110:19

**hard**
21:6 54:3 75:8

**harm**
38:25 55:2 116:15

**head**
3:16 16:10 24:18 74:16 89:15 91:4,18 113:16

**head-first**
73:14

**head/neck**
77:17

**headbutt**
62:18,20 63:8

**hear**
45:21 58:3 116:20,22,23,25 117:1

**heard**
31:13 77:25

**held**
11:5

**hey**
27:1

**hiding**
46:18

**high**
10:12,18

**high-risk**
41:18

**higher**
17:11 107:5 112:18 113:9,22

**highlight**
63:18

**highlighted**
25:15

**hired**
11:2

**hiring**
4:6,10

**hit**
8:17,20

**hitting**
113:3

**hold**
64:2 70:20 71:10,25 88:24 89:2,8

**holds**
72:6

**Holte**
6:19 8:3,4,5

**hooked**
113:15

**hour**
13:12,15

**hours**
14:25 18:25 67:11

**hundred**
16:11 29:6 54:13 63:17 74:3

**I**

**i.e.**
41:17

**ideally**
115:1

**ideas**
93:22

**identical**
96:2 105:13

**identified**
37:4 70:17

**identifies**
45:19 102:6

**identify**
47:18

**image**
84:15 85:3,4,24 86:1,10 89:24 90:25

**images**
84:9 85:6 88:17,24 89:8

**imagine**
77:8

**immediately**
18:14 27:13 37:21

**imminent**
26:23 36:14,22 37:19 38:4 62:20 63:9 104:6

**impact**
113:20

**important**
73:4

**improperly**
102:21

**in-push**
82:2,14 86:6 113:13

**in-service**
19:3 68:6 77:13

**incident**
8:5 20:8 28:19 54:21 66:23 67:2 71:5 78:16 87:24 106:25

**include**
20:16 23:3,4 24:13 45:8 48:16 53:14 103:13

**included**
5:21 39:16 44:14 67:16

**incorporated**
23:20

**incorrectly**
25:18 62:24

**increased**
30:5

**increasing**
66:10

**independent**
106:17

**independently**
42:11

**indicating**
30:21

**indication**
20:2

**individual**
41:25 48:6

**individuals**
4:13 30:3 41:22

**infer**
109:9

**inferred**
28:24

**influence**
95:3

**information**
27:25 29:13,15,22 68:8,12,15,17 92:3,5 101:6 109:9

**initial**
24:12 27:23 28:4 29:13 54:15 55:21 104:8,14 115:8

**initially**
34:3

**injured**
102:7,19,20 103:4

**injuries**
8:2,19 24:22,23 115:23

**injury**
70:6 72:24,25 73:3 103:11,14 110:25 111:14,22 112:14 113:9,23

**inmate**
47:6,7

**innocent**
38:3 104:7

**innocents**
37:19

**inquest**
9:24 10:1

**inside**
4:13,17 30:3 39:13

**instructor**
5:10 16:20 65:3 73:5 100:9,16,18

**instructors**
31:15 32:17

**intend**
85:21

**intense**
93:13

**intent**
55:1

**intentional**
82:19,24 83:1

**intentionally**
83:22 113:18

**interaction**
28:14 104:11

**intermittent**
66:7

**internal**
68:17 115:20

**interrupt**
81:5

**intervene**
37:21

**introduced**
51:20 71:16

**investigating**
28:23 37:1,2

**investigation**
27:9 39:14 47:17 115:20

**investigative**
50:3

**involve**
7:18 8:4 9:16 35:12 80:10 82:18

**involved**
8:13 10:6 24:2 38:20 48:7 101:22 103:1

**involves**
82:5

**involving**
12:15

**issue**
7:21 9:19 43:25

**iteration**
69:15

**J**

**jail**
47:7

**Jarvis**
8:8

**job**
8:23 10:22 11:5 12:22

**JONES**
13:23 18:4 19:7,11 27:3 28:12 29:18 31:25 36:7 43:7,22 48:22 50:5 51:6, 11,21 53:3 56:15 58:10 59:6 61:12 62:16 63:14 80:20 81:3 95:15 97:11, 14 102:10 104:10 108:22 111:16 114:15 116:19 117:1,4

**judged**
90:22

**judges**
48:4

**jump**
6:8

**jumped**
8:18

**June**
25:7

**jury**
10:4

**justice**
10:21 15:23 17:4 22:9 86:17

**justified**
93:24 94:4,14 95:22 96:11 97:1,21 98:21 112:15 113:1 115:9

**K**

**Kenosha**
11:1

**key**
105:3 106:9 107:16

**killed**
8:6 36:23

**kind**
14:16 73:2 94:11

**knowledge**
24:9 44:1 105:9 109:6

**Kuborn**
7:9

**L**

**label**
33:23 35:4

**labeled**
91:21 97:22

**lack**
26:15 38:19

**laid**
108:8

**landscaping**
8:1

**language**
64:1

**large**
100:19

**law**
5:8 6:20 7:5,14 11:22,25 12:6,14 15:24 17:4 18:24 22:9,21 31:23 32:10 33:1,18 35:13 54:24 67:7,13 69:11,16 73:17 83:25 84:2,25 85:25 86:7,11 89:25 92:18 94:2 100:25 108:4,17 116:2

**lawful**
21:13,15 23:13

**lawyers**
48:4

**layers**
21:19

**lead**
23:15

**learn**
90:15

**learning**
77:9

**leave**
51:7,15

**leaves**
18:17

**led**
103:8

**left**
9:3 56:12,13 57:2,3 79:18,24 80:3 87:4 88:1 110:4 114:19

**leg**
87:10,16,19

**legal**
27:17 33:2,20 34:6,9 48:3,11

**legitimately**
45:20 46:22

**length**

30:12

**lengthy**
69:16

**lessened**
106:6

**lesser**
37:20

**level**
17:20,24 30:4 31:17 34:14 54:18 93:17 105:24 107:9

**liaison**
4:19

**Liam**
13:20

**limited**
115:25

**limited-term**
11:7

**lines**
12:16 13:18 34:24 36:24 37:5 48:3,7 62:25 66:9 67:20 78:23

**listed**
16:15 31:13 32:8 65:14 91:16

**lists**
17:14 46:24 90:21

**literally**
59:14

**Litigation**
6:20 7:15 11:25

**location**
47:6

**locations**
110:6

**logic**
67:4,21 68:4

**long**
14:12,20 29:7 39:21 116:19

**looked**
15:8 16:18,19 114:5

**losing**
58:24 59:18,24

**loss**
114:23,24

**lost**
57:11,17 58:1,9,18 59:13,15 60:8 88:12,19,25 89:10,12 113:4,5

**lot**
12:20,21,25 47:10 48:3 66:6 76:25 77:4,8 80:4 93:1 95:3,7,10 112:14

**love**
5:2

**lower**
110:24 111:13,14,22 112:13

**lowering**
82:7 91:2,11,19

**M**

**made**
7:25 24:6 28:5 39:9,11 42:18,21,23,24 44:5 80:18

**maintain**
19:1 46:23 67:12 70:4 77:10 105:25 106:11 107:10 114:8

**make**
5:2 18:24 28:15 34:18 37:2,4 43:2 64:4 66:7 75:13 84:13 93:2 96:13 104:15 107:19

**makes**
43:13 83:20

**making**
4:11 17:13 26:17 28:19 37:1 44:5,20, 21 53:21 54:6 56:2 110:12 113:20 116:12

**man**
9:8

**manage**
4:3

**managed**
54:17

**mandate**
23:2

**maneuver**
80:18

**manner**
28:7

**manual**
16:20 25:1,7 26:6,8 32:11 36:13 37:10 42:2 44:15 55:13 63:24,25 64:5,19,23 65:3,6,17 66:23 67:3,19 68:10,19,22 69:3,5,8,13,15,18 70:10 73:5,10,21,22 75:22,24 76:2,4,6 91:15,20 92:25 93:1 95:22,24 97:6,8,10,16,18,20 100:7,9, 15 102:6,14 105:1

**manual's**
78:1

**manuals**
31:14 32:4,9,13,15 66:6,12

**March**
30:12

**marked**
30:8

**material**
16:15 66:5,6

**materials**
14:13,21 20:1 23:8,10,14 32:16,19 39:15

**matter**
3:7 6:19 10:8 12:8 13:11 26:7

**Maulson**
24:6 25:11 27:21,25 28:1,7,10,20 29:1,4,11,16,25 30:2,7,22,25 31:7 34:1,6,19 35:17 36:1,2,10 38:10,21,25 39:9,12,13,19 40:18 42:18,22 43:1 44:5,6,12,21,22 45:9,14 47:10 49:6 53:13,17,21 54:5,8,17 55:6,9,17,22 56:12 57:2,10,17 58:7,9,22 59:3,4,15, 23 60:8,14,20 61:11,23,24 63:12 71:18,19 82:20 83:6 84:17 87:25 88:1, 8,12,18,25 89:3,5,10,15,22 103:10 104:23 106:20,24 107:8 109:22 110:10,15 112:13,22 113:3,17 114:9 115:13 116:15

**Maulson's**
30:4 57:16 60:6 71:25 72:5 79:15,18, 24 80:3 84:22 87:4,10 103:14 114:6, 12 115:23 117:20

**meaning**
112:24

**meaningfully**
57:24 58:8,13,15,17 59:10

**means**
40:16 73:7

**meant**
3:10 31:10

**meantime**
117:15,21

**mechanism**

59:21,22

**medical**
98:7 101:10

**meetings**
6:22 13:17 14:23

**member**
4:5

**memory**
40:8 115:3

**mention**
18:13 32:16 52:20,21 62:14,18 71:10 104:15

**mentioned**
16:12 29:20 35:22 53:23 55:23 81:20 93:6 94:19 95:18 100:11 113:14,24 114:21

**merged**
112:3

**methods**
71:1,4

**metro**
11:9

**Microsoft**
16:14

**middle**
30:16

**midway**
15:22

**Milwaukee**
3:22 4:20 10:19,24 12:22 13:4

**Mincey**
8:11

**mind**
36:18 103:21

**minimal**
23:1

**minimum**
21:12 23:12 45:9

**minority**
34:25

**minute**
21:5 41:6

**minutes**
41:7

**mischaracterizing**
59:7 97:12

**misrepresent**
62:23

**missed**
14:2 22:25 29:9 53:10 79:10

**missing**
16:25 62:21

**misspoke**
64:3

**mode**
112:1

**model**
72:16 86:2,13,21 90:3,4,6,9,13,23 93:7,23 95:20

**moment**
15:2 71:4,21 81:11 86:12 104:18 110:14 112:16,21

**momentum**
87:14

**motion**
78:18 87:14 114:20

**mouse**
45:25

**move**
41:24 72:15 115:3

**moving**
45:25 52:20 78:14

**multiple**
42:3,7 90:16

**Municipal**
6:20 7:14 11:25

**municipality**
11:22

**N**

**N-O**
31:9

**necessarily**
31:14 84:2

**neck**
82:6

**needed**
46:22 105:24 106:11

**needless**
103:15

**needlessly**
102:8,20 103:4

**nod**
3:16

**non-compliance**
35:10 36:6

**non-sworn**
10:25

**noncompliant**
28:21 31:20 32:22,23 33:24,25 34:2 35:4,8 36:2

**nonetheless**
33:23

**nonviolent**
50:3

**noted**
55:19

**notes**
27:20 101:4

**notice**
17:13 99:18

**notified**
109:24

**noting**
36:2

**November**
5:2

**number**
25:11 84:15 85:3,24 86:10 87:22 88:6,7 89:14 101:13 105:3,21 106:4

**numbers**
99:19

**O**

**oath**
3:3 44:10 51:23 88:11,18

**Object**
48:22 80:20

**objection**
18:4 19:11,14 27:3 28:12 31:25 43:7,22 50:5 53:3 58:10 59:6 61:12 62:16 63:14,15 104:10 108:22 114:15

**OBJECTIVE**
46:20

**objectively**
26:18 108:20 109:4 116:11

**objectives**
21:15

**obligation**
21:19,23 33:20 34:6,10,20 35:16,18, 20 106:5,17

**obligations**
20:12 98:7

**observation**
36:3,4

**observations**
34:14

**observing**
36:5,9

**OC**
25:11

**occupants**
39:13

**occur**
63:19,20

**occurred**
12:5

**occurrence**
68:6

**October**
4:25

**offense**
45:15

**offering**
112:5 115:7,11,15,18,19,21,22,24

**offhand**
75:21

**office**
20:10 21:11 23:1 46:13 49:17,23 52:25 65:21 76:5 86:16,22 97:2 101:8 102:1 106:3,16 115:16

**officer**
5:9,11 7:6 12:6,15 20:13,17 21:20,24 22:2,20 27:12 32:5 33:19 34:12,21 35:4 38:11 41:11 42:2 43:13 45:18 46:13,14 48:6 49:4 51:5 52:5,6 55:2 60:17 67:11,22 69:11 76:17 83:9,11 92:9 93:19 94:6 95:6 96:15,19 97:22 98:11 101:11,15 106:5 108:4 109:16

**officer's**
21:17 33:1 55:1 66:18 93:4 116:14

**officers**
7:23 8:15 10:5 18:25 26:25 27:9 35:2 36:13,14,20 37:18,19,22 38:2,4 41:23 42:3,7,11,13,17 44:16 46:21 52:16 53:1 67:5 68:4,7 72:12 76:24 86:7 93:2,12 95:4,25 96:3,9,12 102:19,25 103:17,20,22 104:2 116:12

**officers's**
55:14

**official**
31:23

**oftentimes**
18:20 26:14 27:8 33:7 66:25 73:6 77:21 93:12,21 96:12 108:25 109:8

**oleoresin**
67:24

**Oneida**
20:9,12,13,17 21:2,11 23:1 45:18 46:12 49:16,23 52:25 65:20 76:4 86:15,19,22 97:2 98:5 101:7,25 106:3, 16 107:22 115:16

**Oneida's**
101:17

**ongoing**
4:5 24:5

**operating**
27:10 48:1,8 109:17,19

**operations**
77:12

**opinion**
22:24 26:13 34:11,25 39:6 57:21 58:1 61:8,9 77:14 80:9 83:4,5 88:18,24 89:2,9 92:16,21 102:3 108:6,9 111:4 112:5 115:8,11,15,18,19,21,23,24

**opinions**
65:25 77:21

**opportunities**
94:11

**opportunity**
51:22 116:8 117:20

**opposed**
48:4 113:23,24

**option**
39:4 93:10 112:7

**options**
37:24 39:5 104:21 112:9

**order**
39:14 61:7 67:12 81:21 113:3 114:24

**organic**
95:7

**organically**
96:18

**organization**
18:16,21 67:15 77:3

**organizational**
42:12 97:23 101:1

**organizations**
18:24 19:2 67:15

**original**
63:1

**Oshkosh**
7:10,16

**outlined**
47:12 51:18 53:1

**overarching**
21:8 102:25

**overcome**
54:18 55:20,22 60:6

**overly**
63:15

**oversimplify**
81:12,14

**overview**
100:22

**Ozaukee**
5:7 11:2,5,11

**P**

**p.m.**
98:18,19

**pages**
3:8 5:20,22 25:9 30:12 40:9 57:15 84:14 89:10

**paragraph**
25:14 30:16 37:13,16 46:21

**parallel**
107:19

**parameter**
94:18 96:24

**paraphrase**
40:15

**paraphrasing**
107:3

**parked**
31:3

**parking**
4:12 47:10

**part**
17:3 19:3 23:7,14 24:14,24 25:1,13, 14,23 27:5 28:17 30:18 33:4 39:15,22 40:23 43:21 48:9 55:13 56:24 58:2 60:3 65:2,14 66:1 67:17,25 70:16 71:13,15 73:4 74:1,10 78:16 81:7 92:21 95:23 103:6 104:11,13 107:2 111:7,17

**participated**
11:21

**parties**
24:1,2 110:3

**parts**
77:10 101:4

**party**
24:9

**passive**
84:3

**Paul**
10:2

**pavement**
83:10 89:16

**Payne**
8:8,13,18

**PDF**
6:9

**pending**
61:20

**people**
31:16 34:22 35:1,10 37:3 38:3 45:3 86:8 109:9

**percent**
16:11 29:6 54:13 63:17 74:3

**perception**
38:24 61:23

**performance**
16:22

**permissible**
70:18

**permit**
37:24

**person**
26:21 31:7,9,12,18,20 32:21,25 34:15 35:6 38:13,17,18,20 41:16 47:7 73:8 74:24 92:4 93:18 103:24 104:7 110:3

**personal**
103:23

**personnel**
47:16

**perspective**
6:12 35:25 48:12

**phase**
47:20 73:20 90:18 107:15

**phone**
12:12 14:23

**photograph**
89:13

**photographs**
88:10,16

**phrase**
26:10 31:9 62:7,9 63:3,6 79:6,11 81:6, 17 86:6 96:25 98:21,24 99:5

**physical**
28:23 48:5 70:4 71:23 73:7

**physically**
30:6 37:21 54:25

**pick**
57:1

**pieces**
66:9 67:19 101:2

**place**
30:25 32:5 33:16 35:21 54:7 76:22 110:5

**placing**
45:3

**plain**
46:18

**plan**
94:1,21 95:8,24

**play**
33:10

**pocket**
56:13 57:3 87:4 91:24 114:14

**point**
20:4 34:12 35:23 39:10 52:4,14,15 53:25 55:8,22 56:9 68:9 73:12 78:14, 15 85:13 112:22 113:5 117:11

**points**
49:11

**police**
4:20,21 5:4 9:5 10:23 12:24 16:3 24:10,16 27:9 30:11 32:5 35:2,4 67:16 109:13

**policies**
20:13 22:5,15 66:19

**policy**
20:17 21:1,8,11,18 23:2,6,9,16 45:19, 24 46:13 47:3 48:15 49:17,21,23 50:2, 7,8,10 51:4,7,8,19 52:16,21,25 65:21 66:3 68:17 76:5 86:20,23,25 97:3,4,23 98:6 101:1,17 102:1 106:3,13,17 107:23

**pops**
16:16

**portion**
17:25

**posed**
27:21 28:10 108:12 114:23

**posing**
26:23 28:7

**position**
11:3 41:25 61:25 70:19 72:2 76:23 81:15 84:5 93:20 112:23,24 114:2,25

**positioning**
113:6 114:24

**positions**
11:8 75:13,18 93:12

**possibly**
28:3 31:20 109:16

**post-force**
98:7

**post-use**
101:9

**posture**
4:17 96:17

**postures**
4:8

**Powerpoint**
100:22

**pre-attack**
96:17

**preference**
43:5,19

**prepared**
6:6

**pressure**
39:19 40:22

**pretty**
12:25 36:16 82:10 106:12

**prevent**
70:5 73:2,12

**previous**
52:17 95:18

**primarily**
4:8 16:23

**primary**
15:8

**principle**
26:13 103:3

**principles**
10:10 38:7 102:7,17,25

**prior**
6:17 11:20 12:9 14:11 17:20 53:12

**Priorities**
37:11

**probable**
27:14,15 45:5 48:1,20 49:2,5,11 109:20 115:12

**problem**
58:5 80:22 81:23

**proceed**
43:4,18 44:12

**process**
4:6 23:7 78:9

**produce**
113:10

**produced**
25:9 96:18

**professions**
77:9

**program**
115:16

**propensity**
110:24 111:13,15,22 112:13 113:9,23

**properly**
109:18

**property**
4:14

**proportionate**
45:14 111:6,8

**protect**
74:16

**protection**
77:17

**protective**
110:25 111:2,23,24,25

**provided**
20:6 23:8 29:13,22 78:22

**provision**
26:6 70:14 73:1

**provisions**
101:20

**proximity**
67:4

**pull**
53:24 55:14 82:2,14 86:4,6 110:19 113:13

**pulled**
113:16

**pulling**
53:17 54:5 56:3 81:8

**purpose**
21:13 23:13

**purposes**
45:19 47:12,19 48:17,19

**pursuit**
7:22 67:8

**push**
59:12 60:15,16 80:18,22 82:11,13 83:16 86:4 87:19,20 89:3 91:24 92:22 114:13

**pushed**
56:12 57:2,25 58:7,16,23 59:3,19,25 60:4,23 61:10 79:24 80:3,17 81:19 83:6 110:14

**pushes**
83:9

**pushing**
58:19 60:14 79:17 87:14 92:9 112:12 114:20

**put**
10:23 21:6 38:10 56:15 59:12 70:17 93:20 103:9 105:18

**putting**
61:6

**Q**

**qualify**
67:9

**question**
18:5,12 19:12,17 21:21 25:2 27:6 28:13 31:1 32:2 33:4,11,20,21 34:20 35:8,17,18,21,24 36:16 37:6 38:1 40:12,22 41:4,15 43:9,10,14,24 45:17, 21 46:2 48:13 49:7 52:3,23 53:4 58:3 60:21 61:4,16,20 62:12,15,23,24 63:1 68:14 73:10 74:7,9,14,25 75:6,17,19 76:13 81:4 84:24 88:15,21,22 89:6 90:11,13 91:5,8 94:19 95:10,11,18 97:19 101:24 108:23 111:7

**questioned**
74:20

**questions**
33:2,8,15 34:3,4,7,24 35:1,11 51:8 62:22 105:15 116:18,20

**quick**
21:6

**quickly**
96:19

**quiz**
108:6

**quote**
16:23 92:17

**quoted**
15:9 98:1

**R**

**rank**
9:2

**rapid**
93:13

**rapidly**
94:1 96:5

**reaches**
51:5

**react**
96:19

**read**
15:7 16:18 21:7,9,15 22:19 25:13,17, 21 26:3,4 32:11 37:15 46:20 50:23 51:1,3,15,22,24,25 52:8,9 54:4,9 56:4 57:5,14,18 59:14 60:11 61:17,20 69:17 70:7 74:9,17,21 75:10 77:24 80:11 97:8,9,13,16 102:22 105:25

**reading**
14:23 26:5,8 30:24 51:17 60:10 70:2 105:22 110:22

**real**
21:6 78:17

**realized**
30:4

**rear**
31:1 70:19,20

**reason**
29:24 33:16 47:22,24 56:2 91:12 95:23

**reasonable**
21:12 23:12 25:19,24 26:1,11,18 27:8, 10,15 45:6,9 48:2,10,20 49:3,14 108:21 109:4,21 115:12 116:11

**reasons**
96:8

**recall**
20:5 24:21,23 26:5,8 28:4,6 29:23 39:22 40:3 45:23 49:20,22 68:23 73:25 74:3 77:7 104:3 110:12,22

**receive**
13:19 14:5,9 92:8 101:5

**received**
14:8 16:3 92:3,5

**recognize**
20:23 30:13

**recollection**
28:18 42:1

**record**
3:18 6:1 14:16 46:9,10 98:18,19

**recorded**
3:15

**recording**
117:25

**records**
14:18 15:4 86:19

**recruit**
16:3 18:1,8,13,14,17 67:6

**recruits**
37:7 41:12 45:1 90:15 100:21 101:5

**reduce**
105:24 106:11

**reduced**
107:10

**reestablish**
57:17 60:8

**refer**
75:22

**reference**
16:12 28:2 59:19

**referenced**
14:13 15:13 16:14 19:5 64:25

**references**
78:21

**referred**
8:14

**referring**
19:13 28:14 33:8 41:16,18 75:25 76:1 91:14 100:14,16 102:11 104:12,13

**refers**
31:12 47:7

**reflected**
112:8

**reflects**
45:16

**refrain**
109:3

**refusing**
33:1

**regain**
56:24 81:14

**relate**
49:11

**relative**
113:5 114:24

**released**
102:21

**relevant**
60:2

**rely**
16:17 65:24 66:19

**remain**
94:15

**remember**
8:23,25 11:4 24:15,17 29:25 52:13 53:18,22,23 77:6 117:8

**remembering**
53:16 78:1,4 111:1

**reminding**
5:13

**remove**
30:7

**removed**
42:22

**removing**
114:22

**render**
95:14 102:3

**repeat**
19:16,18

**rephrase**
111:8

**report**
3:6 5:16,19,20,24 6:5,23 7:17 13:20, 21,23,24,25 14:1,6,8,11,14 15:7,13,20 16:13,18 17:1 22:19 23:3,10,17 24:12, 14 26:9,15 27:23 28:2,5,18 29:13,21 30:1,11,19 33:24 38:24 43:3,15,20 44:4,7,11,14 45:7,12,13,16 47:18 48:16 49:15 53:10,14,15,18 54:2,11, 14,21 55:5,8,19 56:11 57:10,14 59:11, 21,22,23 60:1,18 62:9,18 63:2 64:1,5, 12,14 65:1,8,11,14 66:4,11,17 68:15 70:15 71:9,10,17,24 73:16 77:22 78:22 79:3,8,14,20 80:6 81:1,7 82:17 84:10 85:7,10,12,13,19,22 86:23 87:7 88:14 89:9 92:16 97:3,17,24 98:2,24 99:2,5,10 101:18,21,24 103:6,9,13 107:3,13,20,24 108:16 109:7 110:8,23 111:17 112:8 115:25 116:5 117:8,12, 25

**reported** 24:23
**reporter** 3:15 117:2
**reports** 24:19,21,22 27:20 38:23 47:25 108:24
**reposition** 60:5
**repositioning** 60:20
**represent** 15:18 30:9 40:1
**represented** 8:12
**representing** 7:15 9:12
**represents** 107:5
**requested** 10:2
**required** 18:24 21:24 67:7 107:9
**requires** 98:6,10
**research** 6:22
**researched** 7:16
**residence** 8:20
**resistance** 53:20 54:12,18,20,22,23 55:13,20,25 56:8,10 93:18
**resisted** 9:21
**resisting** 26:22 42:4,8 108:13
**resistive** 17:24 31:21 32:23 33:24 35:5,6 54:19 55:25
**resort** 21:14 23:2 50:2
**resources** 80:7 116:4,6
**respective** 18:16 116:13
**responded** 112:10 113:8
**responding** 27:12 113:1
**response** 3:17 35:24 50:3 97:18
**responsibilities** 4:13
**responsibility** 101:11
**restraint** 45:2
**restroom** 3:12
**result** 9:14 37:24
**retained** 7:14 9:11
**retaining** 4:10
**retains** 12:11
**retire** 9:2
**retired** 5:4
**review** 13:17,19 14:9 26:17 29:2 63:22 65:5 66:5 69:6,8,10 78:10 79:1 85:9,11 98:8 117:20
**reviewed** 14:8 20:2 23:15,19 39:15 47:2 50:15 68:16 85:6,16 86:22 88:16,23 89:7 117:6,12
**reviewing** 14:13,21,23 23:7,9 40:3 66:23 67:22 77:22 80:4 103:8 108:24 117:14
**revision** 18:3,10
**revisions** 69:21,24
**rewinding** 78:18
**risk** 55:2 72:23,25
**role** 3:25 4:9 6:18 8:23
**rotate** 89:4
**rotated** 60:7
**rotating** 57:16 79:15,21 114:1
**round** 4:3
**route** 42:17
**routinely** 67:16
**rule** 106:10,18 107:16
**rules** 102:16 105:4,6
**runs** 22:7 57:15

S

**safety** 36:25 37:11 103:24
**satisfied** 22:25
**scene** 36:15,21,25 37:9,22 38:3 39:3,7 42:17 104:1,19,22
**Schimmel** 9:12
**school** 10:12,18
**schooling** 10:17
**scope** 10:7 48:5
**screen** 6:1,3,15 15:17,18 20:20 21:10 25:3,12 46:14,16 51:7,13 84:10 86:21 99:20
**screeners** 4:10

**scroll**
99:7

**scrolling**
50:9 52:13 99:17

**seconds**
27:22 28:10,15 29:5,8,9 38:9 104:8

**section**
37:10 60:2,11,12 63:23 69:18,22 70:17 71:11 93:3 97:22 102:15

**sections**
54:14 66:12

**secure**
91:3

**security**
3:23 4:3,5,12,15,22 36:25

**selected**
110:24 111:12 112:11

**selective**
13:1

**self-populate**
16:17

**self-sponsored**
10:24

**semi-compliant**
31:19

**semi-cooperative**
31:19

**sentence**
46:21 54:3 56:4 57:2,15 70:2

**sentences**
37:15

**separate**
13:4,5 21:19 30:2 39:13 43:13 44:3 106:17,19

**separated**
24:2

**separately**
31:2

**September**
9:23

**series**
67:6 81:8

**service**
9:3 35:1,14

**services**
4:21

**sets**
101:14

**severity**
26:20 45:15 108:11

**share**
6:1 15:17 20:20 46:14

**sheet**
49:10

**sheriff**
20:13,17 45:18 46:12

**sheriff's**
20:9 21:2 23:1 49:17,23 51:4 52:25 65:21 76:4 86:16,22 97:2 98:6 101:8 102:1 106:3,16 107:22 115:16

**Sheriff’s**
21:11

**shot**
8:6 36:23

**shots**
117:24

**shoulder**
56:13 57:3 79:18,25 80:3 87:4 91:24 92:22 114:14,19

**show**
6:1 16:24,25 17:18,21 25:2,10 30:8 39:24 49:25 50:8,22 54:1,23 56:19 57:12 60:1,2 62:6 66:11 74:5 79:3 84:8 85:3 87:22 89:14 97:4,5 102:10

**showed**
20:6 71:12 91:1

**showing**
37:9 39:25 46:1 50:9 57:12 86:10 89:13 91:10 101:12 102:13

**shown**
95:5

**shows**
68:18 89:15

**significance**
76:21

**significantly**
59:9

**signs**
96:17

**similar**
105:13 106:8,12

**simpler**
37:6

**simplified**
81:18

**simply**
37:7 38:1 58:9 59:5 65:4 88:19 95:11

**Simultaneously**
56:21

**single**
35:6 77:6

**single-hand**
82:11,13

**single-probe**
8:17

**singular**
72:14

**sir**
5:2,13 17:10 18:13 33:12 43:10 45:22 49:7,24 58:3 60:11 62:22 79:13 80:23 82:10 84:11 88:21 97:7,15 98:3,14 99:8 100:9 102:23 104:20 111:2,7 112:21 116:23

**sit**
69:20 72:15 96:1

**situation**
39:3 41:13,18 81:10,24 94:12 96:20 103:19 113:7

**situations**
37:17,18 38:3 46:23,24 104:2

**six-person**
10:4

**size**
42:12

**Skill**
17:20

**skills**
90:20,21 93:8

**skipping**
52:22

**slide**
114:4

**slightly**
18:17 78:13

**slow**
36:15 37:8,22 38:2 39:6 78:18 104:18

**slowed**
78:13 104:22

**slower**
104:24

**slowing**
39:3 104:1

**sole**
33:15

**solution**
81:24,25

**somebody's**
72:9

**sort**
106:5

**sound**
3:8 102:8 108:14

**sounds**
3:9,13 23:25 62:11 106:8

**sources**
66:24

**space**
115:5,6

**speak**
24:11 31:2 35:11 51:11 86:20

**special**
96:16

**specific**
22:3,15 39:22 45:19 46:23,24 62:7,14 74:22 80:9,10 98:7 105:16 106:16

**specifically**
10:9 19:13 45:23 50:6 52:14 73:2 97:16 107:14

**spend**
14:12

**spending**
14:20

**spit**
62:20 63:8

**spot**
46:5 56:20 73:22 75:14

**squad**
31:1,3 47:10 78:10,11 88:17 89:7 117:24

**squared**
44:15

**stabbed**
36:23

**stabilization**
42:9 49:18 83:25 107:2,5

**stabilize**
36:21 44:23

**stabilized**
87:16

**stabilizing**
36:21 72:9

**staff**
4:23

**staffing**
4:7

**standalone**
23:4

**standard**
18:9,19 26:16 66:10 108:20 109:11

**standard's**
101:22

**standards**
15:24 16:23 17:5 18:2 19:5,21 22:10, 11,22 67:14,24 77:2 92:19 96:4 100:14 108:18 116:2

**standing**
74:23 84:5

**standpoint**
66:4 78:1 83:21

**start**
4:7 11:14 21:22 33:8 40:17 66:22,24 72:2 109:1

**started**
29:14 112:20

**starts**
17:2,19 37:17 41:4 72:14 93:4

**state**
22:7,12 32:13 67:13 68:2 100:21,25

**State's**
101:22

**stated**
88:14

**statement**
34:19 97:21

**statements**
110:12

**states**
57:10 71:17 82:17 116:7,8

**stayed**
11:16

**Stegall**
3:5 13:25 14:4 17:7,15,17 19:9,15 40:6 46:3,8 50:21 51:6,9,14 56:17 58:2 61:17 64:10,13,16 81:3 98:13,17 99:4,9,13,15,21,24 105:14 116:17,24

**step**
50:22,23 51:3,5,18 52:1,2,3,6,17 53:2, 5,6 106:4,8,12 107:22

**stepping**
82:6

**steps**
49:22 50:12,15,19 51:22 52:8,17,22 53:12,14 101:15

**stood**
39:20 41:5

**stoop**
8:20

**stop**
115:8

**stopped**
29:11 38:18

**story**
8:14

**straightforward**
81:18

**street**
93:13 95:5

**strike**
82:19,24 103:22 113:2

**striking**
113:8

**student**
15:8 16:24 17:25 64:23 66:25

**stumble**
70:6

**stumbles**
72:19

**stumbling**
73:13

**sub-municipalities** 22:14

**subject** 49:12 70:3,5 74:22 83:9,10,12,24 91:25 92:10 96:16 103:4,21 105:23 107:4,6

**subject's** 82:6,7 103:19

**subjects** 74:2,11,15 102:7,19

**submit** 25:6

**Substance** 11:1

**substantially** 66:7

**suddenly** 16:16 67:22 94:13 112:22

**suffered** 103:11

**suffering** 73:13

**summarizing** 51:4

**summary** 57:7

**supplemental** 30:10 32:16,19 53:15 85:18,22

**support** 4:18

**supporting** 4:15

**supreme** 108:1

**surrounding** 64:2 67:4,21

**suspect** 7:23,24 29:16 37:23 38:18 93:19 96:20 108:12,13

**suspected** 45:15 47:16

**suspicion** 27:8,10,15 45:6 48:2,10,20 49:3,14 109:21 115:13

**sustain** 77:13

**sustained** 8:2,19

**sustaining** 4:6

**swinging** 55:24

**switched** 25:24

**sworn** 3:2 5:8,11 11:3 12:5 77:16

**system** 18:22,23 32:4 44:25 67:25 94:20 96:9 103:7 109:6

**systems** 116:9,10

**T**

**tactic** 66:6,22 77:4 92:25 96:14 109:6,18

**tactical** 95:1,2

**tactics** 19:3 44:18 66:25 67:17 80:13 90:16, 18 93:25 94:23 96:9

**Taege** 16:2,6 19:4,20 20:3,8 23:5 24:3,6 27:19 28:6,9 29:10,16,24 30:24 31:6, 10 38:7,10,13,21,23 39:4,6,18 40:2, 16,21 41:1,8 42:16,21 44:4,19 49:5 53:15 54:16 55:5,17 56:1 59:19,25 60:4,14,22,23 61:22,24 62:5,13,19 63:7,11 64:19 65:16 66:13,19 68:9,15, 21 69:1 70:9 71:4,23 72:12 73:11 74:20 75:2,12,17,24 76:11,17,22 78:14 79:5,11,17,20 81:14 82:18,23 83:6 84:18,20 85:25 86:12 87:6 88:8 89:2 90:1 91:1,10,23 92:7 94:16 95:12 100:15 101:19,25 104:17,21 105:1 106:15 107:8 110:3,5,14,16,17,23 111:5 112:6,10,24 113:6,20 114:6 115:4,12,20

**Taege's** 22:20,25 23:23 28:5 29:3 30:10,19 34:3,7 35:18,25 39:16 43:17 44:11 53:20 54:2 56:7,11 57:7,25 58:6 59:2 61:10 71:17 73:16,19,24 74:6 76:9 77:14,16 79:14,23 80:2 87:3,9,13,24 89:18,21 92:2,17 104:5 105:7 107:14, 21 110:8 114:12 115:2 116:1

**takes** 102:12

**taking** 83:19 113:18

**talk** 6:16 12:19 31:16 35:2,11 46:12 52:6, 10 54:14 73:24 81:22 93:1,5 105:22 107:3 112:20

**talked** 30:1 47:15 48:24 64:23 71:24 100:5 101:21 104:1 106:4,18 108:3

**talking** 28:8 32:14 40:12,18 43:11 44:1 63:1 65:2 66:22 73:23 90:4 93:4 100:25 101:2,8 109:1 111:17

**talks** 30:18 52:4 53:7 79:20 105:3

**taser** 8:16 10:10

**Task** 5:7 11:2

**taught** 69:12 74:1,10,14,23 90:15 101:5

**teach** 12:23 45:1

**teaching** 69:13

**team** 4:5 43:6,20

**team-tactic** 43:11 44:1

**Technical** 10:24 12:23

**technique** 49:18 71:15 72:17 77:6,20 78:2,8 82:3,14,17 84:20,24,25 85:2,25 86:2, 3,4,11,13,15,21 87:1 89:25 90:3,5,7, 10,23 91:2,11,14,18,20,21 92:23 93:10,11,16,21 94:4,15 95:5,11,13,21 110:24 111:5,13 112:5,11 113:8

**techniques** 77:17 90:22 93:5 95:19 96:10 106:6 109:18 112:1 113:22

**temporary**
45:2

**ten**
50:18

**tension**
17:24 54:19 55:25

**term**
21:22 26:16 35:7 38:19 54:24 55:7 59:10 60:15,16 63:18 73:6 80:22 81:6, 13,20 83:19 90:14 91:3,5 92:14 111:3 113:24

**terms**
27:17 32:7 41:11 48:4 49:9 80:8 81:13 111:25

**test**
3:10 77:1 90:19

**testified**
3:2 10:3 47:2 51:23 68:16 76:11,18 91:23 94:17 117:23

**testifies**
76:19

**testifying**
7:3 9:14 73:25

**testimony**
10:8 13:13 14:10 23:19 44:10,13,16, 17 65:10,12,23 69:6 81:16 88:11 110:9

**text**
15:9 16:24 66:25

**thing**
12:15 17:10 90:14 113:12 116:10

**things**
4:15 13:17 28:4,25 34:24 36:19 37:5 43:13 44:3,8 45:23 48:2,7 66:8 67:20 78:20,23 90:16 95:4 104:24 112:14,18

**thought**
14:3 45:22,25 51:14 64:7 91:14 97:9 110:22 111:20

**threat**
25:20 26:2,12,23,25 27:21 28:7,10 61:23 108:12 114:22

**threatened**
38:11,14

**thrive**
42:13

**thrust**
87:13

**time**
4:2,24 7:6,8,23 8:21,24 12:19,20,25 13:2 14:16,18,21 18:19 20:8 29:6,7 30:5,25 37:20,23 39:11,19 40:22 41:2 46:7 52:15,24 54:21 66:13 67:1 68:1 69:1,13 70:11 77:19 78:17,18 89:4,7 104:20 105:6 106:21 107:19 108:4 109:22 110:17 114:11 117:8,12

**times**
21:12 36:18 70:5 80:5,11,24 95:4

**today**
3:6 69:20 92:17 105:10

**told**
29:16 56:2

**tool**
49:18

**tools**
68:3

**top**
9:7 16:10 21:8 24:17 40:17 57:14 67:10 69:25

**torso**
79:15,21

**total**
15:1

**totality**
26:18 36:19 42:14 45:10 94:5 96:11

**touching**
73:7

**traffic**
115:8

**train**
42:11 116:8

**trained**
16:6 18:3,9,18 19:5,20 20:3 27:1 36:15 37:8 38:2,7 41:12,23 53:2 64:20 65:16,20 66:20 68:10,13,18,22 69:2 70:10,12 72:13,16 73:11,21 77:18 84:25 85:2 86:7,15 90:1 91:24 93:11, 24 94:4,14,17 95:13,21 96:10 97:1,21 98:21 100:15 102:25 103:17,20,22 105:2

**trainer**
32:6

**trainers**
32:18 116:9

**training**
4:6,10 16:4,22 18:20 19:1,3 21:18,25 22:8,10,22 31:13,23 32:18,20 42:3 43:19 44:9,20 66:8,10 67:7,9,12,14, 17,24 68:7 70:11 73:12,18,24 74:1,10 76:10,12,15,18,20 77:1,4,13,15 83:20 86:19 90:12 92:2,3,8,19 93:4 94:16 95:9,14 96:22 97:22 101:2 105:7 108:18 109:14 115:16 116:2

**trains**
44:15 52:16

**transcript**
38:24 40:2,8 117:7,21

**transport**
71:14 73:6

**trial**
6:24,25 10:4

**trip**
70:6 86:8 92:4

**tripped**
88:8

**tripping**
73:13 92:14

**trips**
72:19

**turn**
17:22 72:3

**turned**
8:18

**turning**
25:10 30:15 40:11 114:20

**turnover**
71:14

**turns**
112:23

**Tyler**
6:19

**type**
8:1 41:12 94:9 101:5 113:2

**types**
54:17 96:13

**U**

**unbalanced**
89:12

**uncommon** 76:24 78:3
**uncontrollable** 113:11
**underlying** 23:23 110:2
**understand** 3:19 5:3 58:14 69:5 93:25
**understanding** 23:21 24:1,4 35:19 80:12 82:22 94:20
**understood** 98:23
**undoubtedly** 49:22 68:16 69:17
**unfortunate** 77:5
**unique** 94:7
**unit** 11:1,3
**unit's** 23:5
**University** 10:19
**unobtainable** 96:5
**unrealistic** 96:3
**unrestrained** 107:6
**unsure** 38:15
**update** 68:10
**updated** 18:22,23 66:12
**updates** 66:8 67:18
**upper** 57:16 60:5,6,7 89:4 114:1
**usage** 32:8
**utilize** 34:12,13 61:7 66:2,3 71:6 80:12 109:5
**utilized** 6:20 32:3 44:17 89:3 101:21
**utilizes** 114:19
**utilizing** 11:8 35:7 80:8 113:25 114:18

**V**

**vague** 19:12 63:16
**vehicle** 29:5 30:3,7 39:14 42:22 44:6,23 72:3 78:15 104:14
**verbal** 3:17 29:3
**verbally** 41:19
**verbatim** 58:22
**version** 15:9 16:7 20:3 64:8,15 65:7,9 67:3 91:17 93:9 100:16,18
**versions** 16:9
**versus** 6:19 7:9 8:8 9:9 58:1 108:1
**video** 78:10,11,24 88:17 89:8 90:25 92:8
**videoconference** 3:14
**view** 46:18
**violate** 109:14
**violated** 23:5

**W**

**wait** 42:21,25
**walk** 78:9
**wanted** 30:2,25 39:12 61:7 104:25
**warning** 96:17
**watching** 78:19
**Waukesha** 5:4,6 7:6 8:22,24 9:5 11:12,14 12:23 18:22 67:16
**Wauwatosa** 9:9,13
**ways** 74:22
**weapons** 24:19,21
**weight** 87:14
**well-being** 103:20
**West** 10:14,15
**whatsoever** 33:21
**whichever** 6:12
**wife** 31:2
**window** 8:19
**wisconsin** 10:19 15:23 17:4 22:7,9,12,21 73:17 86:16 92:18 100:23 108:17 116:2,4
**wished** 30:21
**witnesses** 37:4
**woman** 9:8
**word** 16:14 52:12 63:12 70:1 111:15,21
**wording** 105:13,16
**words** 55:11 61:6 63:10 80:10 94:16 103:16
**work**

3:22,24 6:13 10:25 13:3,16

**worked**
8:10 52:17 106:15

**working**
12:9,14

**worth**
18:25 67:11

**write**
45:16 48:10 60:13 63:7,10 100:13

**writing**
109:3

**written**
89:9

**wrong**
11:5 53:11 79:10 99:25

**wrote**
30:24 53:16 56:11 59:15 60:3,18,19 117:8,12,25

**Y**

**year**
4:3 5:7 10:15 11:6,7,14 19:1 67:8,9

**years**
5:6 34:25 69:14