# EXHIBIT 4

**Emily Veith, MS, CRC, LPC, CLCP, CEAS**
Vocational Rehabilitation Counselor
eveith@expertvoc.com
P: 608-301-7217

**Vocational rehabilitation and expert testimony services**

April 3, 2026

Attorney David Stegall
Lawton Cates, S.C.
1050 E. Washington Avenue, Suite 330
Madison, WI 53703

**Re: Thomas Maulson**

# INDEPENDENT VOCATIONAL EVALUATION

## REASON FOR REFERRAL

Mr. Maulson was referred for an independent vocational evaluation to assess his past wage loss as a result of the March 30, 2024 incident and right knee injury. Before beginning the interview, we reviewed a professional disclosure form that explained my role as a vocational expert. Mr. Maulson expressed his understanding of my role.

Information contained in this report is based upon an interview with Mr. Maulson conducted through Zoom on March 30, 2026. Mr. Maulson's wife, Rachel, was also present for the interview. This report is also based on a review of medical records, Mr. Maulson's resume, his W-2s/1099s/tax returns from 2020-2025, the complaint, plaintiff's discovery responses, Mr. Maulson's February 13, 2026 deposition, an assessment of past work, a review of published wage data, and general labor market research.

This evaluation is performed utilizing the Vocational and Rehabilitation Assessment Model (VRAM), developed by Robinson and Pomeranz (2011), an empirically-derived structural model of vocational and rehabilitation assessment in a forensic setting. The model is divided into three distinct operational modules: records review and rehabilitation interview; labor market research and inquiry; and rehabilitation analysis and opinion formulation. This model serves as the foundation for the opinions offered in this report.

## MEDICAL RECORD REVIEW

Prior to my interview with Mr. Maulson, medical records from Aspirus, Marshfield Clinic, Bozeman Health, and Peter Christensen Health Center were reviewed.

On March 30, 2024, Mr. Maulson presented to the emergency room for medical treatment after an altercation with the Oneida sheriff's department. He struck his head on the ground while handcuffed and had a laceration above the right eyebrow. He did not lose consciousness. A CT of the cervical spine and head was normal. The wound was sutured.

The next day, Mr. Maulson returned to the emergency room with complaints of right lower leg pain from the altercation. An x-ray of the right knee was normal. He was advised to follow-up with his primary care provider.

On April 2, 2024, Mr. Maulson was evaluated by Dr. Brahm, OD as a walk-in emergency to evaluate the right eye and right side of his face. He would benefit from new glasses today.

Mr. Maulson was eventually referred to Dr. Rossow for a surgical consultation regarding the right knee. On May 15, 2024, Dr. Rossow reviewed an MRI of the knee, which showed an ACL rupture and meniscus tears. Surgery was planned.

On June 12, 2024, Dr. Rossow performed a right knee ACL reconstruction with meniscal resection. Mr. Maulson subsequently started a course of physical therapy.

At the July 29, 2024 6-week post-operative appointment, Dr. Rossow assigned temporary restrictions effective August 5, 2024. Mr. Maulson can perform medium work with no kneeling, squatting, or lifting over 50 pounds.

On September 23, 2024, Dr. Rossow noted Mr. Maulson was working with restrictions. He should continue with restrictions and follow-up in 3 months.

On March 13, 2025, Dr. Rossow wrote Mr. Maulson developed post-traumatic arthritis in the knee. He was referred to a joint replacement surgeon. He can follow-up as needed.

Meanwhile, Mr. Maulson was evaluated for a head injury by Dr. Baculi in neurology. On April 4, 2025, Dr. Baculi wrote a letter To Whom it May Concern stating Mr. Maulson has been unable to work due to his concussion symptoms and knee pain.

On April 18, 2025, Dr. Rossow wrote a letter stating Mr. Maulson's only surgical option for the post-traumatic arthritis is a knee replacement. Surgery is planned for November 18, 2025. Mr. Maulson has no restrictions for the knee but to avoid extensive walking and allow seated breaks as necessary.

Mr. Maulson was hospitalized in April 2025 in Montana for treatment of pulmonary emboli and DVT.

Dr. Bartlett authored an independent medical evaluation report on September 21, 2025. According to this report, Mr. Maulson had a DOT physical two weeks prior to the date of injury and had no complaints of right knee problems at that time. In Dr. Bartlett's opinion, Mr. Maulson sustained a displacement of the right knee preexisting lateral meniscus tear and acute development of a displaced bucket handle tear of the right medial meniscus as a result of the March 30, 2024 incident. It is more likely than not that Mr. Maulson will need a total knee replacement due to injuries sustained in the incident.

**SUBJECTIVE COMPLAINTS / TREATMENT**

Mr. Maulson said he continues to have right knee pain that is a 6 on a 0-10 pain scale. He limps due to limited knee mobility and strength. Prolonged walking causes the knee to swell, and weather changes causes achiness in the knee. Mr. Maulson also reported ongoing problems with headaches, memory, vertigo, and vision due to the head injury.

Due to the knee pain, Mr. Maulson said he can sit about 2 hours, stand about 15 minutes, and walk a quarter mile before needing a break. He can drive 1-1.5 hours, then needs to walk 10-15 minutes to loosen up the knee. He can lift his 4-year-old son who weighs about 35 pounds. Standing from a squat is difficult. He climbs steps one at a time.

Mr. Maulson wears a knee brace as needed to help with stability. He constantly wears compression socks for the DVT.

Regarding his future medical treatment, Mr. Maulson said he is awaiting cardiovascular clearance before proceeding with a knee replacement. His vision is evaluated every 6 months. He will be starting mental health therapy soon for PTSD, which he attributes to the incident. He needs to reestablish care with a neurologist, as his former one left. He does not take any prescription medications for knee pain out of concern about addiction. He does take about 1500 mg of Tylenol every 6-8 hours for knee pain. He is on Eliquis and other prescriptions for the DVT and other health conditions.

Mr. Maulson said he is 6'2" and weighs about 200 pounds. He reported no other health conditions that would affect his ability to work.

**SOCIAL / ECONOMIC BACKGROUND**

Mr. Maulson, age 45, was born December 15, 1980 in Woodruff. He is married with 4 known children, ages 18, 16, 8, and 4. Only the youngest 2 children reside with him.

For most of his life, Mr. Maulson has lived in Lac du Flambeau (Vilas County). He owns a home but may need to sell this soon due to lack of income for child support obligations.

Mr. Maulson has a valid driver's license. He used to have a Class A CDL with endorsements for hazardous materials, tankers, and doubles/triples, but this lapsed in March 2026 because his Fed Med card expired. Mr. Maulson said his primary care provider performs DOT physicals and knows Mr. Maulson would not be able to pass one in light of all of his medical conditions.

Mr. Maulson said he has no felony convictions that would affect his ability to work.

At the time of our meeting, Mr. Maulson had no income. He applied for Social Security disability in March 2026. He has health insurance through Indian Health Services.

We discussed his activities of daily living. Mr. Maulson said he is independent with self-cares. He does chores around the home as best he can, though standing to do dishes is difficult due to knee pain. He is

unable to shovel snow or mow the lawn due to right leg instability and problems walking on uneven ground.

On a typical day, Mr. Maulson will supervise his children, who started homeschooling after the incident. His wife also helps coordinate their schooling. Mr. Maulson is adjusting to this “role switch.” He is no longer able to participate in pre-injury activities such as riding motorcycles and 4-wheeling due to his injuries.

**EDUCATION**

Mr. Maulson attended a juvenile boys school after 6th grade. He earned an HSED in 1999 through Nicolet College.

In 2015, Mr. Maulson completed CDL training at Fox Valley Technical College. He completed firefighter training at Camp Pendelton. He has additional training in the use of explosives and construction safety, which was obtained through his past jobs.

Regarding his computer skills, Mr. Maulson said he has not used a computer in past jobs, but he could probably figure out how to type a letter with word processing software if needed.

**WORK HISTORY**

Early in his work life, Mr. Maulson was a surveillance system monitor at Lake of the Torches Casino for one year. He moved around the country after this and was a dishwasher in California for 6 months.

His next job was at AMCE Machine & Welding in Covington, Louisiana. He was a CNC operator/welder there in 2006 for one year, making wenches and large parts for the gas/oil industry. He ran lathes, CNC machines, and did welding. He lifted 70+ pounds for this work.

From May-July 2007, Mr. Maulson installed irrigation systems for Emerald Isle Landscaping in Englewood, Colorado. He left due to low pay.

From 2007-2013, Mr. Maulson was employed by Tesla Seismic Services out of Greenwood Village, Colorado as a crew boss/trouble shooter/shooter. Mr. Maulson rode in helicopters to access remote locations in 48 states. He drilled holes and set up ground equipment to detonate explosives to access natural resources and control avalanches. This involved climbing mountains and trekking dangerous and remote terrain while carrying 70+ pounds of equipment. He worked 13-18 hours a day and made $30 an hour.

Meanwhile, Mr. Maulson was also employed by the Bureau of Indian Affairs as a firefighter from 2009-2011. He was mainly deployed to Alaska when on break from Tesla. His pay varied by the location. This work ended after a failed drug test.

In 2016, for one season, Mr. Maulson was employed as a full-time dump truck driver and equipment operator for Lac du Flambeau Tribal Roads.

In late 2016, Mr. Maulson started at Ritchie Lakeland Oil & Propane Company in Minocqua as a transporter. He drove a tank trailer to deliver fuel and propane to terminals throughout Wisconsin and Minnesota. He rarely delivered propane to residential homes. The most he lifted/moved was a 25 pound hose. He did this in winters when on layoff from road construction work. He worked 70 hours a week on a seasonal basis and was paid 63 cents a mile. In 2022, he stopped because he was working more hours at Pitlik.

For two summers while at Ritchie Lakeland Oil & Propane, Mr. Maulson was a heavy equipment operator for Rynders in Minocqua. He operated a dump truck and front end loader to haul/move aggregates and asphalt for road construction projects in 2017 and 2018. This required heavy lifting and shoveling. He worked 65-72 hours a week and made $23 an hour.

In 2018, Mr. Maulson was hired as a heavy equipment operator at Pitlik & Wick, a paving contractor in Eagle River. He started as a heavy equipment operator and progressed to a highway foreman with his own crew. This was a working supervisor position in which he operated graders and hot rollers, assigned duties, and supervised a crew of 2-15 people. He worked on road construction projects in northern Wisconsin. He worked year-round in the two years prior to the incident, driving a tanker truck in winters for the company to haul hot oil to terminals in Minnesota and Wisconsin. His typical pay was $32 an hour, though some state jobs paid more.

After the March 2024 incident, Mr. Maulson said he returned to work the following Monday. He was struggling physically and was reportedly medically taken off work shortly after his return. He said he worked a day here and there after the incident, as he was limited by his physical problems and medical appointments.

About 10 weeks after the incident, Mr. Maulson was asked by the tribe to work as a short-term consultant/trainer for the Lac du Flambeau Tribal Roads. He trained a heavy equipment operator for 5 weeks. Physically, Mr. Maulson sat in the vehicle and provided coaching. He was paid $30 an hour.

After Labor Day in September 2024, Mr. Maulson said he returned to Pitlik & Wick as a foreman. He directed crews at job sites, inspected machines, greased/lubricated equipment, and had "minimal duties." He did not operate equipment, as he said he had restrictions at the time of no heavy lifting or commercial driving. Mr. Maulson said he never resumed his full duty job post-incident. On January 30, 2025, Mr. Maulson left because he had "too many health issues going on." He has not worked in any capacity since January 2025.

Mr. Maulson said he has not applied for any jobs since the incident because, "I honestly don't even think I really can work" due to all of his health conditions. He has not had contact with the Division of Vocational Rehabilitation. Had the incident not happened, he planned to stay at Pitlik & Wick for the foreseeable future.

## ASSESSMENT OF PAST WORK

Based on his reported work history, Mr. Maulson has performed the following jobs in the last 15 years. According to the *Dictionary of Occupational Titles (DOT)*, published by the U.S. Department of Labor, these jobs are classified as follows. I have also cross-walked the occupational titles to the corresponding

SOC codes, which are found within O*NET. The U.S. Department of Labor developed the O*NET to replace the *DOT* for purposes of career exploration.

| Occupational Title | *DOT* Code | SOC Code | Strength | SVP* | Employer |
|---|---|---|---|---|---|
| Blaster | 859.261-010 | 47-5032 | Heavy | 7 | Tesla |
| Firefighter | 373.364-010 | 33-2011 | Very heavy | 6 | BIA |
| Tank truck driver | 903.683-018 | 53-3032 | Medium | 3 | Ritchie Lakeland Oil |
| Dump truck driver | 902.683-010 | 53-3032 | Medium | 2 | Lac du Flambeau |
| Operating engineer | 859.683-010 | 47-2073 | Medium | 6 | Lac du Flambeau, Rynders, Pitlik & Wick |
| Supervisor, asphalt paving | 853.133-010 | 47-1011 | Light | 8 | Pitlik & Wick |

**SVP refers to specific vocational preparation. This is the amount of time needed to learn the techniques, acquire the information, and develop the facility for average performance in a specific job-worker situation. SVP 2 jobs take up to 30 days to learn. SVP 3 jobs take over 1 and up to 3 months to learn. SVP 6 jobs take over 1 and up to 2 years to learn. SVP 7 jobs take over 2 and up to 4 years to learn. SVP 8 jobs take over 4 years to learn.*

Mr. Maulson has performed unskilled, semi-skilled, and skilled work. By his report, all of these past jobs required at least medium physical exertion.

## EARNINGS HISTORY / PAST WAGE LOSS

Mr. Maulson's tax returns and W-2s/1099s show box 1 wages as follows:

| Year | Source | Employer | Earnings |
|---|---|---|---|
| 2020 | tax return | n/a | $62,694 |
| 2021 | tax return | n/a | $72,898 |
| 2022 | W-2s | Pitlik & Wick | $77,476 |
| | | Ritchie Lakeland | $11,123 |
| | | Total: | $88,599 |
| 2023 | tax return | n/a | $93,022 |
| 2024 | W-2 | Pitlik & Wick | $54,103 |
| | W-2 | Lac du Flambeau | $5,574 |
| | 1099 | Lac du Flambeau | $1,000 |
| | | Total : | $60,677 |
| 2025 | W-2 | Pitlik & Wick | $7,032 |
| | 1099 | Lac du Flambeau | $1,000 |
| | | Total : | $8,032 |

These documents show that Mr. Maulson was a high wage earner in the years prior to the incident.

Mr. Maulson said the $1,000 annual payments from Lac du Flambeau are annual tribal payments. As such, I will exclude these earnings from my analysis of his wage loss.

At the time of the March 30, 2024 incident, Mr. Maulson was a full-time heavy equipment operator and foreman on a road construction crew for Pitlik & Wick. He drove a tank truck in the winter. His pay was reportedly $32 an hour, with some projects paying more.

For comparison, I reviewed published wage information. According to 2024 data from the U.S. Department of Labor, heavy equipment operators in the Northeastern Wisconsin nonmetropolitan area, which includes Vilas County, earning at the 75-90th percentile make $78,650-$92,820 annually. Asphalt paving supervisors earning at the 50-75th percentile make $76,080-$94,580. Mr. Maulson's actual 2023 earnings were above 90th percentile wages for heavy equipment operators and near 75th percentile wages for paving supervisors. In my opinion, he was earning at his capacity at the time of the incident. I would therefore find his actual earnings of $93,022 in 2023 ($1,788.88 weekly) to be a reasonable reflection of what he could have earned in 2024 had it not been for the incident.

Mr. Maulson attempted a return to work post-incident as a heavy equipment operator trainer and foreman. He worked sporadically due to his symptoms and medical appointments and never resumed his full duty position. He was not medically released to work for the right knee injury until August 5, 2024 when Dr. Rossow assigned medium restrictions with no kneeling or squatting.

As of April 18, 2025, Dr. Rossow lifted the restrictions for the knee, though Mr. Maulson should continue to avoid extensive walking and take seated breaks as needed. In my opinion, Mr. Maulson would be physically able to resume working as a heavy equipment operator and foreman with the April 2025 restrictions from Dr. Rossow such that his past wage loss due to the knee injury alone would cease as of April 18, 2025 (15.5 weeks into 2025).

As compared to his $93,022 capacity as an equipment operator/foreman, Mr. Maulson therefore has experienced a past wage loss since the incident as follows.

| Year | Actual Earnings | Capacity | Wage Loss |
|---|---|---|---|
| 2024 | $59,677 | $93,022 | $33,345 |
| 2025 | $7,032 | $27,728 (15.5 wks at $1,788.88/wk) | $20,696 |
| | | **Total:** | **$54,041** |

Because Mr. Maulson said he stopped working at the end of January 2025 due to all of his health problems, including TBI symptoms, he has continued to lose wages through the date of this report. His full 2025 wage loss would be $93,022 - $7,032, or $85,990 for 2025. He is continuing to lose wages in 2026 of $1,788.88 a week (in 2024 dollars) through the date of this report. His wage loss from April 18, 2025 onward would not be due to the knee injury alone, however, based on the medical records.

## SUMMARY AND CONCLUSIONS

Mr. Maulson is a 45-year-old, high school educated individual. He has over 20 work years remaining before reaching what is now considered full retirement age for Social Security (age 67).

For most of his work life, Mr. Maulson held jobs that required medium to heavy physical exertion or were performed in dangerous/extreme conditions (firefighter, blaster). At the time of the March 30, 2024 incident, he was a heavy equipment operator and road construction foreman earning at his capacity, which in my opinion is $93,022 in 2024 dollars.

After the March 30, 2024 incident, Mr. Maulson treated for a head laceration, head injury, and right knee injury. A right knee ACL reconstruction with meniscal resection was performed in June 2024. On August 5, 2024, Dr. Rossow released him to work with temporary restrictions for the knee. On April 18, 2025, Dr. Rossow lifted all restrictions and recommended avoidance of extensive walking and seated breaks as needed. A right knee replacement has been recommended by Dr. Rossow and Dr. Bartlett, though Mr. Maulson's other medical conditions are delaying his ability to proceed. The right knee injury and future knee replacement was affirmed by Dr. Bartlett to be related to the incident.

Due to the right knee injury sustained in this incident, in my opinion, Mr. Maulson has experienced a past wage loss through April 18, 2025 of $54,041. He has past wage loss of $119,335 through 2025, though this full wage loss would not be attributable to the knee injury alone. Because he continues to be off work due to the totality of his medical conditions, including an inability to proceed with a right knee replacement due to complicating medical factors, he continues to lose wages of $1,788.88 a week (in 2024 dollars) through the date of this report. At 13 weeks into the calendar year, this is an additional loss of $23,255 through the date of this report.

Thank you for referring Mr. Maulson to my attention for evaluation. If additional information becomes available, I respectfully request the opportunity to revisit my opinions. All opinions rendered herein are to a reasonable degree of vocational probability.

Sincerely,

**EXPERT VOCATIONAL CONSULTING, INC.**



Emily Veith, MS, CRC, LPC, CLCP, CEAS
Vocational Rehabilitation Counselor

References

Robinson, R., & Pomeranz, J. (2011). Vocational and rehabilitation assessment model (VRAM): Introduction of an empirically derived model of forensic vocational and rehabilitation assessment. *The Rehabilitation Professional, 19*(4), 91-104.

U.S. Department of Labor, Bureau of Labor Statistics. (2024). Occupational Employment and Wage Statistics.

# Emily M. Veith, MS, CRC, LPC, CLCP, CEAS

Expert Vocational Consulting, Inc.
5325 Wall St. Suite 2505 Madison, WI 53718
Phone (cell): 608-301-7217
Fax: 866-856-6207
Email: eveith@expertvoc.com


## Education

| | |
|---|---|
| 2005 | Master of Science degree: Rehabilitation Psychology<br>University of Wisconsin-Madison |
| 2003 | Bachelor of Science degree: Rehabilitation Psychology<br>University of Wisconsin-Madison |
| 2016 | Life Care Planning Training:<br>Institute of Rehabilitation Education and Training, Newberry, Florida |

## Professional Experience

**9/2012-Present** — **Expert Vocational Consulting** — **Madison, WI**
**Vocational Rehabilitation Counselor / Owner**
Perform vocational rehabilitation services, including vocational counseling, case management, testing and assessment, job placement, return to work and retraining plan development, job analyses, ergonomic assessments, and labor market surveys within the worker's compensation and long-term disability systems. Conduct earning capacity assessments. Provide expert testimony for worker's compensation, family law, personal injury, and employment law matters.

**1/2012-present** — **Social Security Administration – Office of Hearings Operations**
Vocational Expert. Provide vocational expert testimony.

**1/2009-5/2014** — **Madison Area Technical College** — **Madison, WI**
Adjunct psychology faculty.

**1/2005-8/2012** — **GENEX Vocational Specialist/Expert** — **Madison, WI**
In addition to the services above, I also developed, coordinated, and analyzed a disability management program for a local employer with plants throughout the U.S.

## Professional Credentials

Certified Rehabilitation Counselor – No. 83399
Commission on Rehabilitation Counselor Certification

Private Vocational Rehabilitation Counselor – No. 721
WI Department of Workforce Development, Worker's Compensation Division

Licensed Professional Counselor – No. 4332-125
WI Department of Safety and Professional Services

Certified Life Care Planner – No. 1352
International Commission on Health Care Certification

Certified Ergonomics Assessment Specialist

**Presentations**

| | |
|---|---|
| **11/15/2019** | Vocational Evaluation Report Writing: A Panel Discussion on Content Analysis & Writing Styles. IARP-WI Fall Seminar, Madison, WI |
| **9/20/2018** | Conducting a Forensic Vocational Evaluation. IARP Illinois conference, Naperville, IL |
| **5/24/2018 & 1/15/2015** | 2015 and 2018 Wisconsin Worker's Compensation College, Mock Direct and Cross Examination of Vocational Expert, Wisconsin |
| **3/9/2017** | Workers Compensation Gamble: What Are Your Odds With Odd-Lot panel. Kids' Chance of Wisconsin Seminar, Milwaukee, WI |
| **10/24/2015** | Private Sector Career Paths for Students, Emerging Professionals and Transitioning Professionals. IARP Annual Conference, New Orleans, LA |
| **4/11/2014** | Interviewing the Challenging Forensic Client: Breaking Down the Barriers. IARP WI Spring Seminar, Madison, WI |

**Professional Membership**

**2005-present** International Association of Rehabilitation Professionals (IARP)
IARP Forensic Section board leadership: past chair (2018-2019), chair (2017-2018), vice-chair (2016-2017), member at large (2015-2016). Wisconsin-IARP chapter leadership: secretary (2010-2011), president (2012-2013; 2020-2021), past-president (2013-2014; 2021-2022).

**Publications** Veith, E. M., & Meltzer, J. M. (2015). Forensic vocational interviews: An exploration of best practices. *The Rehabilitation Professional*, 23(2), 101-110.

Veith, E., Sherman, J. E., Pellino, T. A., & Yasui, N. Y. (2006). Qualitative analysis of the peer-mentoring relationship among individuals with spinal cord injury. *Rehabilitation Psychology*, 51, 289-298.

**Professional Awards**

IARP Outstanding Professional Member Award 2021