**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| THOMAS J. MAULSON<br>Plaintiff<br>OPTUM CARE, INC.,<br>Involuntary Plaintiff<br>V.<br><br>WILL TAEGE,<br>Defendant | Case No. 25-CV-638<br>EXPERT REPORT<br>February 26, 2026 |

**Expert Report respectfully submitted by:**

Dennis J. Angle
dangle@wi.rr.com

**Report prepared at the request of:**

Attorney Andrew Jones
Hanson Reynolds LLC.
301 N. Broadway Suite 400
Milwaukee, WI 53202

## ***Introduction***

Dear Attorney Jones,

I have concluded my preliminary analysis of the materials provided to me by your office. The opinions contained in this report are based upon the materials listed below, as well as my training and experience as a State of Wisconsin law enforcement officer and a State of Wisconsin law enforcement use of force instructor. My opinions are based on a reasonable degree of professional certainty. I reserve the right to change and/or alter these opinions should other materials become available. Those changes, if needed, will be indicated in a second report. Should other documentation become available, please forward those reports to me at your earliest convenience.

Materials provided:

**Materials from Oneida County - Videos**

- 2024-3575 Taege Squad Video (tia00121_20240331001252e0_01_000)
- 2024-3575 Taege Squad Video (tia00121_20240331001252e0_02_000)
- 2024-3575 Taege Front Squad Video_Redacted
- 2024-3575 Taege Front Squad Video_Redacted_1_Redacted
- 2024-3575 Taege Rear Squad Video_Redacted
- 2024-3575 Bedish Squad Video_Redacted_1
- 2024-3575 Berg Squad Video_Redacted_1
- 2024-3575 Lehman Squad Video_Redacted
- 2024-3575 Smith Front Squad Video_Redacted_1
- 2024-3575 Smith Rear Squad Video_Redacted
- 2024-3575 T. Williams Squad Video

**Materials from Oneida County – Documents**

- **Jail Documents**
  - SIGNED SIGNATURE BOND_018_Redacted
  - MAULSON, THOMAS - SOTER_Redacted
  - MAULSON, THOMAS - RELEASE CARD_Redacted
  - MAULSON, THOMAS - INFORMED CONSENT
  - MAULSON, THOMAS - GREY SHEET
  - MAULSON, THOMAS - DISCHARGE REFERRAL
  - MAULSON, THOMAS - COVID_Redacted

- MAULSON, THOMAS - CITATIONS_Redacted
- MAULSON, THOMAS - BOOKING CARD_Redacted
- MAULSON, THOMAS - BOOK AND RELEASE CHECKLIST

- **Reports**
  - 2024-3575 Incident Report_Redacted
  - 2024-3575 Case Summary Report_Redacted
  - 2024-3575 CAD Report_Redacted
  - 2024-3575 Arrest Report
  - 2024-3575 Arrest Report_Redacted
  - 2024-3575 [Taege] Maulson Resisting Mar31 FINAL_Redacted
  - 2024-3575 [T Williams] Squad Video Usage Dec02 FINAL
  - 2024-3575 [Smith] Supplemental Report Mar31 FINAL_Redacted
  - 2024-3575 [Bedish] Supplemental Report Mar31 FINAL_Redacted
  - 2024-3575 [Taege] Maulson Resisting Mar31

**Deposition Documents**

- Deposition of Will Taege (Full + Condensed)
- Exhibits 1-19

**Materials included in Defendant's First Production of Documents (12.10.2025)**

- OC Maulson 000001-OC Maulson 000096 (Reports)
- OC Maulson 000097-OC Maulson 000118 (Acadis Report)
- OC Maulson 000119-OC Maulson 000468 (OCSO Docs)
- OC Maulson 000469-OC Maulson 000488 (Patrol Docs)
- OC Maulson 000489-OC Maulson 000523 (Case summary, incident, CAD, Supplemental and Arrest Reports)
- OC Maulson 000524-OC Maulson 000537 (Jail Records)
- OC Maulson 000538-OC Maulson 000545 (Squad Camera Recordings)
- OC Maulson 000546-OC Maulson 000554 (Training File)
- OC Maulson 000555-OC Maulson 000565 (24 II 2 Taege Internal)
- OC Maulson 000566-OC Maulson 000582 (PAYROLL ACTION FORMS)
- OC Maulson 000583-OC Maulson 000588 (MISC CORRESPONDENCE)
- OC Maulson 000589-OC Maulson 000663 (Evaluations*(Marked as Confidential))*
- OC Maulson 000664-OC Maulson 000862 (DAAT (2018))
- OC Maulson 000863-OC Maulson 001063 (DAAT (2023))
- OC Maulson 001064-OC Maulson 001069 (2023-14947 [Rudolph] Rossiter DC Nov23 FINAL_Redacted)
- OC Maulson 001070-OC Maulson 001076 (2023-14947 [Taege] Rossiter DC Nov23 FINAL_Redacted)

- OC Maulson 001077-OC Maulson 001080 (20250811_ONEIDA COUNTY SHERIFF'S OFFICE)

**Materials included in Defendant's Second Production of Documents (01.16.2025)**

- OC Maulson 001081-OC Maulson 001241 (Taege CO DORs)
- OC Maulson 001242-OC Maulson 001420 (Taege Patrol DORs)
- OC Maulson 001421-OC Maulson 001457 (Task List)
- OC Maulson 001458-OC Maulson 001535 (2018 FTEP Task List - UPDATED 04-23-18)
- OC Maulson 001536-OC Maulson 001538 (2024-3575 Offense Field Report)

**Expert Information**

- Duggan 1-2026 CV
- Maulson report - 12 Jan 2026 DUGGAN

***Overview of Opinion***

Based on all the information made available to me along with my training and experience (as listed in my CV), it is my opinion to a reasonable degree of professional certainty that the actions taken by Will Taege of the Oneida County Sheriff's Office and the force used to take Thomas Maulson into custody on March 30, 2024 were consistent with Wisconsin Law Enforcement Training and Standards guidelines.

During the initial incident, Deputy Taege responded to a disturbance in which the reporting party advised that there were people fighting around a Walmart/Tractor Supply parking lot located at 2121 Lincoln Street, Rhinelander, Wisconsin.

During Taege's response he conducted a traffic stop on a vehicle that was believed to contain one of the individuals involved in the fight.

Taege had contact with the operator of the vehicle later identified as Thomas Maulson. Maulson was agitated and resistive during the investigation and Taege physically removed Maulson from his truck. Maulson's resistive behavior continued as Taege handcuffed him near the truck. Maulson continued his resistive behavior and argued with Taege as Taege was attempting to bring Maulson towards the squad. While Taege was attempting to move Maulson, Maulson suddenly changed his position from facing away from Taege to facing Taege with Maulson's head six-twelve inches from Taege. This behavior created a threat of physical assault which forced Taege to dynamically respond. Taege used his upper body to try and reposition Maulson's upper body to overcome the threat of bodily harm that was present. While rotating Maulson's upper body and

attempting to reestablish a grip on his arm, Maulson lost his balance and fell to the ground. Once Maulson was on the ground Taege de-escalated his use of force and stabilized Maulson. Taege then activated Emergency Medical Services as he observed Maulson to have a cut above an eyebrow. Maulson was later transported to a local hospital then to Oneida County Jail where he was issued citations for Disorderly Conduct and Resisting.

***<u>Materials, Training, and Experience</u>***

The opinions I have formulated are based on my experience and training as a State of Wisconsin law enforcement officer and State of Wisconsin law enforcement trainer, and the basic law enforcement recruit curriculum provided by the Wisconsin Law Enforcement Training and Standards Bureau. More specifically the Defensive and Arrest Tactics (DAAT) Student Text which offers competencies and performance assessment tasks for recruits to perform and show an understanding of objectively reasonable use of force decision-making. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

I also utilized the Instructor Manual for DAAT Instructors that provides contextual material and examples while teaching DAAT. (Wisconsin Department of Justice Law Enforcement Standards Board, 2017)

Additionally, I utilized the Professional Communication Skills (PCS) Student Text to illustrate Targe's attempts to generate willful cooperation. This also includes his initial contact with Maulson and when he was forced to move past words and into action. (Wisconsin Department of Justice Law Enforcement Standards Board, 2020) Throughout the breakdown of my opinion I will cite concepts from the DAAT, and PCS manuals and utilize my experience to set context.

***Disturbance Resolution*** – A model for how officers should deal with situations in which they must intervene to resolve a disturbance. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023) **Highlighted areas are mentioned in opinion.

**APPROACH CONSIDERATIONS**

| | | |
|---|---|---|
| **A.** | **Decision-Making** | Justification<br>Desirability |
| **B.** | **Tactical Deployment** | Control of Distance<br>Relative Positioning<br>Relative Positioning with Multiple Subjects<br>Team Tactics |
| **C.** | **Tactical Evaluation** | Threat Assessment Opportunities<br>Officer/Subject Factors<br>Special Circumstances<br>Level/Stage/Degree of Stabilization |

**INTERVENTION OPTIONS**

| | **MODE** | **PURPOSE** |
|---|---|---|
| **A.** | **Presence** | To present a visible display of authority |
| **B.** | **Dialogue** | To verbally persuade |
| **C.** | **Control Alternatives** | To overcome passive resistance, active resistance, or their threats |
| **D.** | **Protective Alternatives** | To overcome continued resistance, assaultive behavior, or their threats |
| **E.** | **Deadly Force** | To stop the threat |

**FOLLOW-THROUGH CONSIDERATIONS**

| | | |
|---|---|---|
| **A.** | **Stabilize** | Application of restraints, if necessary |
| **B.** | **Monitor/Debrief** | |
| **C.** | **Search** | If appropriate |
| **D.** | **Escort** | If necessary |
| **E.** | **Transport** | If necessary |
| **F.** | **Turn-Over/Release** | Removal of restraints, if necessary |

***<u>Introduction and Disposition from Supplemental Report written by Deputy Taege 2024-3575</u>***

<u>Introduction</u>

*On March 30, 2024, at approximately 7:10 p.m., Oneida County Dispatch received a call reporting a disturbance at the address of 2121 Lincoln Street, in the city of Rhinelander, County of Oneida, Wisconsin. This address is the Rhinelander Walmart and the reporting party stated there were people fighting in the parking lot closer to Tractor Supply but within the Walmart parking lot. The reporting party indicated there were two people fighting in the parking lot with several bystanders. The reporting party was unaware of who the people were. The reporting party later stated the fight had broken up, but the two individuals were still screaming at each other. The reporting party stated one suspect was leaving in a station wagon that was dark burgundy in color and the second suspect was in a white Ford truck with a topper on the back and the model was an XTR.*

<u>Disposition</u>

*I transported Maulson to Aspirus Rhinelander Hospital where he was given medical attention. Maulson was eventually medically cleared and transported to the Oneida County Jail by Deputy Cole Lehman. Maulson was booked in for Disorderly Conduct and Resisting. Maulson was provided with a citation for Resisting from me and a citation for Disorderly Conduct from Sergeant Kondzela with a court date of April 1, 2024. Please see all reports from other deputies and other officers from the Rhinelander Police Department for further details on the fight and incident.*

***Opinion Statements and Support***

*The initial response by Deputy Taege was consistent with Decision-Making as taught within DAAT training.*

Disturbance Resolution is a model for how officers should deal with situations in which they must intervene to resolve a disturbance. Approach Considerations are one of the major components within the model and Decision-Making is the first of the components contained in Approach Considerations. In this section the officer is taught to balance their justification to act against the desirability to take that action, or more importantly whether they can control a justifiable citizen contact. Taege's report states the following.

> "Nuszkiewicz indicated the driver of the vehicle I had conducted a traffic stop on was the male in question in regard to the disturbance. Nuszkiewicz stated he was a witness to the fight and he was the one that broke up the fight between the two suspects."

This statement explains Taege's logic for contacting the driver (Maulson). Based on the initial information that Taege received regarding the possible fighting parties being separated, he controlled the situation through the use of a contact traffic stop. By initiating the stop in this fashion, he could use distance to offer options as Taege assessed the level of compliance of the operator.

Below are two excerpts from the DAAT manual regarding the Decision-Making components which are justification and desirability, with key points in **bold font**.

**Decision Making**

> Decision making considers whether the officer can legally contact the subject(s), and whether making contact is desirable. If the contact is not voluntary, and the officer does not have legal standing to initiate contact, the officer should not initiate an encounter. If intervention would be tactically foolhardy without additional resources, it would not be desirable to intervene until those resources arrive. (Wisconsin Department of Justice Law Enforcement Standards Board, 2021)

**Legal Justification**

> As an officer, you can make voluntary contact with anyone at any time, providing that you have a legal basis to be in that place and that the contact is indeed voluntary. **With reasonable suspicion, you may detain someone to investigate the situation.**
>
> You do not, for example, have an automatic right to enter private property, just because you're an officer. Nor do you have the *automatic* right to detain someone. Your Constitutional Law training is devoted in part to helping ensure that your decision-making is sound with respect to the legal justification for your action.

**Desirability**

> You may be legally justified in making contact or taking action, but you still need to assess whether it is desirable to do so. The key question to ask yourself is **"Do I think I can control the situation?"** If the answer is no, then you should consider disengaging until you have sufficient backup or until the circumstances change in your favor. This does not mean that you are free to ignore emergency situations unless you feel absolutely safe intervening—as a law enforcement officer, you have a duty to act in some circumstances. And law enforcement activities frequently involve a degree of hazard. The issue is not risk *per se*, but your ability to control the situation. **If you believe you can control it, even at some risk to yourself, then it may be appropriate for you to act.** On the other hand, if you are sure you cannot control it, it may be foolhardy for

> you to act. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Taege had received information that he had located one of the parties involved in the fight and that party was complying to the traffic stop initiated by Taege as the vehicle was stopped. This decision to stop the vehicle and approach to further the investigation was consistent with training.

*Deputy Taege attempted to generate willing cooperation on initial contact with Maulson which is consistent with Professional Communication Skills training.*

Officers in the state of Wisconsin are trained in a communication system known as Professional Communication Skills (PCS). PCS lists its goal as generating willing cooperation and this is achieved using verbalization skills and the application of concepts taught within PCS. The training provides a template for communication referred to as a Basic Contact Model which has three components: Opening, Information Gathering, and Resolution.

In his contact with Maulson, Deputy Taege provided an opening by stating something to the effect of "how are you doing today". He then attempted to engage in information gathering as he asked Maulson what had been going on this evening and asked for Maulson's driver's license and proof of insurance for his truck. Maulson was not cooperative and did not provide his driver's license upon request even though his wallet was observed in his hand. Taege describes in his supplemental report that he believed that Maulson was involved in a disturbance and physical altercation. In his initial encounter Taege was attempting to generate wiling cooperation with Maulson. Below is an excerpt from the PCS Manual regarding willing cooperation.

> **Remember That Your Goal Is Willing Cooperation**
>
> As an officer, you often need to get people to follow your orders or directions. If you can get people to do what you want them to do quickly and with a minimum of "hassle," it makes your job easier, it reduces the need to use physical intervention tactics, and reduces the likelihood of someone getting hurt.

> If you can use professional communication skills to get people to choose to comply voluntarily, it becomes a win-win position for everyone involved. (Wisconsin Department of Justice Law Enforcement Standards Board, 2020)

Taege attempted to fulfill the goal of PCS by generating willing cooperation from Maulson by engaging in information gathering to further the investigation which is consistent with training.

*During the information gathering part of Taege's Basic Contact, Taege characterized Maulson as a "no person" because of his lack of cooperation which influenced his perception of threat.*

The term "no person" was a term commonly in usage within DAAT training in Wisconsin used to separate individuals into three categories: yes people, maybe people, and no people. Yes people were considered compliant and maybe people were considered semi cooperative, and no people were resistive. Taege advised that he felt that Maulson's behavior categorized him as a no person which displays Taege's concern for the potential threat that Maulson posed based on his lack of cooperation and that he was recently involved in a physical confrontation.

*During the information gathering part of Taege's Basic Contact, Taege conducts an Officer/Subject assessment of Maulson which showed Maulson to be a large strong individual which is consistent with training.*

Approach Considerations were mentioned previously in this report, and another component is Tactical Evaluation which is a time for officers to assess the potential hazards they may face in a contact. One of the components of Tactical Evaluation is Officer/Subject Factors. Taege assessed the size of Maulson within his report in the excerpt below.

> "It should be noted that Maulson is a large individual and is approximately six foot two inches and between 200 and 250 pounds. Based on the information gathered from the initial call, I believed Maulson was in the disturbance and physical altercation. I know through training and experience that individuals that have been involved in a fight sometimes have an adrenaline spike causing increased heart rate and breathing rate."

Officers are trained to compare themselves to subjects they have contact during their calls for service and determine if a disparity exists that could influence whether the threat a subject may pose is greater or less. Below is an excerpt from the DAAT Manual that covers Officer/Subject Factors.

> Differences between the officer(s) and subject(s) also have a bearing on threat assessment. The same subject behaviors may pose more or less of a threat depending on these differences.
>
> When you conduct your threat assessment, you should take into account these factors:
>
> - *Numbers* – The most obvious difference is the number of participants on each side of the equation. One officer facing three subjects is in a much different position than the same officer and two partners, facing a lone subject. In general, having greater numbers gives you an advantage— and conversely, being outnumbered puts you at a disadvantage.

- *Age* – a significant age difference between you and the subject may affect your threat assessment. A 25-year-old officer facing a 9-year-old child would probably assess the threat differently than if he or she were facing another adult. On the other hand, the same age difference twenty years later might change the equation—when the officer is 45 and the subject 29.

- *Size* – often related to strength is size. Dealing with a subject who is much bigger or smaller than you are will change your threat assessment. However, do not be lulled into a false sense of security if the subject is relatively small. Certain drugs, mental conditions, adrenaline, or simply strong motivation may make even a small person extremely strong and difficult to control.

- *Strength* – relative strength is another factor. If you are facing a subject who is much stronger or weaker than you, you would assess threat differently than if you were faced with a subject matching your strength.

- *Skill level* – if the subject is a skilled fighter, either trained in martial arts or boxing or simply a skilled street fighter, that fact may change your threat assessment (if you are aware of it). On the other hand, if you are highly skilled, that will also affect your threat assessment. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

The Officer/Subject factor assessment in this incident identifies Maulson as large in size. This large size factor also influences Taege's assessment that Maulson possesses large relative strength as well. The excerpt above also mentions that adrenaline may make a small person extremely strong and difficult to control. Taege had mentioned in his report that he believed that Maulson had been involved in a fight which could influence his adrenaline level. This type of assessment is consistent with training and influences use of force decision making for officers, especially when facing a subject that is large in size and strong, with a possible spike in adrenaline.

*During the information gathering part of Taege's Basic Contact, he was forced to move past words and act. This was based on Maulson's behavioral response to the inquiry. This is considered "No Progress" as taught within Professional Communication Skills.*

Taege attempted to generate willful cooperation from Maulson by using his visible display of authority coupled with verbalization skills. During the initial encounter Taege attempts to verbally persuade Maulson by making requests for his driver's license and proof of insurance. Taege was unsuccessful and made no progress in convincing Maulson to comply after determining that he wanted Maulson to step out of the vehicle. Taege explains in his report that he wanted to separate Maulson from the female passenger so that he could ask her about what had occurred. Maulson had already been uncooperative with Taege regarding his driver's license. Taege had also observed that Maulson appeared to be agitated as his hands were shaking and he was breathing heavily. When asked about his heavy breathing Taege reports that Maulson stated, "Does it matter? I don't answer questions." Taege asked Maulson to step out of the vehicle twice then opened the driver's side door and ordered Maulson to step out of the vehicle. Maulson responded by pulling his hands closer to his chest, facing his chest towards Taege, and retreating deeper into the vehicle to avoid being removed.

Taege had no success gaining willing cooperation at this point and was making no progress with Maulson. Taege then was forced to move past words and

physically control Maulson. During the Professional Communication Skills component of the Basic Recruit Curriculum officers are taught to determine when they may need to move past words with the acronym DONE. An excerpt from the PCS Student Text with an explanation of DONE is below with key statements in **bold**.

> **WHEN to take action**
>
> "**Despite your best efforts, words will not always accomplish your goals.** Even if you apply the techniques you learn in Professional Communication Skills flawlessly, you cannot assume that a subject will respond as you would hope and voluntarily comply. There can be many reasons for non-cooperation. Sometimes, there's just too much going on. You may say all the right things to try to calm someone and get him or her to comply, but other factors affecting the other person's behavior are a stronger influence.
>
> For example, a person may be mentally ill, intoxicated by alcohol and/or drugs, undergoing a medication reaction, or have some other significant problem or situation which affects his or her behavior. Your words may not have the desired effect simply because there are too many complicating factors affecting the subject.
>
> Sometimes a subject will actively *choose* not to cooperate with you because complying means going to jail or leaving some place he or she wants to stay. **When words do not work to achieve compliance from a subject, it is time to act, which means that you either disengage and/or escalate to using physical intervention skills.** You will learn in Principles of Subject Control (POSC) or Defensive and Arrest Tactics (DAAT) training how to make such decisions and what the options are.
>
> In any case, how do you know when to stop trying verbal skills? Remember the acronym **DONE.** It identifies the four conditions in which you are *done* talking, and it is time to act.
>
> > **D**anger
> >
> > **O**verriding concern
> >
> > **No progress**
> >
> > **E**scape
>
> Danger

Whenever you or someone else is in imminent danger of being assaulted, hurt, or killed, it is time to act. Your assessment of when that is the case is based on your training, experience, and the particular situation that you are in. Similarly, whenever property under your control, such as evidence or a crime scene, equipment, weapons, or vehicles, are threatened it is time to act.

Overriding Concern

Whenever you think that a matter of a higher priority requires your immediate attention or your presence, it is time to act. For example, you may be talking to a witness at a crash scene, when you observe that a car is leaking gasoline—it's time to stop talking and act.

**No Progress**

**Whenever you feel that you have exhausted all of your verbal options and the subject is still not complying, it is time to act. The point of no progress will vary with officer, subject, and the situation.** You don't want to cut short the opportunity for a subject to cooperate if a little more talking will bring it about, but at the same time, **you don't want to go over the same ground again and again without any progress**. With experience, you will learn when you aren't getting anywhere verbally, and it's time to act. Remember that at any time, if what you are trying is not working, you have the option to disengage or escalate.

Escape

Whenever a subject unlawfully flees your presence, it is time to act.

Thus, the acronym **DONE** provides a context for your decision-making as to when you are justified in taking appropriate actions—to disengage or escalate. "(Wisconsin Department of Justice Law Enforcement Standards Board, 2020)

Taege had reached a point in his communication with Maulson in which there was no progress as the questions and directions Targe had presented to Maulson were not answered, nor had Maulson complied. Compliance earlier in the traffic stop would have assisted in furthering the investigation. The dialogue with Maulson had become repetitive and unproductive. Maulson appeared angry, agitated with Taege's presence, and dismissed his questions and commands.

The decision to open the door and physically control Maulson was consistent with training and based on the lack of verbal progress with Maulson.

*Maulson's non-compliant behavior at the time he was removed from his vehicle and handcuffed would be considered resistive tension that led to active resistance as Maulson was escorted towards the squad.*

In the DAAT system a component of Approach Considerations is Tactical Evaluation which contains a subcomponent known as Threat Assessment Opportunities. One of the Threat Assessment Opportunities is Level of Resistive Tension. An excerpt from the DAAT Manual explaining it is below.

> ***Level of Resistive Tension***
> Simply noticing whether a subject appears tense or agitated will give you some information about that person's state of mind. In other words, are the subject's muscles tensed? Is the subject physically tense or agitated, even if his or her words are calm? Resistive tension is not just a visual observation--it may be felt during physical contact with the subject. The more tension or agitation, the more threat potential. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

After Maulson exited the vehicle Taege made initial physical contact with Maulson and described Maulson's behavior below.

> Maulson's level of agitation continued and he was still very angry, he also was talking loudly with an angry tone of voice. I advised Maulson to turn around and began attempting to handcuff him. At this time, Maulson continued resistance by flexing and making his arms very tense. Maulson was not pulling his hands away from me but was not making it easy for me to place handcuffs on him. Eventually, the handcuffs were placed on Maulson behind the back."

The flexing of Maulson's arms demonstrates an increased level of tension in his upper body. Taege was forced to physically overcome this behavior while placing handcuffs on Maulson. This would not be considered passive resistance, which is non-threatening and non-compliant behavior within the DAAT system. Below is an excerpt regarding passive resistance.

> Passive resistance is defined as "non-compliant and non-threatening behavior." An example would be a person staging a “sit-in” who refuses to leave when ordered to do so. The person is not fighting with you—he or she is simply not complying with your orders. Protestors often use passive resistance as a political tactic to advance their agendas. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Once Maulson was handcuffed he began to engage in counteractive behavior as Maulson argued about the legality of Taege’s actions. This behavior segued into Maulson attempting to physically counteract Taege’s control efforts. A description of the behavior is in the excerpt below from Taege’s report.

> “Maulson then stated, “This is illegal” and began pulling away from me. At this time, I had Maulson in an escort position with my right hand on his left bicep in an attempt to escort him towards my squad car. I ordered Maulson to stop pulling away multiple times during this time frame. Maulson continued stating and yelling “This is illegal. What did I do?”
>
> At this time, Maulson was very tense and I had to push Maulson slightly to get him to begin walking. I ordered Maulson to the front of my squad. I advised Maulson’s wife to stay in the vehicle while I walked Maulson away. Again, Maulson was in an escort position at this time with my right hand on his left bicep and we were walking towards my squad. As I directed Maulson’s wife to stay in the vehicle, my attention was shifted towards her.”

Maulson physically counteracting Taege’s control efforts is a form of active resistance as recognized in the DAAT System. An excerpt below from the DAAT Manual describes active resistance.

> Active resistance is defined as "**behavior which physically counteracts an officer’s control efforts and which creates a risk of bodily harm to the officer, subject, and/or other persons.**" Examples of active resistance include **attempting to pull away from the officer’s grasp**, running away, getting up after being directed to the ground, and so on.
>
> As you learn these techniques, remember to incorporate verbalization with them. When you physically intervene to gain control of a subject, you are using force to require the subject to comply with your orders—you must always make reasonable efforts to be sure that the subject understands what it is you want him or her to do. In addition, you can use verbalization

> to help calm the subject once he or she is stabilized. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Maulson was attempting to pull away from Taege's grasp as Taege had secured an escort hold on Maulson's arm. The utilization of an escort hold was appropriate during this encounter and consistent with training. An escort hold is a Control Alternative and low-level use of force technique within the DAAT System. Information regarding Control Alternatives and the Escort Hold are below.

> The mode of Control Alternatives includes four tactics/tools:
>
> - Escort Holds
> - Compliance Holds
> - Control Devices (OC spray, ECD's)
> - Passive Countermeasures
>
> Each of these is appropriate in different circumstances, as they provide different amounts of control: in general, they are arranged in increasing order of level of force and propensity for injury to the subject. As always, the appropriate choice of tactic depends on your tactical evaluation: your use of force must always be objectively reasonable.
>
> **Escort Holds**
> The goal of escort holds is *to safely initiate physical contact.* If a subject does not comply with your verbal directions, **you can use an escort hold to gain control of the subject, preventing a physical confrontation. An escort hold also enables you to move the subject in a controlled way**—out of a dangerous location, for example.
>
> Two techniques are used sequentially in this tactic:
> 1. Blanket the arm
> 2. Escort position

The process of Maulson exiting his vehicle and being handcuffed with initial steps towards Taege's squad contained physical behaviors identified within the DAAT System that demonstrate that Maulson was a resistive suspect and Taege's response to that resistive behavior was consistent with training.

*Maulson displayed behavior which indicated a higher level of danger to Taege as recognized in the DAAT System.*

In the Disturbance Resolution Model, a component of Approach Considerations is called Threat Assessment Opportunities. One of those components are Early Warning Signs which are signals or certain behaviors provided by the subject that are often associated with a high level of danger to officers. One of those Early Warning Signs is Excessive Emotional Attention. This behavior was displayed as Maulson yelled at Taege during their contact. Another Early Warning Signs is Known Violent History. The nature of the call and the initial information that Taege received from the witness, coupled with his observations of Maulson's heavy breathing and shaking, led Taege to determine that Maulson had been engaged in a fight. Officers are provided training to recognize Early Warning Signs in the DAAT portion of the Basic Recruit Curriculum and is supported with the below excerpt with key statements in **bold text**.

**Early Warning Signs**

Early warning signs are signals or certain behaviors provided by the subject that are often associated with a high level of danger to officers. Some of the early warning signs that should increase your level of perceived threat are if a subject:

1. Conspicuously ignores you
2. Gives you **excessive emotional attention**
3. Moves in an exaggerated way
4. Ceases all movement
5. Has a known **violent history**

If you have dealt with this person before, has he or she been cooperative or violent? While anyone can become violent, a history of violent behavior dictates a more cautious approach. **Even if you have not personally dealt with the subject, you may have information from other sources, such as dispatch, other**

**officers, briefing information, etc. that raises your threat level**. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Taege's perception of the threat posed by Maulson up until this point in the contact were accurate and the use of force applied at this time was consistent with training.

*While moving Maulson towards Taege's squad Taege was temporarily distracted by the passenger in the truck and Taege briefly was not facing Maulson. Maulson quickly turned towards Taege and entered Taege's inside position which demonstrated a threat of bodily harm. The identification of the threats this position, and action create are consistent with training and are covered in many trained DAAT Principles.*

The DAAT system contains many principles that train officers in recognizing threats. Below are the principles that will be covered in this section to understand the physical danger that Taege faced at this point in the incident.

1. Five Key Rules for Use of Force
2. Relative Positioning
3. Control of Distance
4. Pre-attack Postures
5. Special Circumstances
6. Assaultive Behavior

**Five Key Rules for Use of Force (excerpt from DAAT manual)**

The suspect determines the level of force officers must use to establish control.

Here are five key rules for use of force:

1. The purpose for use of force is to gain control in pursuit of a legitimate law enforcement objective. If verbalization is effective in gaining control, it is always preferable to physical force.
2. You may initially use the level and degree of force that is objectively reasonable to achieve control. You need not escalate step-by-step through the Intervention Options.
3. At any time, if the level of force you are using is not effective to gain control, you may disengage and/or escalate to a higher level of force. This involves transitioning to a different level of force or different tactics based on the totality of circumstances.

4. Once you have gained control of a subject, you must de-escalate the level of force to that needed to maintain control.
5. **You must always maintain a position of advantage.** (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

When Maulson quickly turned towards Taege and removed the distance between the two of them Maulson had eliminated the position of advantage that Taege had. Initially Taege was slightly behind Maulson with a hold on Maulson's arm which allowed Taege to better control Maulson and provided Taege with a tactical advantage.

To further understand the concept of maintaining the position of advantage the DAAT Instructor Manual provides the below guidance during the general Use of Force block of instruction.

> Officers must maintain a position of advantage. **This means that you strive to ensure that you have the advantage prior to, during, and after any use of force.** Furthermore, it means that **your use of force should be sufficient to control the subject, rather than leaving the encounter to chance.**
>
> For example, let's assume you encounter a subject who raises his fists and threatens to strike you. It would generally be inappropriate for you to respond by engaging in a boxing match on equal footing. This leaves the result of the encounter to chance, rather than ensuring that you achieve your legitimate law enforcement objective of gaining control. Instead, if you are required to use force, the force should be sufficient to ensure you gain control of the subject.
>
> **Generally, a use of force one mode higher than that threatened or used by the subject would place you in a position of advantage. For example, if a subject passively resists, you could go hands-on. If he goes hands-on (wrestles), you could strike him. If he hits you, you could hit him with something (a baton).** If he pulls a knife, you could draw your gun. However, any number of factors unique to each situation can alter this balance. This will be discussed in-depth later in this presentation. (Wisconsin Department of Justice Law Enforcement Standards Board, 2017)

**Relative Positioning (excerpt from DAAT manual)**

**Your position in relation to a subject may put you at an advantage—or a disadvantage. For example, if you are behind a person, you are less likely to be punched or kicked than if you are in front, simply because hands and feet are designed to work more effectively forward than backward. As an officer, you always want to be in a position of advantage relative to the subject**. With a single subject, direction and height are the relevant variables.

***Direction***

A convenient way to visualize relative positioning is to use a numbering system, as illustrated below. In this system, an officer is placed as follows:

Level 1: 45-degree angle from the front of the subject
Level 2: Directly beside the subject
Level 2½: 45-degree angle to the rear of the subject
Level 3: Directly behind the subject




Figure 1: Officer Position Relative to a Subject. Officers bracketing a subject at Levels 1 and 2½.

**Each of these provides the officer with a tactical advantage over standing directly in front of the subject (the "inside" position).** How do you decide what position to use? As you will see, you will use Levels 1, 2½, and 3 most often. Level 1 is best when you are approaching a subject from the front, and is used frequently when you are simply talking to a subject, interviewing a witness, or otherwise interacting verbally with a subject. Level 2½ is the best position for escorting a subject. It is also the position you will use to make contact with a driver in an approach vehicle contact. Level 3 is most commonly used for certain decentralizations (taking someone to the ground). Level 2 is rarely used, simply because the subject will usually reposition if you approach

from the side. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

The above excerpt points out that the inside position does not provide a tactical advantage that levels one through three do. Instead, it is a disadvantageous position that should be avoided due to the vulnerability of assault that an officer experiences while within the inside position of a suspect. In training officers are trained to avoid this position.

**Control of Distance (excerpt from DAAT manual)**

For officers, social norms are not the only issue in what constitutes an appropriate distance—the additional concern is safety. Because in your role as an officer, you represent authority and may have to take enforcement action, including arresting people, you must always be aware of the possibility that someone might attack you. If you are within normal social distance of a hostile subject, you could be punched or kicked. Naturally, if someone is armed, the "safe" distance increases. Here is a rough guide to the danger zones associated with unarmed and armed subjects:

| Subject's Arms | Danger Zone |
|---|---|
| **Unarmed** | **Less than 10 feet.**[2] |
| Club or edged weapon | Any distance where the officer reasonably perceives an imminent threat of death or great bodily harm. |
| Firearm | In the line of sight unbroken by cover (something that would stop the bullet). |

As with the table, these are rough guides. **In general, the more distance the better (within reason), because more distance gives you more time to react appropriately to a sudden assault or other hostile action by the subject.** (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Deputy Taege was working within the unarmed danger zone while controlling Maulson. He is safer when operating in that zone when he has a position of advantage such as a level 2 ½ as mentioned earlier. Taege wanted to stay slightly behind Maulson and escort him to the squad car. However, at this point in

the incident, Maulson had removed the commodity of distance and relative positioning by quickly turning towards Taege. Taege's understanding and assessment that he had lost the position of advantage was consistent with training.

**Pre-Attack Postures (excerpt from DAAT manual)**

Pre-attack postures are behaviors which may indicate an imminent threat of physical assault. Is the person showing signs of being ready to fight, or preparing to fight? Is the person's body tense? Is the person focusing visually on a target or gazing in an unfocused way? These are physical postures that may indicate the subject is about to attack you:

1. Boxer stance
2. Hand set/clenched fists
3. Shoulder shift, or **rolling the shoulders forward as if preparing to attack**
4. Target glance – looking at a potential target (such as your gun)
5. The "thousand-yard stare" – a direct, continuing, but unfocused stare

Maulson's upper body movement towards Taege indicated that there was a threat of physical assault as this change of position and angle relative to Taege created an environment in which Maulson could easily assault Taege.

**Special Circumstances (excerpt from DAAT manual)**

Special circumstances are **factors or situations which may justify a rapid escalation of force, or selection of higher force options**. A number of other factors affect your threat assessment.
Some of these include:

- Reasonable perception of threat. Is the person armed? Do you have any information to suggest that he or she is armed—bulges in the clothing, information from another source, past experience? Can you see the subject's hands, especially the palms? If not, consider that the person might be holding a weapon. The actions you take must be based on your reasonable perception of the threat. Your perception—that a subject was armed with a gun, for example—may turn out to be incorrect (e.g., the "gun" was a toy pistol), but if your perception was reasonable, your action in response to that perceived threat may well be justified nonetheless.

- Special knowledge of the subject. If you have information, either from

your own contacts or from other reliable sources (dispatch, other officers, citizens, etc…) that a subject has a history of violent behavior or is a member of a gang known for violent behavior, you may assess threat differently than you would without that knowledge.

• **Sudden assaults. Naturally, if the subject assaults you, another officer, or someone else, your assessment of the threat posed by that subject should increase.**

• **Subject's ability to escalate force rapidly. Even if the subject does not actually assault you, his or her ability to do so should affect your threat assessment. Examples of factors to consider include ready access to weapons (actual or improvised), physical abilities, and relative positioning.** Are there items nearby that could be used as improvised weapons, such as rocks, bottles, bricks, etc.?

• **Your physical positioning. How you are positioned relative to the subject may affect your threat assessment**. If you are indoors, are you in tight quarters that make it difficult to move freely or require you to be closer to the subject than you would like? **If you are at a tactical disadvantage, your threat assessment would be higher than if you were in a better position.**

• Injury or exhaustion. If you are injured or very fatigued, you are likely to be less able to use force effectively against a subject than if you were in better condition. How tired are you? Are you fighting off a cold, or recovering from an injury? Are you taking medication that might affect your ability to fight? If you don't achieve control in the first 20 seconds of a fight, you are likely to quickly run out of energy.

• Equipment or training. If you do not have the equipment or training needed to manage a particular situation safely, your threat assessment may be higher than it otherwise would.

• Availability of backup. If backup is far away or not available, your threat assessment may be higher than if you could count on immediate help if needed.

• Other special circumstances. Many other issues may enter into your threat assessment, such as the presence of other people, special knowledge of the subject or circumstances, etc. What is available for cover and concealment? Do you have escape routes if you need them? Are there environmental hazards such as uneven ground, icy sidewalks, steep banks, water, etc. that could be a problem? Are there obstacles such as furniture, bicycles, children's toys or other objects that would

make it difficult to move or disengage? (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Maulson quickly turning towards Taege as he was distracted created an environment in which a rapid escalation of force is justified. Three special circumstances are observable and are listed below with context for this situation.

- *Sudden Assault* – Maulson's sudden behavior of turning towards Taege and closing distance is required for Maulson to assault Taege effectively.
- *Subject's Ability to Escalate Force Rapidly* – Maulson's ability to assault Taege was apparent based on the combination of turning towards Taege while closing distance. Maulson's ability to escalate force rapidly was evident and Taege's threat perception was consistent with training.
- *Your Physical positioning* – Taege did not have the same threat perception as he initially has when he began to move Maulson towards the direction of the squad. Taege's perception of threat increases quickly based on Maulson's relative positioning and closure of distance.

The application of the Special Circumstances at this point in the incident increase Taege's perception of threat and this perception is consistent with training.

**Assaultive Behavior (excerpt from DAAT manual and DAAT Instructor manual)**

Protective Alternatives is the fourth mode in Intervention Options. **The overall purpose is to overcome continued resistance, assaultive behavior or their threats**. These interventions are designed to protect officers in situations when they face subjects continuing to resist or threatening to assault.

Continued resistance is defined as "maintaining a level of counteractive behavior that is not controlled with the officer's current level of force." In essence when an officer's attempts to overcome active resistance are unsuccessful, the behavior

displayed by the suspect has segued into continued resistance. Some examples of this type of behavior include a suspect who has been directed to the ground but is continuing to actively resist by attempting to stand. Another example is a suspect who has been directed to the ground but is pulling his/her hands under their body while officers attempt to control his/her hands. An officers' inability to physically direct the suspect's hands behind his/her back is continued resistance, as the suspect's physical act of preventing ground stabilization has counteracted the officer's intended control efforts of bringing the hands into a handcuffing position. The drawing of the hands under a suspect's body offers an additional threat as this display of continued resistance also puts the suspect's hands around their waistband which could be a motion to access a weapon as covered in Threat Assessment Opportunities, Weapon Control Factors, and Special Circumstances, such as the subject's ability to escalate force rapidly.

Additionally, situations like this often involve a great deal of physical exertion on the part of the officers making Injury/Exhaustion (Special Circumstances) an influential part to the overall use of force decision making as the officers are unable to get the confrontation over quickly. Lastly, these types of encounters require detailed report writing as this type of continued resistance cannot always be viewed on video due to the physical positioning and the perceived stalemate between the officer's intended control efforts and the suspect's successful resistance.

**Assaultive behavior is defined as "direct actions or conduct that generates bodily harm to the officer(s) and/or another person(s)."** (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

Additional insight regarding Assaultive Behavior is located in the DAAT Instructor Manual with the below slide and explaination from the General Use of Force Presentation.

The diagram represents the difference between an officer put in a position to overcome active resistance and protecting themselves from assaultive behavior. It also shows how continued resistance is best managed with protective alternatives. Arrows represent what goes toward an officer versus what goes away from an officer. (Wisconsin Department of Justice Law Enforcement Standards Board, 2017)




The quick turning of Maulson coupled with him closing distance between created a threat of bodily harm. This type of behavior requires an immediate response as the commodities of time, distance and relative position have been compromised by Maulson. This environment also restricts Taege's options as his reaction to this assault is very limited.

**Level Stage Degree of Stabilization (excerpt from DAAT Manual and DAAT Instructor manual)**

Stabilization refers to the subject's ability to use force. The less ability a suspect has to fight or flee, the more they are stabilized. An officer might verbally stabilize a compliant subject by ordering him to place his hands on his head, palms up. But the officer achieves higher stabilization with the subject kneeling, facing away with ankles crossed and arms outstretched, palms to the rear. An example of a high degree of stabilization would be a proned subject, handcuffed behind his back. An unrestrained, standing subject is in a much better position to be able to deliver force against you than a subject who is prone on the ground and in handcuffs. **Never assume that just because a subject is restrained that he or she no longer poses a threat—but in general, the less stabilization, the greater the threat.** (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

**Explain to recruits that in some circumstances force may still be reasonably used on a subject that is already handcuffed. While handcuffs decrease the subject's ability to resist and assault, they do not eliminate it. Officers may use force against handcuffed subjects when such force is objectively reasonable based on the subject's actions.** (Wisconsin Department of Justice Law Enforcement Standards Board, 2017)

Although Maulson was stabilized in handcuffs his ability to resist or assault was not eliminated. Maulson still retained the mobility to turn quickly towards Taege and close distance which brings the potential physical striking tools he possesses in range to use against Taege. Maulson retained the ability to kick, knee strike, headbutt, bite, and possibly tackle using his shoulders.

*Applying the concept of De-escalation at the time Maulson quickly turned and moved towards Taege was not a viable alternative or consistent with training.*

De-escalation is a viable alternative and strategy that officers can use to reduce the immediacy of a threat that is posed under some circumstances. The DAAT system outlines de-escalation in the excerpt below.

> **The concept of de-escalation involves an officer's use of time, distance, and relative positioning in combination with Professional Communication Skills to attempt to stabilize a situation and reduce the immediacy of threat posed by an individual.** The merging of Professional Communication Skills such as Crisis Intervention, and sound tactical positioning can be instrumental in generating the needed time, options, and resources to gain willful cooperation and ensure everyone's safety.
>
> > Imagine officers responding to a despondent individual armed with a knife threatening self-harm at an apartment building. When located the individual is at the end of a long hallway providing the officers with a reasonable distance to engage in dialogue, yet not feel the imminent threat of a knife assault. The officers can maintain distance with firearms in hand while getting the individual's attention. They can check the individual's perception of reality and establish a rapport with the individual. As they communicate with the individual, they can share their perception of reality and move into a solution to assist the individual. The individual then disarms and is safely taken into protective custody to get treatment.
>
> The above scenario is a practical application of the concept of de-escalation which is primarily the ability to apply Professional Communication Skills under allowable and safe circumstances to reduce the likelihood of force being applied. As mentioned earlier, if verbalization is effective in gaining control, it is always preferable to physical force.
>
> **There are many circumstances in which de-escalation is not applicable to a situation and the Professional Communication Skill concept of DONE offers examples and guidance**. The acronym DONE stands for Danger, Overriding Concern, No Progress, and Escape. Below are examples of DONE being applied to the de-escalation situation mentioned earlier.
>
> **Danger** As the officers are checking the perception of reality of the individual he charges at the officers with the knife. This sudden assault creates danger to the officers and forces

> them to escalate. **The commodities of time, distance, and relative positioning have been negatively affected and have removed deescalation as a viable option.**

Although the above example involves a subject with a knife, the application of the concept is the same. When a suspect has negatively affected the commodities of time, distance, and relative position, de-escalation is not a viable option. Taege not applying de-escalation at this point in the incident was consistent with training.

*Taege's attempt to overcome the threat of assaultive behavior by rotating Maulson forward and away to create distance and regain the position of advantage was consistent with training.*

The DAAT system highlights several trained techniques to assist officers in making objectively reasonable use of force decisions. However, the dynamics of use of force encounters does not allow for every situation to have a specific technique. The DAAT system acknowledges this by providing purposes to each mode to assist in understanding the intended purpose of a particular technique rather than just its existence in a training manual. Below are excerpts from both the DAAT Student and Instructor Text regarding officer training.

> **Officer Training**
>
> In DAAT you will learn a number of effective physical techniques to gain compliance from a subject. You may have been trained in other methods (such as one of the martial arts) as well. When you use force as part of your law enforcement duties, your use of force must fit into one of these categories:
>
> 1. A trained technique
> 2. A dynamic application of a trained technique (i.e., not quite the classroom model, but as close to it as possible under the circumstances)
> 3. **A technique not trained, but justifiable under the circumstances** (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)
>
> The third category—a technique not trained, but justified—reflects that Graham v. Connor **does not limit officers to trained techniques. The force used by an officer need only be reasonable under the circumstances, and in some situations an untrained technique may be appropriate**. For example, if a subject is standing in the street while shooting at innocent people, an officer might stop the shooting by striking the shooter with a squad car. Officers are not trained to deliver deadly force with a squad car, but the technique could be justified in some circumstances. (Wisconsin Department of Justice Law Enforcement Standards Board, 2017)

Taege's description of what he did at the time in the incident is below.

> "At this time, I had no control over Maulson. Due to not having control of Maulson and Maulson facing me and being so close, I attempted to regain control of his left bicep with my right hand. At this time, I Maulson was in a position of advantage to attack me in some way due to his posturing and level of resistance and tension. Simultaneously, I utilized my left hand to create a greater distance between Maulson's face and my own to prevent an attack such as a head butt or spitting toward me. As I attempted to regain control with my right hand, I pushed Maulson with my left hand into the pocket of his left shoulder attempting to create distance causing him to fall to the ground."

The use of force decision that Taege made to attempt to turn Maulson's torso to overcome the threat of assaultive behavior while reestablishing a grip on Maulson demonstrates that he was trying to regain the position of advantage by fixing the angle. The fixing of the angle would protect him from an assault as Maulson's torso and hips would be facing away from Taege's inside position while reestablishing a grip could assist Taege in maintaining a relative position of 2 ½ which is best for escorting suspects. The use of his hands around Maulson's chest area and his arm are not described in the DAAT manual, but this untrained technique was consistent with Taege's training in the DAAT concepts mentioned throughout this opinion. Additionally, even though this technique is not in the DAAT manual it would be classified within Control Alternatives similar to an escort hold. It does not involve a focused strike nor an intentional attempt to decentralize Maulson.

*Based on his training Taege could have responded to Maulson's behavior by using a Protective Alternatives and/or a Passive Countermeasure when facing the threat of assaultive behavior.*

Based on the Approach Considerations observed during the incident and the threat of assaultive behavior, Taege could have used a higher level of force to protect himself against a large and strong suspect. Protective Alternatives are intended to overcome continued resistance, assaultive behavior or their threats. As Taege was facing the threat of assaultive behavior, he could have utilized techniques like a focused strike (active countermeasure) or an incapacitating technique to protect himself. These techniques have a higher propensity for injury than the technique Taege used and would have been followed up by directing Maulson to the ground for stabilization. Additionally in this situation Taege could have attempted a Passive Countermeasure with the goal of decentralizing Maulson to overcome the threat of assault. This could involve using a DAAT technique like the Pull in/Push Down Decentralization or dynamically applying one of the other Passive Countermeasures.

Taege selected a technique that demonstrated that he was trying to fix the angle by pivoting Maulson's torso in a direction so that Maulson's hips and upper body did not face Taege and reestablish a grip to retain the relative position of 2 ½. Maulson's hips and upper body facing Taege at this close distance created a threat of assault that Taege attempted to overcome by fixing the angle. Taege selected a technique that had a lower propensity for injury than a Protective Countermeasure and was consistent with training.

*Taege applied Follow Through Considerations after Maulson was stabilized that were consistent with training.*

After Maulson was stabilized on the ground Taege waited for additional resources and began applying follow through considerations consistent with training. This involved assisting him to his feet and activating EMS based on the laceration observed above Maulson's eyebrow. Maulson was constantly monitored.

These steps can be found in the DAAT Manual as Follow Through

> After any contact involving a possibility of illness or injury—which certainly includes contacts involving physical intervention—you must conduct an initial medical assessment to find out if the subject (or anyone else) requires medical care. The stress of a physical struggle or foot chase, especially when combined with drug use, may cause sudden and severe changes in a person's condition. In some cases, these can be life-threatening emergencies. (As always, when dealing with possible contact with blood and/or other body fluids, use appropriate personal protective equipment, including gloves and/or a mask.)
>
> Here are the steps:
>
> 1. Determine level of consciousness, using verbal or physical stimulus.
> 2. Check airway, breathing, and circulation.
> 3. Perform a body check for injuries—severe bleeding, broken bones, etc.
> 4. Provide any necessary treatment to your level of training, and if needed (or the subject requests it), activate the emergency medical system.
> 5. Continue to monitor and remain with the subject until he or she is turned over to someone of equal or greater responsibility. Find out if there is a need for long-term monitoring of the subject because of special medical or mental health needs. (Wisconsin Department of Justice Law Enforcement Standards Board, 2023)

## ***Conclusion***

Based on my training and experience as a State of Wisconsin law enforcement officer and a State of Wisconsin law enforcement use of force instructor, it is my opinion to a reasonable degree of professional certainty that Deputy Taege's conduct and actions in this encounter were consistent with Wisconsin Law Enforcement Training and Standards found in Defensive and Arrest Tactics and Professional Communication Skills. My opinions are summarized below.

- The initial response by Deputy Taege was consistent with Decision-Making as taught within DAAT training.
- Deputy Taege attempted to generate willing cooperation on initial contact with Maulson which is consistent with Professional Communication Skills training.
- During the information gathering part of Taege's Basic Contact, Taege characterized Maulson as a "no person" because of his lack of cooperation which influenced his perception of threat.
- During the information gathering part of Taege's Basic Contact, Taege conducts an Officer/Subject assessment of Maulson which showed Maulson to be a large strong individual which is consistent with training.
- During the information gathering part of Taege's Basic Contact, he was forced to move past words and act. This was based on Maulson's behavioral response to the inquiry. This is considered "No Progress" as taught within Professional Communication Skills training.
- Maulson's non-compliant behavior at the time he was removed from his vehicle and handcuffed would be considered resistive tension that led to active resistance as Maulson was escorted towards the squad.
- Maulson displayed behavior which indicated a higher level of danger to Taege as recognized in the DAAT System.

- While moving Maulson towards Taege's squad Taege was temporarily distracted by the passenger in the truck and Taege briefly was not facing Maulson. Maulson quickly turned towards Taege and entered Taege's inside position which demonstrated a threat of bodily harm. The identification of the threats this position, and action create are consistent with training and are covered in many trained DAAT Principles.
- Applying the concept of De-escalation at the time Maulson quickly turned and moved towards Taege was not a viable alternative or consistent with training.
- Taege's attempt to overcome the threat of assaultive behavior by rotating Maulson forward and away to create distance and regain the position of advantage was consistent with training.
- Based on his training Taege could have responded to Maulson's behavior by using a Protective Alternatives and/or a Passive Countermeasure when facing the threat of assaultive behavior.
- Taege applied Follow Through Considerations after Maulson was stabilized that were consistent with training.

This is a case of a suspect engaging in resistive behavior that segued into the threat of assaultive behavior. The behavior forced the deputy to protect himself in a very dynamic fashion. During this encounter the deputy used a level of force consistent with training standards and followed several principles within the DAAT and PCS curriculums.

Respectfully Submitted,

Dennis J. Angle

**Works Cited**

Wisconsin Department of Justice Law Enforcement Standards Board. (2017). *Defensive and Arrest Tactics Instructor Manual.* Madison, WI: Wisconsin Department of Justice Law Enforcement Standards Board.

Wisconsin Department of Justice Law Enforcement Standards Board. (2020). *Professional Communication Skills A Guide for Law Enforcement Officers.* Madision, WI: Wisconsin Department of Justice Law Enforcement Standards Board.

Wisconsin Department of Justice Law Enforcement Standards Board. (2021). *Defensive and Arrest Tactics - A Training Guide for Law Enforcement Officers.* Madison, WI: Wisconsin Department of Justice Law Enforcement Standards Board.